UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  04-60573-CIV-MORENO/STRAUSS

SECURITIES AND EXCHANGE
COMMISSION,

     Plaintiff,

v.

MUTUAL BENEFITS CORP., *et al.*,

     Defendants.

_____/

## REPORT AND RECOMMENDATION
## ON MOTION BY ACHERON CAPITAL, LTD.
## FOR ORDER DIRECTING (A) THE WIND DOWN AND END OF THE MUTUAL
## BENEFITS KEEP POLICY TRUST AND (B) DISBURSEMENT OF CERTAIN ASSETS
## TO THE NON-ACHERON RELATED INVESTORS IN KEEP POLICIES
## ("ACHERON'S WIND DOWN MOTION") (DE 2593) AND
## ON TRUSTEE'S AMENDED MOTION
## TO AUTHORIZE THE INITIATION OF TRUST WIND DOWN AND TERMINATION
## ("TRUSTEE'S AMENDED WIND DOWN MOTION") (DE 2640)

**THIS CAUSE** is before the Court upon Acheron's Wind Down Motion (DE 2593) made

by Acheron Capital, Ltd., in its capacity as the investment manager for Acheron Portfolio Trust,

Avernus Portfolio Trust, Lorenzo Tonti 2006 Trust and STYX Portfolio Trust, (collectively,

"Acheron") and the Trustee's Amended Wind Down Motion[1] (DE 2640) made by Barry Mukamal,

as Trustee (the "Trustee") of the Mutual Benefits Keep Policy Trust (the "Trust").  These matters

have been referred to the undersigned by the District Court to take all necessary and proper action

---

[1] The Trustee's motion, filed on April 10, 2020 (DE 2640), is an amended motion that the Trustee filed pursuant to Court Order (DE 2639) granting the Trustee leave to correct a scrivener's error (DE 2625) and directing the Trustee to address Acheron's expressed concerns, as owner of approximately 67% of the face value of the interests in the Trust, that the Trustee had not considered the impacts of the coronavirus pandemic in making his original motion (DE 2609) for implementation of steps that would lead to the wind down of the Trust. (DE 2638 at ¶¶ 1-2).

as required by law pursuant to 28 U.S.C. § 636 and the Magistrate Judge Rules of the United States District Court for the Southern District of Florida ("Referral").  (DE 2631).  Pursuant to the Referral, the undersigned held a status conference on June 10, 2020 ("Status Conference") to address pending motions in this case.[2]  (DE 2673).  The undersigned has carefully considered the record, applicable authority, the motions (DE 2593; DE 2640), the responses (DE 2606; DE 2610; DE 2641; DE 2642; DE 2715), and the replies (DE 2617; DE 2707), and, at the Status Conference, heard oral argument from the parties.  (DE 2693).  Being thus duly advised, for the reasons set forth below, the undersigned **RECOMMENDS** that Acheron's Wind Down Motion (DE 2593) be **DENIED** and that the Trustee's Amended Wind Down Motion (DE 2640) be **GRANTED**.

I.    BACKGROUND

In 2004, the Securities and Exchange Commission commenced an enforcement action against Mutual Benefits Corporation and other Defendants for fraudulently selling fractional viaticated investment interests in life insurance policies.  (DE 1).  *See also SEC v. Mut. Benefits*

---

[2] At the Status Conference, the undersigned inquired of the parties as to the pending motions in this case that they considered dispositive, thus requiring a Report and Recommendation, versus motions that they considered non-dispositive, thus permitting the undersigned to issue an Order. (DE 2693 at 11-21).  After considering the positions of the parties, and following research, the undersigned concludes that a Report and Recommendation is appropriate for the subject motions. *Mayer v. Wall St. Equity Grp., Inc.*, 672 F.3d 1222, 1224 (11th Cir. 2012) (holding that postjudgment proceedings are free-standing litigation, and an order is final in those proceedings "if it disposes of all the issues raised in the motion that initially sparked the . . . proceedings"). "Congress has taken care to ensure that parties face final dispositions by magistrate judges only by the parties' free will."  *Rembert v. Apfel*, 213 F.3d 1331, 1334 (11th Cir. 2000) (*abrogated on other grounds by Chambless v. Louisiana-Pac. Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007)). Consent of the parties to magistrate jurisdiction may be express or implied.  *Chambless*, 481 F.3d at 1350.  Here, the parties did not consent.  Further, the subject motions raise discrete issues that would be disposed of completely if this Court issued an Order versus a Report and Recommendation.   Accordingly, the undersigned proceeds by issuing a Report and Recommendation for these motions.

*Corp.*, 408 F.3d 737, 738 (11th Cir. 2005).[3]  The entities involved were put into receivership, and Roberto Martinez was appointed as receiver (the "Receiver").  (DE 26).  The Receiver reported in June 2009 that, pursuant to Court approval, investors in the life insurance policies had voted to either: a) sell the policy; or b) retain the policy ("Keep Policies").[4]  (DE 2291 at 3).  The Receiver also requested, and the Court approved, the creation of a trust to "provide for the continued maintenance and processing of the Keep Policies in accordance with the directives of this Court." (DE 2291 at 5-6, 8; DE 2322).  Thus, on September 25, 2009, the Receiver and the Trustee

---

[3]

> A viatical settlement is a transaction in which a terminally ill insured sells the benefits of his life insurance policy to a third party in return for a lump-sum cash payment equal to a percentage of the policy's face value. The purchaser of the viatical settlement realizes a profit if, when the insured dies, the policy benefits paid are greater than the purchase price, adjusted for time value. Thus, in purchasing a viatical settlement, it is of paramount importance that an accurate determination be made of the insured's expected date of death. If the insured lives longer than expected, the purchaser of the policy will realize a reduced return, or may lose money on the investment.

