UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-60573-CIV-MORENO/STRAUSS

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

MUTUAL BENEFITS CORP., *et al.*,

      Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART TRUSTEE'S MOTION FOR AUTHORITY TO SELECTIVELY PRESERVE OR LAPSE UNPAID KEEP POLICIES (DE 2579)

**THIS CAUSE** is before the Court upon Trustee's Motion for Authority to Selectively Preserve or Lapse Unpaid Keep Policies ("Motion to Preserve or Lapse"). (DE 2579). This matter has been referred to me to take all necessary and proper action as required by law with respect to any and all post-judgment matters pursuant to 28 U.S.C. § 636 and the Magistrate Judge Rules of the United States District Court for the Southern District of Florida ("Referral"). (DE 2631). Pursuant to the Referral, I held a status conference on June 10, 2020 ("Status Conference") attended by Litai Assets LLC ("Litai"), Barry Mukamal, as Trustee (the "Trustee") of the Mutual Benefits Keep Policy Trust (the "Trust"), Acheron Capital, Ltd., in its capacity as the investment manager for Acheron Portfolio Trust, Avernus Portfolio Trust, Lorenzo Tonti 2006 Trust and STYX Portfolio Trust, (collectively, "Acheron"), and their respective counsel. (DE 2693). At the Status Conference, the parties consented to my authority to decide the Motion to Preserve or Lapse. (DE 2693 at 14:13-19:5; 20:18-21:4). I have carefully reviewed the motion (DE 2579), the responses (DE 2581; DE2583), the reply (DE 2589), the sur-reply (DE 2596) and the record.

Additionally, at the Status Conference, I heard oral argument from the parties.  Being otherwise duly advised, the Motion to Preserve or Lapse (DE 2579) is **GRANTED IN PART AND DENIED IN PART** as set forth below.

I.      BACKGROUND

In 2004, the Securities and Exchange Commission commenced an enforcement action against Mutual Benefits Corporation and other Defendants for fraudulently selling fractional viaticated investment interests in life insurance policies.  (DE 1).  *See also SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 738 (11th Cir. 2005).[1]  The entities involved were put into receivership, and Roberto Martinez was appointed as receiver (the "Receiver").  (DE 26).  The Receiver reported in June 2009, that pursuant to Court approval, investors in the life insurance policies had voted to either: a) sell the policy; or b) retain the policy ("Keep Policies").[2]  (DE 2291 at 3).  The Receiver

---

[1]

>  A viatical settlement is a transaction in which a terminally ill insured sells the benefits of his life insurance policy to a third party in return for a lump-sum cash payment equal to a percentage of the policy's face value. The purchaser of the viatical settlement realizes a profit if, when the insured dies, the policy benefits paid are greater than the purchase price, adjusted for time value. Thus, in purchasing a viatical settlement, it is of paramount importance that an accurate determination be made of the insured's expected date of death. If the insured lives longer than expected, the purchaser of the policy will realize a reduced return, or may lose money on the investment.

*Id.*

[2] Approximately 3,138 policies with a face value of $383,580,782 (or 27% of the total) were designated to be sold, and approximately 3,037 policies with a face value of approximately $1,054,421,049 (or 73% of the total) were designated to be retained by investors (the Keep Policies).  *Id.*  At the Status Conference, Litai reported that there are 1,333 total policies still held by the Trust, of which there are 192 policies 100% owned by a non-Acheron investor.  (DE 2693 at 68:11-14).  The parties agreed at the Status Conference that there are 280 policies where Acheron has a 100% interest.  *Id.* at 68:19-69:1. Furthermore, Litai reported that Acheron has an interest in 1,068 policies, including the 280 that it 100% owns.  *Id.* at 68:15-16.  Accordingly, following is a breakdown of the Trust's policies by ownership type: (1) 280 policies 100% Acheron-owned; (2) 788 policies in which Acheron holds a fractional interest; (3) 192 policies

also requested, and the Court approved, the creation of a trust to "provide for the continued maintenance and processing of the Keep Policies in accordance with the directives of this Court." (DE 2291 at 5-6, 8; DE 2322).   Thus, on September 25, 2009, the Receiver and the Trustee executed the Mutual Benefits "Keep Policy" Trust Agreement (the "Trust Agreement").   (DE 2540 at 2; DE 2540-1).  The Trust Agreement is between the Receiver and the Receivership Entities as settlor, and the Trustee.  (DE 2540-1 at 1).  Section 7 of the Trust Agreement establishes that the Trust Agreement is governed by Florida law, and Section 9 addresses amendments of the Trust Agreement as follows:

> Section 7.1 <u>Governing Law</u>.  This Trust Agreement shall be governed by and construed and enforced in accordance with the Laws of the State of Florida, without regard to any choice-of-law rules thereof which might apply the Laws of any other jurisdiction.