*Id.*

[4] Approximately 3,138 policies with a face value of $383,580,782 (or 27% of the total) were designated to be sold, and approximately 3,037 policies with a face value of approximately $1,054,421,049 (or 73% of the total) were designated to be retained by investors (the Keep Policies). *Id.*  At the Status Conference, Litai Assets, LLC ("Litai"), the Trust's servicer, reported that there are 1,333 total policies still held by the Trust, of which there are 192 policies 100% owned by a non-Acheron investor.  (DE 2693 at 68:11-14).  The parties agreed at the Status Conference that there are 280 policies where Acheron has a 100% interest.  *Id.* at 68:19-69:1. Furthermore, Litai reported that Acheron has an interest in 1,068 policies, including the 280 that it 100% owns.  *Id.* at 68:15-16.  Accordingly, following is a breakdown of the Trust's policies by ownership type: (1) 280 policies 100% Acheron-owned; (2) 788 policies in which Acheron holds a fractional interest; (3) 192 policies 100% owned by a non-Acheron investor; and (4) 73 policies with fractional interests owned entirely by non-Acheron investors.  There are approximately 3,900 total policy interests being maintained by the Trust with a face value of approximately $270 million of which $179.5 million or nearly 67% belong to Acheron (DE 2676-1 at 7).  According to the Trustee, of the approximately 3,900 total policy interests, the Trust is servicing 2,310 interests for victims of the original fraud.  *Id.*  The Trustee estimates that 150 to 300 policy interests are necessary to rationalize the costs of servicing and maintain the viability of the Trust.  *Id.* at 6.

executed the Mutual Benefits "Keep Policy" Trust Agreement (the "Trust Agreement"). (DE 2540 at 2; DE 2540-1). The Trust Agreement is between the Receiver and the Receivership Entities as settlor, and the Trustee. (DE 2540-1 at 1). Section 7 of the Trust Agreement includes provisions for this Court to address disputes related to the Trust Agreement in accordance with Florida law as follows:

> Section 7.1 <u>Governing Law</u>. This Trust Agreement shall be governed by and construed and enforced in accordance with the Laws of the State of Florida, without regard to any choice-of-law rules thereof which might apply the Laws of any other jurisdiction.

> Section 7.2 <u>Jurisdiction and Venue</u>. The Court shall have jurisdiction of all matters related to this Trust Agreement and all Actions with respect to this Trust Agreement, including without limitation the determination of all controversies and disputes arising under or in connection with the Trust Agreement, unless the Court shall not have subject matter jurisdiction in respect thereof, in which case such legal action, suit or proceeding, as the case may be, shall be brought in the courts of the State of Florida, sitting in Miami-Dade County.

*Id.* at §§ 7.1, 7.2.[5]

Concomitant with the formation of the Trust and with Court approval, the Receiver executed a sale of the receivership entity servicing the Keep Policies to Litai. (DE 2340; DE 2367). Ultimately, the Trustee and Litai entered into a servicing agreement effective September 25, 2009 (DE 2266-3; DE 2491; DE 2627 at 2, n. 1) that has since been renewed (DE 2500-1; DE 2626-1) to extend servicing through December 31, 2020.[6]

---

[5] The Trust is thus governed by the provisions of The Florida Trust Code. *See Demircan v. Mikhaylov*, No. 3D18-1684, 2020 WL 2550067, at *4 (Fla. 3rd DCA May 20, 2020) (stating that The Florida Trust Code was first enacted in 2007 and applies to "all judicial proceedings concerning trusts commenced on or after July 1, 2007"); *see also* Fla. Stat. § 736.0102 (stating that "[t]his chapter may be cited as 'The Florida Trust Code'").

[6] The servicing agreement defines an "Overpayment Balance," which is an amount that had accumulated from the Receiver's billing of the Keep Policy Investors in accordance with Court Order and which was transferred to the Trustee upon creation of the Trust. *See* DE 2266-3 at § 2. The Overpayment Balance pays for the operations of the Trust, including the costs of the Trustee. (DE 2266-3 at § 13). The Overpayment Balance also subsidizes the Keep Policy Investors'

On March 19, 2015, the Trustee made an agreement (the "March 2015 Agreement") with Acheron. (DE 2500-2). The March 2015 Agreement resulted from extensive negotiations between Acheron and the Trustee and was intended to resolve Acheron's concerns as a buyer of defaulting policy interests held by the Trust.[7] (DE 2500 at 4, 9). Section 2 of the March 2015 Agreement, for example, grants Acheron rights to share fairly and equitably in "distributions, rebates, benefits, [and] credits" that are provided to other holders of interests in Keep Policies. (DE 2500-2 at § 2.) Disagreements between the Trustee and Acheron have nonetheless continued, which prompted Acheron's filing of a separate lawsuit against the Trustee. *See Acheron Portfolio Trust, et al., v. Barry Mukamal, as Trustee of the Mutual Benefits Keep Policy Trust*, Case No. 18-25099-CIV-MORENO initiated December 5, 2018 (the "Acheron Litigation").

Acheron's Wind Down Motion seeks, *inter alia*, to transfer to Acheron, within 30 days of the Court's approval of the Trust's termination, title to all Keep Policies subject to the interests of non-Acheron investors in the policies. (DE 2593 at 5; DE 2593-1 at 2). In exchange, Acheron would agree to pay the future servicing fees for the policies. (DE 2593 at 5). The Trustee's

---

Administrative Fees. (DE 2266-3 at § 12.1.7). Sales of defaulted fractional interests in Keep Policies replenish the Overpayment Balance. (DE 2266-3 at § 12.1.8). Renewal of the servicing agreement in 2015 included a provision stating that "[u]pon conclusion of the Renewal Term, Trustee shall distribute [to Litai] the amount, if any, by which the Overpayment Balance exceeds the amount of the Initial Overpayment Balance." (DE 2500-1 at § 3.4). Such payment to Litai is conditioned, however, on "[the] Trustee [having] determined in his sole discretion" that the funds remaining are adequate to sustain the operations of the Trust. *Id.* at § 3.1. Furthermore, the Trustee contends that the Initial Overpayment Balance was $3 million; therefore, Litai's potential interest would be in amounts that are over a $3 million balance. (DE 2693 at 75:1-15).