> Section 9.4 <u>Amendments</u>.  This Agreement may be amended from time to time by the Trustee with the approval of the Court; provided, however that such approval shall not be required in the case of amendments made for the purposes of correcting technical errors consistent with the purposes of the Trust, so long as such amendments do not materially affect the rights of any Keep Policy Investors.

*Id.* at §§ 7.1,[3] 9.4.

Concomitant with the formation of the Trust and with Court approval, the Receiver executed a sale of the receivership entity servicing the Keep Policies to Litai. (DE 2340; DE 2367).

---

100% owned by a non-Acheron investor; and (4) 73 policies with fractional interests owned entirely by non-Acheron investors.  There are approximately 3,900 total policy interests being maintained by the Trust with a face value of approximately $270 million of which $179.5 million or nearly 67% belong to Acheron (DE 2676-1 at 7).  According to the Trustee, of the approximately 3,900 total policy interests, the Trust is servicing 2,310 interests for victims of the original fraud. *Id.*

[3] The Trust is thus governed by the provisions of The Florida Trust Code.  *See Demircan v. Mikhaylov*, No. 3D18-1684, 2020 WL 2550067, at *4 (Fla. 3rd DCA May 20, 2020) (stating that The Florida Trust Code was first enacted in 2007 and applies to "all judicial proceedings concerning trusts commenced on or after July 1, 2007"); *see also* Fla. Stat. § 736.0102 (stating that "[t]his chapter may be cited as 'The Florida Trust Code'").

Ultimately, the Trustee and Litai entered into a servicing agreement effective September 25, 2009 (DE 2266-3; DE 2491; DE 2627 at 2, n. 1) that has since been renewed (DE 2500-1; DE 2626-1) to extend servicing through December 31, 2020 (collectively, the "Servicing Agreement").[4]

On March 19, 2015, the Trustee made an agreement (the "March 2015 Agreement") with Acheron.  (DE 2500-2).  The March 2015 Agreement resulted from extensive negotiations between Acheron and the Trustee and was intended to resolve Acheron's concerns as a buyer of defaulting policy interests held by the Trust.[5]  (DE 2500 at 4, 9).  Section 2 of the March 2015 Agreement, for example, grants Acheron rights to share fairly and equitably in "distributions, rebates, benefits, [and] credits" that are provided to other holders of interests in Keep Policies.  (DE 2500-2 at § 2). Disagreements between the Trustee and Acheron have nonetheless continued, which prompted Acheron's filing of a separate lawsuit against the Trustee.  *See Acheron Portfolio Trust, et al., v.*

---

[4] The Servicing Agreement defines an "Overpayment Balance," which is an amount that had accumulated from the Receiver's billing of the Keep Policy Investors in accordance with Court Order and which was transferred to the Trustee upon creation of the Trust.  *See* DE 2266-3 at § 2. The Overpayment Balance pays for the operations of the Trust, including the costs of the Trustee. (DE 2266-3 at § 13).  The Overpayment Balance also subsidizes the Keep Policy Investors' Administrative Fees.  (DE 2266-3 at § 12.1.7).  Sales of defaulted fractional interests in Keep Policies replenish the Overpayment Balance.  (DE 2266-3 at § 12.1.8).  Renewal of the servicing agreement in 2015 included a provision stating that "[u]pon conclusion of the Renewal Term, Trustee shall distribute [to Litai] the amount, if any, by which the Overpayment Balance exceeds the amount of the Initial Overpayment Balance."  (DE 2500-1 at § 3.4).  Such payment to Litai is conditioned, however, on "[the] Trustee [having] determined in his sole discretion" that the funds remaining are adequate to sustain the operations of the Trust.  *Id.* at § 3.1.  Furthermore, the Trustee contends that the Initial Overpayment Balance was $3 million; therefore, Litai's potential interest would be in amounts that are over a $3 million balance.  (DE 2693 at 75:1-15).  The amount of the Overpayment Balance at May 31, 2020 was $5,476,160.  (DE 2676-1 at 1-2).