[7] "[W]hen investors in [the life insurance policies held by the Trust] do not pay their *pro rata* share of the premium obligations associated with their interest, the policy is at risk of lapse." (DE 2500 at 4). Acheron's purchase of such interest and payment of the premium obligations avoids the lapse of the policy and kept the non-defaulting investors from losing their interests in the policy. *Id.* As a result of its purchases, Acheron is now the owner of more than two-thirds of the investment interests held by the Trust. (DE 2676-1 at 7).

Amended Wind Down Motion, in contrast, seeks Court approval and confirmation of his authority to initiate a process "that could serve as the basis for wind-down and eventual Trust Termination." (DE 2640 at 4-5).  Each motion is addressed in turn.

II.     LEGAL STANDARDS

Under The Florida Trust Code, the terms of a trust may confer upon the trustee or other person the power to modify or terminate a trust.  Fla. Stat. § 736.0808.  Further, the Florida Statutes provide that the "terms of a trust prevail over any provision of [the] code" except for provisions that are not relevant here.  Fla. Stat. § 736.0105(2).

Where the power to terminate or modify a trust has not been explicitly conferred by the terms of the trust instrument, courts have statutory authority to modify an irrevocable trust[8] when

---

[8] An irrevocable trust is one that may not be terminated by the settlor once it has been established. *See, e.g., Diamond v. Diamond*, No. 16-CV-81923, 2018 WL 7147331, at *2 (S.D. Fla. Dec. 18, 2018), *appeal dismissed sub nom. Diamond as Tr. of Diamond Tr. v. Diamond*, No. 20-10202-JJ, 2020 WL 1933928 (11th Cir. Apr. 14, 2020) (stating that, "[i]n Florida, a revocable trust is a unique type of transfer in which the settlor subjects property *owned by him* to a trust for the benefit of at least one other person, reserving to himself as settlor-beneficiary the income from the trust property for life and the power to revoke the trust in whole or in part at any time) (citation and internal quotation marks omitted) (emphasis added).  Here, the undersigned concludes that the Trust is irrevocable by its nature as a custodial vehicle for former receivership assets because the Receiver never personally owned any of the assets transferred into the Trust.  *Diamond*, 2018 WL 7147331 at *2.  Additionally, the Trust is irrevocable by the terms of the Trust Agreement.  For example, through the Trust Agreement, the Receiver transferred to the Trustee all of the Receiver's "rights, powers and privileges" under the Court's various Policy Administration Orders.  (DE 2540-1 at §§ 1.1; 2.3).  Also, the Trust Agreement provides for the Trust's continuance in the event of "[t]he death, resignation, disability, or removal of the Trustee." *Id.* at § 6.4.  Finally, "[i]n the event of the death, resignation, disability or removal of the Trustee without designation of a Successor Trustee . . . the Court [retains] exclusive authority to appoint a Successor Trustee."  Thus, the Receiver retained no control over the Trust's assets, and there is no scenario where the Receiver, as settlor, would have power to revoke the Trust.  Furthermore, the parties do not argue that the Trust is revocable.  *See Nelson v. Nelson*, 206 So. 3d 818, 819 (Fla. 2nd DCA 2016) (finding a trust irrevocable where the settlor's intent to retain no power or control to do so was discernable from the terms of the Trust Agreement).  Accordingly, the Court finds that the Trust is irrevocable.

such modification is not inconsistent with the settlor's purpose.  Specifically, § 736.04113 provides

in relevant part:

(1)    Upon the application of a trustee of the trust or any qualified beneficiary, a court at any time may modify the terms of a trust that is not then revocable in the manner provided in subsection (2), if:

    (a)    The purposes of the trust have been fulfilled or have become illegal, impossible, wasteful, or impracticable to fulfill;

    (b)    Because of circumstances not anticipated by the settlor, compliance with the terms of the trust would defeat or substantially impair the accomplishment of a material purpose of the trust; or

    (c)    A material purpose of the trust no longer exists.

(2)    In modifying a trust under this section, a court may:

    (a)    Amend or change the terms of the trust, including terms governing distribution of the trust income or principal or terms governing administration of the trust;

    (b)    Terminate the trust in whole or in part;

    (c)    Direct or permit the trustee to do acts that are not authorized or that are prohibited by the terms of the trust; or

    (d)    Prohibit the trustee from performing acts that are permitted or required by the terms of the trust.

Fla. Stat. § 736.04113.

In addition, upon the application of a trustee or any qualified beneficiary, Fla. Stat. § 736.04115 provides for judicial modification of irrevocable trusts created on or after January 1, 2001, in accordance with § 736.04113(2), when the modification is in the best interests of beneficiaries.  However, "[t]he court shall exercise [such] discretion in a manner that conforms to the extent possible with the intent of the settlor, taking into account the current circumstances and best interests of the beneficiaries."  Fla. Stat. § 736.04115(2)(a).  Further, under either § 736.04113 or § 736.04115, "[t]he court shall consider the terms and purposes of the trust, the facts and

circumstances surrounding the creation of the trust, and extrinsic evidence relevant to the proposed modification." Fla. Stat. §§ 736.04113(3)(a); 736.04115(2)(b).