[5] "[W]hen investors in [the life insurance policies held by the Trust] do not pay their *pro rata* share of the premium obligations associated with their interest, the policy is at risk of lapse."  (DE 2500 at 4).  Acheron's purchase of such interest and payment of the premium obligations avoids the lapse of the policy and keeps the non-defaulting investors from losing their interests in the policy. *Id.*

*Barry Mukamal, as Trustee of the Mutual Benefits Keep Policy Trust*, Case No. 18-25099-CIV-MORENO initiated December 5, 2018 (the "Acheron Litigation").

The Trustee's Motion to Preserve or Lapse requests the Court to either: 1) clarify that the Trust Agreement confers upon the Trustee the authority to selectively preserve or lapse Keep Policies when investors default on their premium payments; or, 2) to authorize an amendment to the Trust Agreement that grants authority to the Trustee to selectively preserve or lapse Keep Policies when investors default on their premium payments. (DE 2579 at 1, 3-4). The Trustee maintains that the authority he seeks is necessitated by the ongoing litigation with Acheron and the inability to rely on Acheron to continue purchasing defaulted policy interests. *Id.* at 6. Further, the Trustee asserts that his use of the authorization would be limited to those instances where it is in the best interests of the Keep Policy Investors that he does so. *Id.* at 6. Moreover, the Trustee anticipates only a limited number of instances where he would use the Trust's funds to preserve a policy. *Id.* at 5.

## II.   LEGAL STANDARDS

Under The Florida Trust Code, the terms of a trust may confer upon the trustee or other person the power to modify or terminate a trust. Fla. Stat. § 736.0808. Further, the Florida Statutes provide that the "terms of a trust prevail over any provision of [the] code" except for provisions governing judicial modification that are set out herein and other provisions that are not relevant here. Fla. Stat. § 736.0105(2).

Courts have statutory authority to modify an irrevocable trust[6] when such modification is not inconsistent with the settlor's purpose. Specifically, § 736.04113 provides in relevant part:

---

[6] An irrevocable trust is one that may not be terminated by the settlor once it has been established. *See, e.g., Diamond v. Diamond*, No. 16-CV-81923, 2018 WL 7147331, at *2 (S.D. Fla. Dec. 18, 2018), *appeal dismissed sub nom. Diamond as Tr. of Diamond Tr. v. Diamond*, No. 20-10202-JJ,

(1)     Upon the application of a trustee of the trust or any qualified beneficiary, a court at any time may modify the terms of a trust that is not then revocable in the manner provided in subsection (2), if:

      (a)     The purposes of the trust have been fulfilled or have become illegal, impossible, wasteful, or impracticable to fulfill;

      (b)     Because of circumstances not anticipated by the settlor, compliance with the terms of the trust would defeat or substantially impair the accomplishment of a material purpose of the trust; or

      (c)     A material purpose of the trust no longer exists.

(2)     In modifying a trust under this section, a court may:

      (a)     Amend or change the terms of the trust, including terms governing distribution of the trust income or principal or terms governing administration of the trust;

      (b)     Terminate the trust in whole or in part;

      (c)     Direct or permit the trustee to do acts that are not authorized or that are prohibited by the terms of the trust; or

---

2020 WL 1933928 (11th Cir. Apr. 14, 2020) (stating that, "[i]n Florida, a revocable trust is a unique type of transfer in which the settlor subjects property *owned by him* to a trust for the benefit of at least one other person, reserving to himself as settlor-beneficiary the income from the trust property for life and the power to revoke the trust in whole or in part at any time") (citation and internal quotation marks omitted) (emphasis added).  Here, the undersigned concludes that the Trust is irrevocable by its nature as a custodial vehicle for former receivership assets because the Receiver never personally owned any of the assets transferred into the Trust.  *Diamond*, 2018 WL 7147331 at *2.  Additionally, the Trust is irrevocable by the terms of the Trust Agreement.  For example, through the Trust Agreement, the Receiver transferred to the Trustee all of the Receiver's "rights, powers and privileges" under the Court's various Policy Administration Orders.  (DE 2540-1 at §§ 1.1; 2.3).  Also, the Trust Agreement provides for the Trust's continuance in the event of "[t]he death, resignation, disability, or removal of the Trustee."  *Id.* at § 6.4.  Finally, "[i]n the event of the death, resignation, disability or removal of the Trustee without designation of a Successor Trustee . . . the Court [retains] exclusive authority to appoint a Successor Trustee."  Thus, the Receiver retained no control over the Trust's assets, and there is no scenario where the Receiver, as settlor, would have power to revoke the Trust.  Furthermore, the parties do not argue that the Trust is revocable.  *See Nelson v. Nelson*, 206 So. 3d 818, 819 (Fla. 2nd DCA 2016) (finding a trust irrevocable where the settlor's intent to retain no power or control to do so was discernable from the terms of the Trust Agreement).  Accordingly, the Court finds that the Trust is irrevocable.