Moreover, neither § 736.04113 nor § 736.04115 abrogate the court's common law authority to modify or terminate an irrevocable trust. Fla. Stat. §§ 736.04113(4); 736.04115(5). For example, under Florida's common law, unless a trust's terms preclude termination without the trustee's consent, a court may terminate a trust upon consent of the settlor and all of the beneficiaries without making any of the findings required by The Florida Trust Code. *Demircan*, 2020 WL 2550067, at *3–*5 (citations omitted).   However, "[a] court cannot terminate a trust when all the beneficiaries are not parties to a termination action, and without a determination that the purpose for which the trust was established has been accomplished." *Featherston v. Tompkins*, 339 So. 2d 306, 307 (Fla. 3d DCA 1976) (citing *Smith v. Mass. Mutual Life Ins. Co.*, 116 Fla. 390 (1934); *Florida National Bank and Trust Company v. Blake*, 155 So.2d 798 (Fla.3d DCA 1963)); see also *Byers v. Beddow*, 106 Fla. 166, 170–71 (1932).  In other words, "[at common law,] a trust can be modified [or terminated] upon the consent of the settlor and all the beneficiaries, regardless of whether the purpose of the trust is satisfied, or upon the consent of all beneficiaries if not inconsistent with the trust's purpose." *Shire v. Unknown/Undiscovered Heirs*, 299 Neb. 25, 35 (2018); *but see Demircan*, 2020 WL 2550067 at *3 (stating that, "[a]t common law, neither settlors nor beneficiaries have, by themselves, a right to modify an irrevocable trust, except pursuant to a power identified in the trust").

III.   DISCUSSION

   A.   Acheron's Wind Down Motion (DE 2580)

Acheron proposes the following: 1) that the cash assets of the Trust, including restitution funds administered by the Trustee, be distributed *pro rata* to non-Acheron investors after payment

of appropriate expenses, except for cash designated to pay policy premiums; 2) that non-Acheron investors be offered the option to sell their fractional interests to Acheron for either: a) 5% of face value (HIV Policies); or b) 7.5% of face value (non-HIV Policies);[9] 3) that all remaining policy-related assets of the Trust be transferred to Acheron in exchange for Acheron agreeing to pay future servicing fees for the policies;[10] 4) that the policies transferred to Acheron remain subject to the investor interests of the non-Acheron investors; 5) that non-Acheron investors receive once per year a statement confirming their policy-interest status along with their billing for premiums owed; 6) that non-Acheron investors remain responsible for payment of their *pro rata* share of premiums; 7) that Acheron agree not to sell any policy in which a non-Acheron investor holds an interest without that investor's written consent; 8) that Acheron secure its obligation to pay servicing fees on behalf of non-Acheron investors with a $4 million escrow fund; 9) that Acheron pay for an annual audit of the administration of policies in which non-Acheron investors maintain an interest, up to $50,000, until the face value of such policies total less than $25 million; and 10) that the Court appoint an ombudsman[11] to oversee the administration of policies in which non-

---

[9] Acheron proposes that the existing Trust servicer send a court-approved form to investors within forty-five (45) days of the approval of the Trust's termination explaining the termination and investor options including Acheron's offer to purchase, which offer is to remain open for sixty (60) days following the sending of the notice and which offer Acheron shall retain the discretion to extend. (DE 2593-1 at ¶ 2).

[10] The assets to be transferred to Acheron include all *cash in or allocable to policies*. (DE 2593-1 at ¶ 1(a)). Acheron does not specify the amount of cash value that is in or allocable to policies, the Trustee does not address this amount in his response, and this amount is otherwise unknown to the Court.

[11] Acheron asserted at the Status Conference that the ombudsman would be a fiduciary, but Acheron's Wind Down Motion does not state that the ombudsman would be a fiduciary. (DE 2693 at 157:9-15). Nor does the structure of Acheron's proposal contemplate the fiduciary structure of a Trust such as that which currently exists.

Acheron investors maintain an interest, whose fees will be paid by Acheron subject to Acheron retaining the ability to bill investors for amounts exceeding $200,000 per year.  (DE 2593 at 3-6).

Acheron argues that its proposal for the Trust's termination is better for non-Acheron investors in Keep Policies because: (1) litigation between Acheron and the Trustee would end, thus preserving Trust assets for the benefit of non-Acheron investors; (2) all non-Acheron investors would promptly receive their proportionate share of restitution funds, rather than just a credit against servicing fees over time; (3) non-Acheron investors would be entitled to receive other net cash assets of the Trust after provision is made for Court-approved expenses; (4) non-Acheron investors unwilling or unable to pay Policy premiums will have a choice to sell their interests to Acheron for the same price that Acheron historically paid to the Trustee for purchases of fractional interests;[12] (5) non-Acheron investors retaining their interests will no longer have to pay their share of servicing fees;[13] and  (6) there will be greater transparency and supervision because Acheron will pay for annual audits of the administration of policies in which non-Acheron investors retain an interest.  (DE 2593 at 4-8).

---

[12] The Trustee reported at the Status Conference that the historical pricing was 5% of face value for HIV policies and 7.5% of face value for non-HIV policies.  For the last year-and-a-half to two years, coinciding with escalating disputes between Acheron and the Trustee, Acheron's offering price has dropped to half of these historical prices.  (DE 2693 at 62:5-14).

[13] Litai's response supports Acheron's Wind Down Motion and reports that, based upon its interactions with investors, most want to wait for their policies to mature rather than be forced to receive a small percentage of the face value of their policy interests.  (DE 2610).  Additionally, at the Status Conference, Litai stated that it would be "willing to give up its right to [the] overpayment balance" if Acheron's Wind Down Motion was approved and the investors protected by being able to retain their interests.  (DE 2693 at 265:18-21).  As previously noted, however, Litai's rights to the Overpayment Balance are conditioned on the Trustee determining "in his sole discretion" that any remaining balance would be adequate to sustain the operations of the Trust.  (DE 2500-1 at § 3.1).

To effectuate its proposal, Acheron seeks a Court Order directing the immediate wind down and termination of the Trust. *Id.* at 1. Furthermore, given the objection from the Trustee to Acheron's proposal, Acheron requests that the Court allow the non-Acheron investors to vote whether to maintain the Trustee's current administration or to terminate the Trust in accordance with Acheron's proposal. *Id.* at 8-9.