        (d)      Prohibit the trustee from performing acts that are permitted or required by the terms of the trust.

Fla. Stat. § 736.04113.

In addition, upon the application of a trustee or any qualified beneficiary, Fla. Stat. § 736.04115 provides for judicial modification of irrevocable trusts created on or after January 1, 2001, in accordance with § 736.04113(2), when the modification is in the best interests of beneficiaries. However, "[t]he court shall exercise [such] discretion in a manner that conforms to the extent possible with the intent of the settlor, taking into account the current circumstances and best interests of the beneficiaries." Fla. Stat. § 736.04115(2)(a). Further, under either § 736.04113 or § 736.04115, "[t]he court shall consider the terms and purposes of the trust, the facts and circumstances surrounding the creation of the trust, and extrinsic evidence relevant to the proposed modification." Fla. Stat. §§ 736.04113(3)(a); 736.04115(2)(b).

Moreover, neither § 736.04113 nor § 736.04115 abrogate the court's common law authority to modify or terminate an irrevocable trust. Fla. Stat. §§ 736.04113(4); 736.04115(5). "[At common law,] a trust can be modified upon the consent of the settlor and all the beneficiaries, regardless of whether the purpose of the trust is satisfied, or upon the consent of all beneficiaries if not inconsistent with the trust's purpose." *Shire v. Unknown/Undiscovered Heirs*, 299 Neb. 25, 35 (2018); *but see Demircan*, 2020 WL 2550067 at *3 (stating that, "[a]t common law, neither settlors nor beneficiaries have, by themselves, a right to modify an irrevocable trust, except pursuant to a power identified in the trust").

III.   <u>DISCUSSION</u>

The Trustee's Motion to Preserve or Lapse arises from disputes with both Litai and Acheron. (DE 2579 at 4, n.3). The Trustee asserts that Litai will not assist him in identifying potential purchasers of defaulted policy interests (other than Acheron) and that Acheron's

continued purchases of such interests are uncertain in light of the acrimony between him and Acheron.[7]  *Id.*  Therefore, the Trustee seeks to amend the Trust Agreement under § 9.4 so that, "with the approval of the Court," he is authorized to invest in defaulted policy interests when he determines it is advantageous to do so.[8]  (DE 2579 at 7; DE 2693 at 71:25-72:15).

The Trustee explains that, when defaulting policy interests are sold (to Acheron), premium shortfalls are temporarily funded from Trust Assets (the Overpayment Balance) and then replenished upon sale because part of the sales price includes the premium that the Trust advanced. (DE 2579 at 5).  If unpaid policy interests cannot be sold, existing options for the Trustee to keep a policy active when an interest defaults (the "Non-Lapse Options") are as follows:

1.  Reducing the policy face value in proportion to the forfeited ownership interest;

2.  Converting whole life policies to reduced paid up or extended term (historically used only a handful of times); or

3.  Obtaining a loan against policy value to fund the proportionate premium shortfall (has not been used to date).

*Id.* at 4.

The Trustee seeks to supplement the existing options for covering premium shortfalls through amendment of the Trust Agreement so that he may use an unspecified amount of funds from the Overpayment Balance to pay premium shortfalls when:

---

[7] Acheron has been the only purchaser to date of defaulting fractional interests.  (DE 2693 at 61:1-2).