The Trustee responds that Acheron seeks to avoid the Trust Agreement's termination provisions because these provisions contemplate the sale of Keep Policies in their entirety to enable Keep Policy Investors to realize the policies' true market value.[14] (DE 2606 at 5-6). Also, the Trustee disputes the Court's authority to grant Acheron's requested relief, stating at the Status Conference, that "the Court is not by the Trust Agreement granted the authority [unilaterally] to determine how the Trust winds down." (DE 2693 at 137:6-10). Rather, the Trustee contends that the Trust Agreement was written with a professional fiduciary in mind who would have broad authority to manage the Trust's wind down. *Id.* at 137:11-139:20. Furthermore, the Trustee notes that Acheron seeks termination of the Trust pursuant to its claims for breach of fiduciary duty in the separate Acheron Litigation. (DE 2606 at 4).

---

[14] At the Status Conference, Acheron indicated that, if the Trustee sold entire policies in which Acheron maintained an interest prior to a termination of the Trust, it would preserve its rights to raise this as a breach of the March 2015 Agreement because that agreement extended rights to Acheron to acquire further fractional interests in policies where it had already acquired some interest. (DE 2693 at 84:23-86:5; DE 2500-2 at § 4). The March 2015 Agreement allows the Trustee, though, to sell whole policies if he is terminating the Trust. (DE 2500-2 at § 4). In the event of such whole policy sales, Acheron may bid on the whole policy against other potential buyers and is entitled to the opportunity to top any other bids. *Id.* Thus, Acheron will likely be required to pay significantly more than what it initially paid for its fractional interest in a policy in order to preserve its opportunity to realize the face value of the underlying policy upon maturity. Given the likelihood that Acheron has contributed to paying the premiums for the underlying policies, and considering the initial amount that Acheron paid to purchase its fractional policy interests, adding a payment for the current market value of a whole policy in order to salvage this previous investment will significantly reduce Acheron's return on investment.

Acheron's Wind Down Motion cites no legal authority for the relief it requests, namely for the Court to either direct initiation of the wind down according to Acheron's proposed plan or to require that a voting ballot be put before the non-Acheron Investors to vote on whether to terminate the Trust according to Acheron's proposal. (DE 2593). Nor does the undersigned find that the Court has authority to immediately terminate the Trust or to seek the beneficiaries' approval for termination of the Trust in order to facilitate the implementation of Acheron's proposed alternative for continued administration of the Keep Policies.

Indeed, the undersigned finds that, under Florida law, the Court lacks authority to grant Acheron's requested relief. Several considerations inform the Court's conclusion. First, both statutory and common law recognize that the terms of a trust instrument control where there are provisions governing termination. Fla. Stat. § 736.0105(2); *Schwarzkopf v. Am. Heart Ass'n of Greater Miami, Inc.*, 541 So. 2d 1348, 1349-50 (Fla. 3d DCA 1989) (citing *Ginsburg v. Katz*, 303 So. 2d 340, 341 (Fla. 3d DCA 1974). Here, the governing trust instrument provides that "[the] Trust Agreement shall terminate upon the final disposition of all Keep Policies, whether by maturity, sale, surrender, or lapse, and the distribution of all other Trust Assets in accordance with the terms of the Servicing Agreement." (DE 2540-1 at § 8). Furthermore, the Trust Agreement gives power to the Trustee to "authorize and direct the sale, surrender, or lapse of the Keep Policies" and thus terminate the Trust under circumstances where continued servicing of the Keep Policies becomes unfeasible. *Id.* at § 3.1(b)(xvii). Therefore, the undersigned concludes that the terms of Trust Agreement govern the Trust's termination under Florida law. Furthermore, these terms do not allow for causing termination through the means Acheron proposes.

Second, even if the terms of the Trust Agreement did not control, in order for the Court to modify or terminate the Trust, The Florida Trust Code requires the Court to consider the purpose

for which the Trust was created, and whether that purpose has been (or can still be) fulfilled. Fla. Stat. §§ 736.04113(1)(a), (3)(a); 736.04115(2)(b). The Court is also required under Florida's common law to ensure that judicial terminations of a trust are consistent with the purpose of the trust. *Featherston*, 339 So. 2d at 307; *Byers*, 106 Fla. at 170 (stating that "[courts do not] dissolve a trust before the expiration of the term for which it was created" except in rare circumstances such as where performance has become impossible).

The Court approved creation of the Trust as a custodial vehicle for the former receivership assets in order to "maintain and administer the Trust Assets [including the Keep Policies] for the benefit of the Keep Policy Investors" (DE 2540-1 at § 2.2) after the overwhelming majority (73%) of the fraud victims in this case voted to retain their policies and continue paying insurance premiums. Those victims did so in order to have the opportunity to realize the face value of the insurance policies in which they had invested, upon the maturity of those policies. (DE 2291 at 3). Thus, the purpose of the Trust is to maintain the policies until they mature or until servicing is no longer feasible so long as the investors continue to pay the policy premiums.