[8] Proceeds from policy maturities, that are attributable to fractional interests that the Trust essentially purchases by paying premium shortfalls, would become Trust Assets (part of the Overpayment Balance).  (DE 2579 at 5).

   a) The policy interest will not be purchased for an appropriate price (which the Trustee apparently deems to be at least equivalent to Acheron's historical purchase prices);[9]

   b) The Non-Lapse Options will not be available; and

   c) The Trustee determines, in his business judgment and in consultation with industry professionals, that keeping such a policy active would serve the remaining Fractional Owners of that policy.[10]

(DE 2579 at 5; DE 2693 at 72:17-21). The Trustee notes that an additional option, of last resort, is to allow the policy to lapse.[11] *Id.* at 6. Lapsing, however, is disfavored "because it would result in a loss to the remaining Fractional Owners on the policy."[12] *Id.* Therefore, the Trustee avows that "[e]very forfeited policy interest will be *offered* to prospective purchasers before a policy is

---

[9] The Trustee confirmed at the Status Conference that he seeks an ability to acquire leverage with Acheron because, over the last two years, Acheron has reduced in half the amount it pays for defaulted policy interests from what it had historically paid. (DE 2693 at 60:7-67:3; 69:2-81:21). The Trustee stated that selling fractional interests to Acheron at the higher historical prices of 5% for HIV policies and 7.5% for non-HIV policies provided sufficient funds to sustain the Trust through to its natural end. (DE 2693 at 62:5-10; 63:8-15; 79:12-19). The Trustee expressed an unwillingness, however, to continue selling to Acheron at the now reduced pricing of 2% for HIV policy interests and 3.5% for non-HIV policy interests. (DE 2693 at 69:5-17; 79:4-24). Therefore, the Trustee deems it appropriate to either market the policies, market the fractional interests, or deploy a portion of the Trust assets to purchase defaulting interests by paying policy premiums when it appears advantageous to do so. (DE 2693 at 79:21-24; 81:16-21).

[10] The Trustee explains that various factors will inform his decision to use Trust funds to keep policies active "including: the total number of Fractional Owners on the policy, the policy face value, the current premium shortfall, anticipated future premiums that may need to be funded for the forfeited ownership interest, all remaining Fractional Owners' estimated gain or loss on the policy, the insured's age and health status, the life expectancy of the insured, the potential for future premium shortfalls in subsequent years, and the potential for selling the current shortfall interest to a purchaser in a subsequent year." (DE 2579 at 5). Also, the Trustee intends to use industry professionals to determine a value for defaulting fractional interests to inform his decision whether to default the policy or use Non-Lapse options. (DE 2693 at 71:25-72:5).

[11] A lapsed policy no longer pays benefits or provides coverage.

[12] At the Status Conference, the Trustee affirmed his belief that he has authority now under the Trust Agreement to lapse policies. (DE 2693 at 77:4-11).

allowed to lapse." *Id.* (emphasis added).  Additionally, the Trustee "submits that the proposed amendments described above are appropriate and necessary in order to most effectively preserve the value of the Keep Policies in the most effective manner available *in the event that defaulting Fractional Interests cannot[13] be sold*." *Id.* at 7 (emphasis added).  Finally, the Trustee is not by the instant motion addressing the ultimate disposition of the net proceeds from maturities of any interests that the Trust acquires, which the Trustee asserts is more appropriately addressed upon the ultimate termination of the Trust.  *Id.* at 6-7.

Acheron objects to the Trustee's Motion to Preserve or Lapse as extraordinary and unnecessary because: 1) Acheron commits and stands ready to fund ongoing premiums; and 2) Acheron construes the Trustee's motion as seeking authority to lapse policies despite Acheron's willingness to make ongoing premium payments.  (DE 2581 at 1).  Acheron also claims that the motion is a fundamental change in the longstanding practices of the Trust and violates the March 2015 Agreement between Acheron and the Trustee.[14]  *Id.* at 2.  Additionally, Acheron contends that approval of the Trustee's motion "transform[s] the Trustee from a fiduciary into a speculative investor, who will be funding his long term speculation in illiquid assets, with unspecified amounts of cash from the Trust[,] . . . which puts all investors at risk."  *Id.*  Acheron further posits that, by investing in defaulted fractional interests with the Trust's cash, the Trustee creates a conflict of

---

[13] Notably, the criteria that the Trustee describes here for when he could exercise the authority he seeks conflicts with the criteria described elsewhere in the motion.  Here, the Trustee describes the criteria as when a defaulting interest "cannot be sold," whereas elsewhere he describes when a defaulting interest "cannot be sold <u>for an appropriate price</u>." *Id.* at 5, 7.  The former suggests a complete absence of interested buyers, while the latter suggests a willing buyer whose offer the Trustee deems insufficient.