Acheron seeks termination of the Trust Agreement before expiration of the period necessary to accomplish the Trust's purpose and before that purpose has become illegal, impossible, wasteful or impractical to fulfill.[15]  *See* Fla. Stat. § 736.04113(1)(a). As Acheron

---

[15] The Trustee himself noted at the Status Conference that the Trust Agreement provides no end date; the Trust Agreement "provides for the Trust [to] continue until all the policies are either matured or defaulted." (DE 2693 at 29:25-30:3). Acheron contends in its sur-reply, however, that the Trust "is likely to run out of funds before it can complete its proposed wind down," in part because the Trustee has greatly underestimated litigation expenses. (DE 2707 at ¶¶ 5-7). The Trustee finds fault with Acheron's assumptions, asserts that he contemplated and properly included an estimate for all the litigation that Acheron cites, and avows that he is prudently managing the funds available for the Trust's administration. (DE 2715 at 1-5). Furthermore, the Trustee points out that "the Trust Agreement specifically authorizes the Trustee to adjust the amount of the Administrative Fee Credit paid by the Trust, and to adjust the amount of the Administrative Fees paid by investors, in order to sustain the operations of the Trust if the amount of the Overpayment Balance is insufficient to do so." *Id.* at 4. In any event, under these circumstances, the terms of

acknowledged at the Status Conference, the victims who have been paying premiums for 15 to 20 years deserve to be paid off.  (DE 2693 at 162:1-6).  While Acheron says that it is not urging anyone to get out under its proposal (DE 2693 at 162:1-2), Acheron is proposing a premature termination of the Trust at a point where the Trustee argues that many of the Keep Policies have become very valuable and are expected to have short periods until maturity going forward.  *See* DE 2693 at 161:1-2 (stating that the Trust has "$90 million worth of death benefits on insureds that are over 90 years old").  Thus, the undersigned concludes that the Trust continues to fulfill its purpose by maintaining the Keep Policies for the benefit of the original investors in them who were defrauded.   Accordingly, Acheron's request for relief should be denied because it is inconsistent with the purpose and duration of the Trust as explicitly expressed in the Trust Agreement.

Also, to the extent that Acheron argued at the Status Conference that the Trust Agreement "is not clear" as to terms governing the Trust's termination including terms that would be relevant to the application of governing law, the undersigned disagrees.  (DE 2693 at 153:18-21).  "Under Florida law, the polestar of trust interpretation is the settlors' intent."  *Littell v. Law Firm of Trinkle, Moody, Swanson, Byrd & Colton*, 345 F. App'x 415, 419 (11th Cir. 2009) (internal quotations and citation omitted).  The Trust's structure was intended by the Receiver to continue a standard of fiduciary care that the receivership had been providing to the victims of the fraud.  Court-appointed receivers have fiduciary duties.  *Alonso v. Weiss*, 932 F.3d 995, 1002-1004 (7th Cir. 2019) (referencing 28 U.S.C. § 959(b) for the proposition that state law supplies the controlling standard of fiduciary care for court-appointed receivers).  Likewise, "[a] trustee is held to something stricter than the morals of the market place."  *Van Dusen v. Se. First Nat. Bank of Miami*, 478 So. 2d 82,

---

the Trust Agreement empower the Trustee to either: 1) increase servicing fees; or 2) terminate the Trust.

92 (Fla. 3d DCA 1985) (quoting Justice Cardozo in *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928)).  As the Receiver stated to the Court at the time the Court approved the Trust, "we came up with . . . a quasi-receiver giving the investor certain remedies and abilities to come to court if necessary to enforce their rights . . . [a]nd the [T]rustee will serve as an ombudsman in essence."  (DE 2310 at 11:15-19).  The Receiver's description of the Trustee as an ombudsman, however, is not at all equivalent to the ombudsman proposed by Acheron, who Acheron would pay only up to stated cap amounts and who would "be [the] contact person for investor questions and complaints" while Acheron took over servicing responsibility for the policies.  (DE 2593-1 at ¶ 6).  Under Acheron's plan, the proposed ombudsman, and Acheron itself, would have no fiduciary duty to the Keep Policy Investors.  Nor is Court oversight of the ombudsman under Acheron's proposal a sufficient substitute for a structure such as the Trust that facilitates administration of the Keep Policies by a fiduciary.  By law, Acheron would be able to conduct itself consistent with "[the] morals of the market place" and put its own interests ahead of the Keep Policy Investors.  Thus, the relief requested by Acheron must be denied because the lack of any continued fiduciary duty in the continued administration of Keep Policies directly conflicts with the purpose and terms of the Trust.

Third, the relevant statutory sections of The Florida Trust Code provide for judicial termination only "*upon the application of a trustee or any qualified beneficiary.*"  Fla. Stat. §§ 736.04113; 736.04115.  Whether Acheron should be recognized as a beneficiary of the Trust is the subject of the separate Acheron Litigation.  (DE 2606 at 3-5; DE 2617 at 3; DE 2707 at n. 9; DE 2715 at 3-4).  Therefore, Acheron cannot presently assert the rights of a qualified beneficiary. *Rachins v. Minassian*, 251 So. 3d 919, 923–26, n. 3 (Fla. 4th DCA 2018) (citations omitted)

(explaining that qualified beneficiaries are a subset of beneficiaries).[16]   Accordingly, even if the Trust Agreement was not controlling, Acheron's motion should be denied because the Court is unable to look to The Florida Trust Code for authority to terminate, or even modify, the Trust upon application by Acheron.

At the Status Conference, Acheron argued that the Court has authority to consider and order its proposed plan based upon the Trustee asking for guidance regarding wind down of the Trust – in essence that the Trustee opened the door to the Court's involvement by asking for guidance.  (DE 151: 4-153:21).  As the Trustee pointed out, however, the Trust Agreement gives the Trustee very broad powers.  (DE 134:22-141:18).  The Trustee is not obligated to come to the Court for instructions but may if he chooses.  *Id.*  The Trustee asserts that he does not need the Court's approval for the actions that the Trustee's Amended Wind Down Motion proposes but is only exercising the option to come to the Court, in part, to inform the Court.  (DE 2693 at 137:7-139:20).  Further, the Trustee disputes that this opens the door to the Court granting Acheron's requested relief.  (DE 2693 at 151:5-15).  The undersigned agrees, particularly when doing so would contravene the terms of the Trust Agreement and Florida law.  Therefore, the Court does not find Acheron's argument regarding the Court's authority to grant its relief stemming from the Trustee's actions in coming to the Court to be meritorious.