[14] Acheron's response requested that the Court direct the Trustee to separate the interests of Acheron from the interests of the other investors.  (DE 2581 at 18).  At the Status Conference, however, Acheron acknowledged that this is not feasible.  (DE 2693 at 86:10-87-18).  Accordingly, the Court does not further address this request.

interest.[15]  *Id.*  Moreover, Acheron describes the Trustee's Motion to Preserve or Lapse as a "thinly veiled threat directed at Acheron."  *Id.* at 10.  Acheron especially objects to the Trustee being able to lapse policies, where the Trustee refuses to accept Acheron's offer to continue paying premiums for a defaulted policy interest, and Acheron is the only remaining investor to lapse.  *Id.*

Litai's response argues that it was never a purpose of the Trust for the Trustee to become a beneficial owner of defaulting policy interests by choosing not to sell these interests and by paying the policy premiums with funds from the Overpayment Balance.  (DE 2583 at 1-2).  Litai also disputes any aspersions cast upon it by the Trustee relative to Litai not assisting with finding other policy interest purchasers to compete with Acheron.  *Id.* at 3, n 2.  According to Litai, the Court agreed with Litai that the Servicing Agreement does not require Litai to identify other possible purchasers of policy interests.  *Id.* at n. 2.  Litai also notes that the Court authorized the Trustee, at the Trust's expense, to engage a licensed broker to assist in the identification of prospective purchasers.  *Id.*  At the Status Conference, however, the Trustee reported that he had not engaged a broker to sell policy interests, and he also acknowledged that selling fractional interests in policies is difficult because the expense of paying a broker would outweigh the return

---

[15] Acheron asserts that the Trustee would be using information he obtained in his fiduciary capacity to make decisions about purchases in order to compete with it for policy interests in Keep Policies. (DE 2581at 12-13). Acheron also asserts that monies from matured policy interests that the Trust acquires incents the Trustee to increase administrative expenses paid to him and his firm because these proceeds are not proposed to be distributed to remaining investors but rather will go into the account that funds the Trust's operations.  *Id.* at 13.  Further, Acheron argues that the Trustee is placing himself in a position to have to consider further investments to cover prior investment decisions (because another investor defaults on a policy in which the Trustee has paid premiums) or suffer a loss on the prior investment, which position conflicts with the Trustee's fiduciary duties. *Id.* at 13-14.  Acheron also points out that the Trustee has acquired authority to negotiate payment plans with defaulting investors, and the instant motion diminishes the Trustee's incentive to accommodate investors with a payment plan if he can use Trust assets to pay premiums in the hopes that a policy matures to generate additional funds to pay his and his firm's ongoing fees and expenses.  *Id.* at 14.

from selling an individual fractional interest. (DE 2693 at 63:16-20; 64:4-67:3; 66:22-25; 78:2-3; 80:12-81:10). Indeed, Litai asserts that there is no market for fractional interests beyond Acheron. (DE 2693 at 89:1-90:10).[16]

To the extent that the Trustee seeks authority to invest in defaulting fractional policy interests, I do not find the requested amendment of the Trust Agreement to be consistent with the purpose for which the Trust was formed, namely to maintain and administer the Trust Assets for as long as possible to facilitate victims being able to fully realize on their investments. *See* DE 2590 at 2; DE 2693 at 29:5-31-9; 94:12-25; 160:16-161:4. Several considerations inform this conclusion.

First, the Trustee has acknowledged that investing in fractional policy interests could hasten the termination of the Trust because funds would be diverted to the investment activity that would otherwise be available to fund the Trust's operations. (DE 2693 at 72:16-73:22). The Trustee has not specified the exact amount of funds that would be segregated for investing in fractional interests; but, he characterizes the request as a failsafe option to be used sparingly. (DE 2579 at 5; DE 2693 at 75:8-11). Nonetheless, it appears that a significant amount of funds may be dedicated to such use. At the Status Conference, the Trustee posed a hypothetical that removed two million dollars from the Overpayment Balance for selective use in paying policy premiums for defaulted policy interests. (DE 2693 at 73:10-13). While the Trustee counts on death benefits to provide cash flow and replenish the Overpayment Balance (*Id.* at 73:9-14) as a result of