Moreover, to the extent that The Trust Code allows for judicial modification of a trust when it is in the best interest of the beneficiaries and not inconsistent with the Trust's purpose, it is not clear that Acheron's proposal is in the best interest of the beneficiaries.  Despite asserted benefits

---

[16] The undersigned's Report and Recommendation on the Motion by [Acheron] for Order Directing Disclosure of Trustee's Fees and Expenses and Audit of Trust Operations as Required by 736.0813(d) and 736.08135(2)(b), Fla. Stat. addressed who qualifies as a qualified beneficiary under Florida law and addressed the fact that Acheron's status as such is currently indeterminate. (DE 2705 at 6-12).

described in Acheron's motion, the Court has reasons to be circumspect regarding Acheron's proposal for a number of reasons. One, while not speculating as to exactly how much each investor would receive should the Trust immediately terminate and pay all of its obligations, such amount is likely to be a small percentage of face value, (perhaps only 2% to 3%) based on the fact that there will be wind down costs (including payment of the extension fee owed to Litai and cancellation fees for other contracts) and the fact that interests representing approximately $90,000,000 in face value are still held by non-Acheron investors.[17] (DE 2676-1 at 1-7). Two, the option that Acheron proposes to initially offer for a period of sixty (60) days to the non-Acheron investors to sell their interests to Acheron likewise offers only a small fraction of the total face value of the polices (5% or 7.5%). Three, although Acheron proposes paying ongoing servicing fees for non-Acheron investors who choose to maintain their interests – and the record indicates that most do want to keep their interests – Acheron will get "in exchange" an unspecified amount from the cash in or allocated to specific policies to offset such expense on Acheron's part. (DE 2593-1 at ¶ 1(a)). Acheron's offset in this regard is at the expense of non-Acheron investors.[18] Four, as discussed above, Acheron is a profit-seeking entity with obligations to its own existing investors but, under its proposal, would step into the role currently filled by a trustee owing a fiduciary duty to the victims of the original fraud. Accordingly, the bargain Acheron offers seems potentially small, especially given the cost of relinquishing the protections of a fiduciary structure

---

[17] At the Status Conference, the Trustee's counsel quickly and roughly estimated that, at most, about $12 million (13% of face value) in total would be available in cash to distribute to non-Acheron investors (before considering wind down costs and other costs) if all the existing non-Acheron investors sold their interests to Acheron at Acheron's offering prices and the Trust immediately terminated. (DE 2693 at 160:1-161-4).

[18] Moreover, whether such distribution to Acheron of cash from individual policies creates "rights" issues with particular non-Acheron investors is unknown and not addressed by the parties.

(which is *per se* to the detriment of the victims of the original fraud in this case who would choose to retain their interests under Acheron's proposal).

Thus, under both the relevant statutory provisions of The Trust Code and the common law, the undersigned finds that the Court lacks authority to grant Acheron's Wind Down Motion and terminate the Trust Agreement, even if Acheron had standing as a beneficiary to request this and even if every Keep Policy Investor voted for Acheron's proposal.  Despite the asserted benefits, Acheron's proposal for terminating the Trust Agreement removes any fiduciary duty to the Keep Policy Investors and thus contradicts a primary purpose of creating the Trust.  Furthermore, as previously stated, the Trust Agreement specifies the terms for the Trust's termination, which terms are controlling under Florida law.  Thus, the undersigned recommends that Acheron's Wind Down Motion be **DENIED**.

   B.   Trustee's Amended Wind Down Motion (DE 2640)

As the Trustee asserts, the Trust Agreement provides authority for the Trustee to terminate the Trust.  (DE 2640 at ¶¶ 9-11).  Specifically, the Trust Agreement provides in relevant part:

> [T]he Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Trust, including . . . [i]n the event that the Servicing Agreement is terminated or expires and the continued servicing of the Keep Policies becomes unfeasible, to authorize and direct the sale, surrender, or lapse of the Keep Policies, and to distribute the proceeds, if any, of the Keep Policies, upon such sale, surrender or lapse, to the Keep Policy Investors in such manner as the Trustee determines to be appropriate.

(DE 2540-1 at § 3.1(a), (b)(xvii)).  The Trustee's motion requests only that the Court confirm the Trustee's authority and approve implementation of the steps necessary for the Trust's termination, subject to the Court's oversight.  (DE 2640 at ¶ 12).  Once the preparation is in place, the Trustee anticipates that termination will be driven by the point at which the cost of servicing the remaining policies becomes significantly higher than it is presently.  *Id.* at ¶ 13.  The Trustee has not yet

determined the exact mechanics of the Trust's termination but anticipates that these will include the sale of all policies remaining in the Trust at the time of termination. *Id.* at ¶ 16. Further, the sale of the remaining policies at the Trust's termination *may* include providing investors, including institutional investors, "tag along" rights so that these investors could continue to hold their beneficial interests in policy proceeds. *Id.* (emphasis added).

At the Status Conference, the Trustee further clarified his motion. He explained that, because of advances in medical science, the Trust has lasted longer than the original estimate of ten (10) to twelve (12) years. (DE 2693 at 30:23-31:1). Despite the unexpected longevity, the Trustee expressed a fiduciary duty to maintain the Trust as long as it was feasible for the purpose of allowing the Keep Policy Investors an opportunity to realize a return on their investment rather than merely receive pennies on the dollar should the Trust terminate and the policies be sold.[19] *Id.* at 31:3-9-34:14. The Trustee also made clear that the relief requested is for court authorization to take steps over the next eighteen (18) to thirty-six (36) months to prepare for a wind down at which point the wind down would begin. *Id.* at 128:4-17; 129:21-23; 159:4-14.