---

[16] Litai's assertions, in its response, as to contractual rights to the Overpayment Balance (DE 2583 at 2-4) is not a matter properly before the Court, and Litai acknowledged at the Status Conference that it's interest in the Overpayment Balance is speculative because the funds are subject to exhaustion in the natural course of events – paying the costs for the operations of the Trust. (DE 2693 at 91:20-92:20). Therefore, I do not further address Litai's potential interests in the Overpayment Balance.

investing in fractional policy interests, the Trustee acknowledged that there is a risk that the Trust would have to terminate sooner than it would otherwise because of such investments.  *Id.* at 72:16-73:7.  At termination, there would be a forced sale of remaining policies.  *Id.* at 73:3-7.  Remaining investors would receive pennies on the dollar rather than the face value of their policy interests. *Id.* at 34:3-16; 73:3-7.  Thus, investing in illiquid fractional policy interests, even if selectively and informatively done, is inapposite to the Trust's primary purpose of affording the victims the greatest possible time period to realize a full return on their investments.

Second, investing in defaulting fractional policy interests exposes the Trustee to potential conflicts of interest.  For example, as Acheron noted, the Trustee's investment in one fractional interest affects the Trustee's decision going forward with respect to any other undersubscribed policy interests in the same policy.  Indeed, given additional defaults in the same policy, the Trustee is no longer impartial regarding additional investments.  Another example pertains to Acheron's assertion that the Trustee has authority to grant payment plans to Keep Policy Investors who are at risk of default.  (DE 2581 at 14.)  Under these circumstances, any action taken by the Trustee to invest in a policy interest after declining to extend a payment plan to the defaulting Keep Policy Investor would create the appearance of a conflict of interest.  Furthermore, the Trustee is responsible for overseeing the operations of the Trust and conducting periodic reviews of those operations to ensure the proper administration of the policies and the policy interests.  If the Trustee is a beneficial interest holder in a policy, there is the potential for a conflict of interest to the extent that such policies or policy interests might appear to receive greater attention or favored treatment.  Moreover, the mere position of the Trustee as administrator of the Trust gives rise to the potential for conflicts of interest where the Trustee also becomes a beneficial owner of policy interests alongside Keep Policy Investors.  Accordingly, authorizing the Trustee to invest

13

in undersubscribed policies does not appear appropriate in light of the potential for conflicts of interest.

Third, fractional policy interests are unusual and high-risk investments incompatible with the Trust's risk profile.[17]  (DE 2693 at 74:18-75:11).  Presently, the Trust is authorized, per amendments to the Trust Agreement (DE 2500), to invest the Trust's cash "in investment grade securities with a maturity of average duration not to exceed five years, in addition to [highly liquid and low risk treasury bills, bank deposits, or commercial paper]."  (DE 2500 at 8-9; DE 2501). The investment restrictions have been long-standing and are consistent with the Trustee's obligation to make preservation of capital a priority with respect to investment decisions. Amending the Trust to allow investments in fractional policy interests is a significant change to the risk profile of the Trust; and, while such investments may provide the opportunity for much higher returns, the nature of such investments also present much greater opportunity for loss.

As an initial matter, the Trustee does not dispute that the fractional interests he seeks to invest in are illiquid.  Illiquidity alone makes such investments an unacceptable risk for an administrator charged with making preservation of capital a priority.  However, there are additional risks.  For example, there is risk that the insurance company becomes insolvent or disputes paying death benefits at a policy's maturity.  There are also operational risks.  Policies and policy interests are subject to lapse if not properly administered.  This risk is inherent in the nature of fractional policy interests as investments.  For these reasons, the proposed amendment to the Trust is not

---

[17] I recognize that the Trustee is not seeking to invest in fractional policy interests as an investment strategy for managing the liquidity of the Trust.  Rather, the Trustee is pursuing the purchase of the defaulting policy interests as a means of benefiting the original victims of the fraud that remain as beneficiaries of the Trust.  Nevertheless, the Court must still address the Trustee's pursuit as an investment.

aligned with the fiduciary duty of the Trustee to preserve and safeguard the Trust's cash in order to fund the Trust's operations for the longest period feasible.