Specifically, the Trustee seeks Court approval now for "the opportunity to proceed[, by] . . . giving the investors notice, [and] trying to obtain updated life expectancy reports, [and] portfolio evaluations[;] . . . [the Trustee is coming before the Court to] ensure that the Court is . . . as apprized as it wants to be while the Trustee does what he thinks is appropriate with his fiduciary duty." *Id.* at 127:5-132:2; 132:14-25. In addition, the Trustee seeks approval for interim sales of victims'

---

[19] For example, at the Status Conference, the Trustee stated that there are "some very valuable fractional interests relating to non-HIV older policies with insureds that are well into their eighties." (DE 2693 at 72:13-15). Also, Trustee's counsel analyzed the composition of the Keep Policies held in the Trust and said the data does not indicate that the less valuable HIV policy interests are defaulting at any greater rate than the non-HIV policy interests. (DE 2693 at 93:4-94:11). Accordingly, the Trustee's motivation continues to be "to maintain the policies and the Trust for a period of time to enable those investors to realize their expected return on their investment." (DE 2693 at 94:12-16).

non-defaulted fractional interests even though the Trustee professes that Court approval for this action is not required because the "Trust Agreement provide[s] the Trustee with a broad exercise of discretion." *Id.* at 133:4-134:14.  The Trustee acknowledges, however, that interim dispositions of non-lapsed policy interests are not encompassed by the existing servicing agreement and would require fresh negotiations regarding servicing.  *Id.* at 141:25-142:8.  Litai asserts that getting life expectancy reports to position the Trust to do interim sales of fractional interests is a waste of resources because the process is expensive – a few hundred thousand dollars – and there is "not really a market for [it]." *Id.* at 144:13-145:9.  The Trustee acknowledges that "it's easier to market a full policy than it is the fractional interest" and that it is potentially expensive and difficult to market and sell fractional interests.  (DE 2606 at 5-6; DE 2693 at 78:2-3; 80:16-81-6).  The Trustee's motion, however, is to prepare for wind down by valuing whole policies.  Therefore, the undersigned does not find that Litai's objection merits further comment.

The Trust Agreement uncontrovertibly authorizes the Trustee to take the steps he proposes.  The Trustee essentially seeks confirmation of his authority to:  1) communicate with Keep Policy Investors about preparations for the Trust's termination; 2) value the Keep Policies in anticipation, if necessary, of their sale, and 3) seek-out as many options as reasonably possible to offer to Keep Policy Investors during the period preceding termination and liquidation of the Trust's assets.  These steps are clearly consistent with the purpose for which the Trust was created and consistent with the terms of the Trust Agreement.

Acheron's response primarily promotes its own wind down proposal, alleges that the Trustee's motivation in continuing the Trust is to enrich the Trustee and his professionals, and criticizes the Trustee for considering a change in servicers while "moving into a wind down mode." (DE 2641 at 1-3, 7-10, n.4).  Acheron argues, without citing authority allowing for its proposal,

that non-Acheron investors should be offered a choice between Acheron's wind down plan and the Trustee's wind down plan after the Trustee details specifics and estimated costs of his plan. *Id.* at 10.

As explained above, however, Florida law does not support the Court terminating the Trust in favor of Acheron's wind down plan.  Rather, under Florida law, the terms of a trust instrument that specifically address trust termination and that confer termination powers upon a trustee prevail over other provisions under the law, which allow for judicial modification or termination of a trust when not inconsistent with a trust's purpose.  Fla. Stat. § 736.0105(2); *see also Featherston*, 339 So. 2d at 307.

Furthermore, the Court does not credit Acheron's insinuations of improper conduct on the part of the Trustee.  Acheron's Wind Down Motion states that "[w]hile the size of the Trust has decreased significantly, Acheron *believes* the expenses of administering the Trust . . . have increased [disproportionally considering the shrinking size of the Trust]" and further notes that Acheron has requested the Court "to direct the Trustee to disclose the Trust's expenses including without limitation, the fees paid to the Trustee and his self-owned accounting firm."  (DE 2593 at 2, n.1-2) (emphasis added).  As previously noted, there are other motions and other actions addressing the Trust's obligations to disclose expenses.  Nothing in those proceedings, and nothing in Acheron's filings, provides evidence that the Trustee is operating in a manner inconsistent with his obligations as a fiduciary.  Accordingly, the undersigned cannot credit such innuendo when unproven and when subject to other legal proceedings.

The Trust Agreement expressly provides the Trustee with broad powers to take actions "that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Trust" including those necessary to carry out the Trust's termination.  (DE 2540-1 at § 3.1(a), (b)(xvii)).

Nothing in the Trustee's Amended Wind Down Motion is inconsistent with the broad powers that the Trust Agreement confers on the Trustee.  Accordingly, the undersigned finds that Acheron's arguments advancing its alternative wind down proposal – and the innuendos regarding the Trustee putting his own interests before those of the Trust's beneficiaries – lack merit.  Furthermore, notwithstanding Litai's and Acheron's objections, as stated above, the undersigned finds nothing in the Trustee's request that is inconsistent with the purpose of the Trust or that conflicts with any of the terms of the Trust Agreement.  Thus, the Court concludes that the Trustee's Amended Wind Down Motion (DE 2640) should be **GRANTED**.

IV.    <u>CONCLUSION</u>

Accordingly, the undersigned respectfully **RECOMMENDS** as follows:

1.    That Acheron's Wind Down Motion (DE 2593) be **DENIED**;

2.    That the Trustee's Amended Wind Down Motion (DE 2640) be **GRANTED**;

3.    That the Trustee be **ORDERED** to: 1) file with the Court monthly status reports regarding his preparatory efforts for the Trust's eventual wind down; 2) include in the monthly status reports the Trustee's efforts and progress to secure servicing for the Trust's assets beyond December 31, 2020; and 3) update monthly the information that the Trustee provided to the Court at the June 10, 2020 Status Conference that was afterwards filed with Court (DE 2676).

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge.  Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained

in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

      **DONE AND SUBMITTED** in Fort Lauderdale, Florida, this 27th day of July 2020.

**Jared M. Strauss**
**United States Magistrate Judge**

Copies furnished via CM/ECF to:

Hon. Federico A. Moreno

Counsel of record