Moreover, while the Trustee declares in a conclusory manner that the relief he requests would be in the best interest of beneficiaries, this appears to be based upon consideration of select beneficiaries that might be protected from a specific policy lapse given the Trustee's investment to pay policy premiums on a defaulting policy interest. However, other beneficiaries are put at risk of being denied the time necessary to fully realize on their investments because the Trustee's selective investments shorten the period before the Trust terminates. Likewise, changing the risk profile of the Trust's cash investments to accommodate greater risk increases the potential for premature trust termination.

I conclude, therefore, that statutory modification of the Trust is not available. The risk of accelerating the Trust's termination, the potential for creating conflicts of interest, and the high-risk nature of policy interests as investments are all inconsistent with the purposes for which the Trust was formed. Thus, modification under Fla. Stat. § 736.04113 (titled "Judicial modification of irrevocable trust when modification is not inconsistent with settlor's purpose") is not available. Further, while Fla. Stat. § 736.04115 (titled "Judicial modification of irrevocable trust when modification is in best interests of beneficiaries") allows modification when it is the best interest interests of beneficiaries, I have previously explained why the relief requested here does not so qualify. Thus, modification of the Trust Agreement is also not available under Fla. Stat. § 736.04115.

Additionally, Florida's common law does not accommodate the Trustee's requested relief because: 1) the amendment requested is inconsistent with the purpose of the Trust; 2) there is no

unanimous consent by the beneficiaries; and 3) the Trust Agreement does not confer unilateral modification power upon the Trustee.  *Shire*, 299 Neb. at 35; *Demircan*, 2020 WL 2550067 at *3.

Moreover, while I am sympathetic to the Trustee's frustration in having only one available purchaser (Acheron) for the defaulted policy interests and in lacking leverage to negotiate sales prices with that single purchaser, I find that the risks involved in allowing the Trustee the ability to invest in the policies in order to acquire leverage with Acheron are not merited. The authority the Trustee seeks is not truly necessary to protect other investors from the risks of a defaulting co-investor.  In addition to the Non-Lapse Options available to the Trustee, he acknowledges that there is "[no] reason to believe that Acheron will not be available to buy the defaulted interests going forward," albeit at discounted pricing.  (DE 2693 at 70:2-11).  While obtaining higher prices for defaulting fractional interests from Acheron would benefit investors in Keep Policies who were original victims, the proposed cure is potentially worse than the disease.  The risks identified above and the unprecedented way that the relief would change the character of the Trustee in relationship to the existing Trust beneficiaries outweigh the potential benefits.  Therefore, for all of the reasons stated, I decline to authorize an amendment to the Trust Agreement that allows the Trustee to deviate from the existing restrictions on how the Trust's cash may be invested.

As far as lapsing policies, the Trustee seeks authority, or confirmation of authority, to "allow [a] policy to lapse if (1) the policy interest is not purchased, [and] (2) the Non-Lapse Options are not available." (DE 2579 at 6).  To the extent that this request is consistent with the Trustee's existing authority, I affirm the Trustee's ability to exercise his business judgment in making decisions regarding whether to allow a policy to lapse.  The situation raised in Acheron's response, of whether Acheron should be able to merely pay future premiums on defaulted interests, where it is the only remaining beneficial owner of a policy, is speculative and not squarely before

16

the Court at the present time. *Ass'n For Children for Enf't of Support, Inc. v. Conger*, 899 F.2d 1164, 1165 (11th Cir. 1990) ("It is axiomatic that federal courts should avoid premature adjudication of abstract or hypothetical disputes."). Therefore, I decline to opine on the appropriate course of action for this specific circumstance and encourage the parties to confer and agree upon appropriate courses of action for situations that may arise in the future. If the parties are unable to agree, then resorting to the Court for resolution is an option at the appropriate time.

IV.     CONCLUSION

Accordingly, it is hereby

**ORDERED AND ADJUDGED** that the Motion to Preserve or Lapse (DE 2579) is **GRANTED IN PART AND DENIED IN PART** as follows:

1.     To the extent that the Trustee seeks to invest in defaulting fractional policy interests in departure from the current restrictions that the Trust Agreement places on investments of the Trust's cash, the Motion to Preserve or Lapse is **DENIED**.

2.     To the extent that the Trustee seek confirmation of his authority to lapse policies when defaulting policy interests are not purchased and the Non-Lapse Options are not available, the Motion to Preserve or Lapse is **GRANTED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 7th day of August 2020.

Jared M. Strauss
**United States Magistrate Judge**

Copies furnished to counsel via CM/ECF