UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-60573-CIV-MORENO/STRAUSS

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

MUTUAL BENEFITS CORP., *et al.*,

      Defendants.

_____/

## ORDER GRANTING TRUSTEE'S MOTION TO REMOVE ALL 100% ACHERON OWNED POLICIES FROM THE TRUST (DE 2591)

**THIS CAUSE** is before the Court upon the Trustee's Motion to Remove All 100% Acheron Owned Policies From the Trust ("Motion to Remove"). (DE 2591). This matter has been referred to me to take all necessary and proper action as required by law with respect to any and all post-judgment matters pursuant to 28 U.S.C. § 636 and the Magistrate Judge Rules of the United States District Court for the Southern District of Florida ("Referral"). (DE 2631). Pursuant to the Referral, I held a status conference on June 10, 2020 ("Status Conference") attended by Litai Assets LLC ("Litai"), Barry Mukamal, as Trustee (the "Trustee") of the Mutual Benefits Keep Policy Trust (the "Trust"), Acheron Capital, Ltd., in its capacity as the investment manager for Acheron Portfolio Trust, Avernus Portfolio Trust, Lorenzo Tonti 2006 Trust and STYX Portfolio Trust, (collectively, "Acheron"), and their respective counsel. (DE 2693). At the Status Conference, the parties consented to my authority to decide the Motion to Remove. (DE 2693 at 20:21-21:4). Following the Status Conference, I held an Evidentiary Hearing to address the matters subject to dispute in this motion. (DE 2729). I have carefully reviewed the motion (DE 2591), the responses (DE 2602; DE 2605), the reply (DE 2611), the post-hearing briefs

(DE 2727; DE 2728) and the record.  Additionally, at the Status Conference I heard oral argument, and, at the Evidentiary Hearing, I took testimony, heard oral argument, and reviewed evidence pertaining to this matter.  Being otherwise duly advised, I hereby **GRANT** the Motion to Remove for reasons set forth herein.

I.    BACKGROUND

In 2004, the Securities and Exchange Commission commenced an enforcement action against Mutual Benefits Corporation and other Defendants for fraudulently selling fractional viaticated investment interests in life insurance policies.  (DE 1).  *See also SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 738 (11th Cir. 2005).[1]  The entities involved were put into receivership, and Roberto Martinez was appointed as receiver (the "Receiver").  (DE 26).  The Receiver reported in June 2009, that pursuant to Court approval, investors in the life insurance policies had voted to either: a) sell the policy; or b) retain the policy ("Keep Policies").[2]  (DE 2291 at 3).  The Receiver

---

[1]

   A viatical settlement is a transaction in which a terminally ill insured sells the benefits of his life insurance policy to a third party in return for a lump-sum cash payment equal to a percentage of the policy's face value. The purchaser of the viatical settlement realizes a profit if, when the insured dies, the policy benefits paid are greater than the purchase price, adjusted for time value. Thus, in purchasing a viatical settlement, it is of paramount importance that an accurate determination be made of the insured's expected date of death. If the insured lives longer than expected, the purchaser of the policy will realize a reduced return, or may lose money on the investment.

*Id.*

[2] Approximately 3,138 policies with a face value of $383,580,782 (or 27% of the total) were designated to be sold, and approximately 3,037 policies with a face value of approximately $1,054,421,049 (or 73% of the total) were designated to be retained by investors (the Keep Policies).  *Id.*  At the Status Conference, Litai reported that there are 1,333 total policies still held by the Trust, of which there are 192 policies 100% owned by a non-Acheron investor.  (DE 2693 at 68:11-14).  The parties agreed at the Status Conference that there are 280 policies where Acheron has a 100% interest.  *Id.* at 68:19-69:1. Furthermore, Litai reported that Acheron has an interest in 1,068 policies, including the 280 that it 100% owns.  *Id.* at 68:15-16.  Accordingly,

also requested, and the Court approved, the creation of a trust to "provide for the continued maintenance and processing of the Keep Policies in accordance with the directives of this Court." (DE 2291 at 5-6, 8; DE 2322).   Thus, on September 25, 2009, the Receiver and the Trustee executed the Mutual Benefits "Keep Policy" Trust Agreement (the "Trust Agreement").   (DE 2540 at 2; DE 2540-1).   The Trust Agreement is between the Receiver and the Receivership Entities as settlor, and the Trustee.   (DE 2540-1 at 1).   Section 7 of the Trust Agreement establishes that the Trust Agreement is governed by Florida law:

> Section 7.1 Governing Law.   This Trust Agreement shall be governed by and construed and enforced in accordance with the Laws of the State of Florida, without regard to any choice-of-law rules thereof which might apply the Laws of any other jurisdiction.

Id. at § 7.1.[3]   Section 3 of the Trust Agreement confers broad powers on the Trustee to administer the Trust and states in relevant part:

> Section 3.1(a) Powers & Duties.   Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Trust, including, without limitation, each power expressly granted in this Section 3.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Florida.

---

following is a breakdown of the Trust's policies by ownership type: (1) 280 policies 100% Acheron-owned; (2) 788 policies in which Acheron holds a fractional interest; (3) 192 policies 100% owned by a non-Acheron investor; and (4) 73 policies with fractional interests owned entirely by non-Acheron investors.   There are approximately 3,900 total policy interests being maintained by the Trust with a face value of approximately $270 million of which $179.5 million or nearly 67% belong to Acheron (DE 2676-1 at 7).   According to the Trustee, of the approximately 3,900 total policy interests, the Trust is servicing 2,310 interests for victims of the original fraud. Id.

[3] The Trust is thus governed by the provisions of The Florida Trust Code.   See Demircan v. Mikhaylov, No. 3D18-1684, 2020 WL 2550067, at *4 (Fla. 3rd DCA May 20, 2020) (stating that The Florida Trust Code was first enacted in 2007 and applies to "all judicial proceedings concerning trusts commenced on or after July 1, 2007"); see also Fla. Stat. § 736.0102 (stating that "[t]his chapter may be cited as 'The Florida Trust Code'").

(b) Without limiting the generality of the Section 3.1(a) above, the Trustee shall have the following powers and duties:

    (i)    To receive and hold the Trust Assets, subject to the terms of this Trust Agreement;

    (ii)    To hold the status of owner and "nominal beneficiary" with respect to all Keep Policies, as is presently held by the Receiver pursuant to the Policy Administration Orders, and to hold and execute, in his discretion, all of the rights, powers and privileges of the Receiver under the Policy Administration Orders.

*Id.* at § 3.1.

Concomitant with the formation of the Trust and with Court approval, the Receiver executed a sale of the receivership entity servicing the Keep Policies to Litai. (DE 2340; DE 2367). Ultimately, the Trustee and Litai entered into a servicing agreement effective September 25, 2009 (DE 2266-3; DE 2491; DE 2627 at 2, n. 1) that has since been renewed (DE 2500-1; DE 2626-1) to extend servicing through December 31, 2020 (collectively, the "Servicing Agreement").[4]

On March 19, 2015, the Trustee made an agreement (the "March 2015 Agreement") with Acheron.[5]  (DE 2500-2).  The March 2015 Agreement resulted from extensive negotiations

---

[4] The Servicing Agreement defines an "Overpayment Balance," which is an amount that had accumulated from the Receiver's billing of the Keep Policy Investors ("KPIs") in accordance with Court Order and which was transferred to the Trustee upon creation of the Trust.  *See* DE 2266-3 at § 2.  The Overpayment Balance pays for the operations of the Trust, including the costs of the Trustee. (DE 2266-3 at § 13).  The Overpayment Balance also subsidizes the KPIs' Administrative Fees.  (DE 2266-3 at § 12.1.7).  Sales of defaulted fractional interests in Keep Policies replenish the Overpayment Balance.  (DE 2266-3 at § 12.1.8).

[5] The March 2015 Agreement acknowledges the dispute between Acheron and the Trustee as to whether Acheron is a beneficiary of the Trust, and states in relevant part:

WHEREAS, as a purchaser of fractional interests in Keep Policies, Acheron asserts that it has acquired all right, title and interest of the Keep Policy Investors in such policies, and therefore, stands in the shoes of the Keep Policy Investors with respect to such fractional interests, and therefore, is entitled to all of the same rights and benefits as the Keep Policy Investors under the Trust, the Servicing Agreement, the Renewal Agreement, and any further extension of the Servicing Agreement or new servicing agreement, an assertion with which the Trustee does not necessarily agree

4

between Acheron and the Trustee and was intended to resolve Acheron's concerns as a buyer of defaulting policy interests held by the Trust.[6]  (DE 2500 at 4, 9).  Section 2 of the March 2015 Agreement, for example, grants Acheron rights to share fairly and equitably in "distributions, rebates, benefits, credits, Overpayment Balance distribution or other consideration" that is provided to other holders of interests in Keep Policies.  (DE 2500-2 at § 2).  Disagreements between the Trustee and Acheron have nonetheless continued, which prompted Acheron's filing of a separate lawsuit against the Trustee.  *See Acheron Portfolio Trust, et al., v. Barry Mukamal, as Trustee of the Mutual Benefits Keep Policy Trust*, Case No. 18-25099-CIV-MORENO initiated December 5, 2018 (the "Acheron Litigation").

The Trustee's Motion to Remove requests the Court to authorize and direct the removal of 100% Acheron-owned policies[7] from the Trust and to authorize the Trustee to remove such policies in the future.  (DE 2591 at 1, 4-5).  The parties' dispute as to such removal has centered on passive language that is found in Section 6 of the March 2015 Agreement, which states:

> 6.  Removal of Policies From Trust.  To the extent not already permitted, any policy as to which Acheron has acquired 100% of the interests *may be removed* from the Trust.  The Trustee, at Acheron's expense, shall provide such assistance to Acheron

---

and as to which the Trustee reserves all rights including the right to contest these assertions, subject to the terms and conditions set forth in this Agreement.

(DE 2500-2 at 2).

[6] "[W]hen investors in [the life insurance policies held by the Trust] do not pay their *pro rata* share of the premium obligations associated with their interest, the policy is at risk of lapse."  (DE 2500 at 4).  Acheron's purchase of such interest and payment of the premium obligations avoids the lapse of the policy and kept the non-defaulting investors from losing their interests in the policy. *Id.*

[7] Acheron objects to the characterization of the policies as 100% owned by Acheron and notes that the policies are actually owned by the Trust and/or Trustee; further Acheron reports that the Trust or the Trustee is also the named beneficiary.  (DE 2727 at 2).  Nonetheless, for clarity, I will continue to refer to the policies at issue as 100% Acheron-owned policies because Acheron has purchased 100% of the beneficial interests in these policies.

as is reasonably required to transfer ownership of the policy to Acheron.  Upon
written notice to the Trustee that such transfer has been effectuated and that
Acheron has engaged a replacement servicer, Acheron will no longer be obligated
to utilize the services of Servicer to service said policy or to pay the servicing fees
associated therewith.

(the "Removal Provision") (DE 2500-2 at § 6) (emphasis added).  Because of the passive language,

the provision does not explicitly state who can do the removing.

Nevertheless, "[i]n accordance with [the Removal Provision], on January 24, 2020, the

Trustee gave direction to the servicer, [Litai], to take the steps necessary to remove all 100%

Acheron Owned Policies from the Trust."   (DE 2591 at 3).   Acheron then attempted to

countermand the Trustee's directive by requesting Litai not to remove the policies until Acheron

issued instructions to do so.  (DE 2591 at 3; DE 2602 at 5).  Although the Trustee's argument has

evolved to include that the Trustee has always had the right to remove 100% owned policies that

were purchased by a third-party such as Acheron (DE 2728 at n. 4), what remains at issue is

whether the Removal Provision vests sole authority in Acheron to remove the policies or whether

the provision permits or preserves a unilateral ability on the part of the Trustee to remove them.

II.      LEGAL STANDARDS

Under Florida law, the interpretation of a contract is governed by the parties' intent.  *Royal*

*Oak Landing Homeowner's Ass'n, Inc. v. Pelletier*, 620 So. 2d 786, 788 (Fla. 4th DCA 1993).

"The intent of the parties is derived from the language of the contract when such language is

without ambiguity."  *Royal Cont'l Hotels, Inc. v. Broward Vending, Inc.*, 404 So. 2d 782, 783–84

(Fla. 4th DCA 1981).  "The language being [thus] construed should be read in common with other

provisions of the contract."  *Royal Oak Landing Homeowner's Ass'n, Inc.*, 620 So. 2d at 788.

Furthermore, courts may look to the parties' post-agreement conduct to discern intent.  *Hirsch v.*

*Jupiter Golf Club LLC*, 232 F. Supp. 3d 1243, 1252–53 (S.D. Fla. 2017).  If a contract is clear and

unambiguous, parol evidence is inadmissible to vary or contradict it.  *Vencor Hosps. S., Inc. v. Blue Cross & Blue Shield of Rhode Island*, 86 F. Supp. 2d 1155, 1160 (S.D. Fla. 2000), *aff'd sub nom. Vencor Hosps. v. Blue Cross Blue Shield of Rhode Island*, 284 F.3d 1174 (11th Cir. 2002) (citing *J.M. Montgomery Roofing Co. v. Fred Howland, Inc.*, 98 So.2d 484, 485–86 (Fla.1957)).

If a written contract is ambiguous, a court must first determine the character of the ambiguity before deciding whether to admit parol evidence to explain the ambiguity.  *See MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 720 F.3d 833, 844 (11th Cir. 2013), *certified question answered*, 143 So. 3d 881 (Fla. 2014) (citations omitted).  "A patent ambiguity arises from defective, obscure, or insensible language, and Florida law does not permit the introduction of extrinsic evidence to discern the parties' intentions." *Id.* (citation omitted).  Allowing parol evidence to construe a patent ambiguity would necessarily involve a court impermissibly rewriting the contract.  *Emergency Assocs. of Tampa, P.A. v. Sassano*, 664 So. 2d 1000, 1002 (Fla. 2d DCA 1995).  "A latent ambiguity [exists] where a contract fails to specify the rights or duties of the parties in certain situations and extrinsic evidence is [thus] necessary for interpretation . . . between two possible meanings."  *MDS (Canada) Inc.*, 720 F.3d at 844 (citation omitted).  When the ambiguity is both latent and patent, Florida courts recognize an "intermediate ambiguity," and "extrinsic evidence is permitted to clarify the parties' intentions."  *Id.*  If a contract term remains ambiguous after the application of all the rules of construction, and the intent of the parties remains inconclusive following the admission of parol evidence, then the ambiguous term is construed against the drafter as a last resort because that party had the opportunity to draft language that would avoid the dispute.  *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1247-48 (11th Cir. 2002).

III.        DISCUSSION

Here, the language at issue, while not defective, obscure, or insensible, fails to explicitly

denote the rights or duties of the parties when they are not in agreement regarding removal of the

policies.  Finding that, alone or in combination, other provisions of the March 2015 Agreement

and the parties' course of performance do not clarify the parties' intent sufficiently to overcome

the Removal Provision's use of passive voice, I conclude that a latent ambiguity exists and that

extrinsic evidence should be considered to construe it.  Indeed, I find that there are four potential

ways to interpret "may be removed" in the Removal Provision as it applies to the 100% Acheron-

owned policies:

1.    It confirms that the parties, when in agreement, can remove the 100%
      Acheron-owned policies; otherwise, the policies remain in the Trust.

2.    It provides Acheron the sole unilateral right to remove, or not remove, the
      100% Acheron-owned policies;

3.    It provides the Trustee the sole unilateral right to remove, or not remove,
      the 100% Acheron-owned policies, or it confirms the Trustee's pre-existing
      right to do so;

4.    It provides both parties a right to unilaterally remove the 100% Acheron-
      owned policies, or it confirms Acheron's right while also preserving the
      Trustee's pre-existing right to do so;

I consider each of these possible interpretations in turn:

A.        Whether the Parties May Only Remove When in Agreement

Neither party argues that the March 2015 Agreement requires the Trustee and Acheron to

agree regarding removal in order to remove policies from the Trust.  The plain language, however,

when taken in the context of the agreement, is consistent with interpretation number one – that the

parties may agree to remove the 100% Acheron-owned policies and then effect their removal in

accordance with section 6 of the March 2015 Agreement at Acheron's expense and with assistance

8

from the Trustee.  Such interpretation is also consistent with the March 2015 Agreement's purpose in putting Acheron on equal footing with non-Acheron investors in many respects while establishing a unique relationship between Acheron and the Trust in other respects (such as giving Acheron rights to participate in negotiation of future servicing agreements).  (DE 2500-2 at 2, § 3; DE 2729 at 24:22-29:16).  Nevertheless, the plain language and purpose of the agreement do not compel this interpretation, and, as discussed below, based on the testimony provided at the Evidentiary Hearing, it is clear that neither party intended the Removal Provision to allow removal only if both parties agreed.  Therefore, I reject this interpretation of the Removal Provision.

B.     Whether Acheron Soley has a Unilateral Right to Remove or Not Remove

Acheron advances several arguments for interpretation number two.  First, Acheron argues that the intent to allow only Acheron to remove policies may be inferred from the language in the Removal Provision itself because "[t]he Trustee is reacting to actions taken by Acheron," and "[t]he only role of the Trustee . . . is to provide Acheron with 'reasonable assistance.'"  (DE 2693 at 117:4-8; DE 2602 at 6).   Acheron furthered this argument in its brief following the Evidentiary Hearing by explaining that the language requires the Trustee to cooperate to procure the transfer of policies at Acheron's expense, the language does not provide for Acheron to cooperate with the Trustee, and cooperation is necessary to complete the transfer instructions required by the insurance companies.  (DE 2727 at ¶ 16; DE 2729 at 62:19-23; 137:23-138-2).

Acheron's argument that the active role of Acheron and passive role of the Trustee in the text of the Removal Provision, combined with the assertion that both parties must act to accomplish removal, shows that Acheron is the sole party who may initiate removal is unavailing.  As an initial matter, the language on which Acheron relies does little to imply that Acheron must be the party initiating the removal.  That language only indicates that "[t]he Trustee, at Acheron's expense,

shall provide such assistance to Acheron as is reasonably required to transfer ownership of the policy to Acheron." This language is just as consistent with the Trustee initiating the removal – ensuring that the Trustee will assist Acheron with the administrative matters necessary to fully effectuate the transfer of ownership of the policies for which Acheron has paid. While one could read this language as consistent with Acheron's counsel's expressed desire in proposing the Removal Provision – to ensure that Acheron could remove policies from the Trust (DE 2729 at 128:21-129:6) – this language does not address whether the Trustee may remove policies or whether Acheron may insist that those policies remain in the Trust. Construing the language to restrict the Trustee potentially conflicts with the Removal Provision's passive language in the absence of evidence to indicate intent to restrict the Trustee.

Additionally, Acheron's argument, that both parties must sign forms that the insurance companies require in order to transfer ownership of the policies, does not support interpretation number two just because the Removal Provision requires the Trustee to assist with facilitating the transfer. If anything, any implied requirement for the Trustee to assist as it pertains to insurance forms appears to be an acknowledgment of the Trustee's greater power to solely determine whether or not Acheron's 100% owned policies "may be removed" by either party. Furthermore, testimony regarding insurance company requirements for transferring the ownership of policies is not dispositive regarding how the parties may accomplish policy removal. As the history of the case reveals, the Court may, and did, issue orders instructing insurance companies to transfer ownership of policies. *See e.g.*, DE 1835; DE 1837; DE 1867; DE 1887; DE 2134; DE 2142; DE 2340; DE 2367 at ¶¶14-15. Furthermore, nothing in the March 2015 Agreement prohibits the Court from ordering insurance companies to transfer ownership in the future. Moreover, the Trustee testified that, relative to effectuating a transfer of ownership with insurance companies, he "didn't need

[Acheron's] cooperation in order to remove a policy from the Trust."  (DE 2729 at 169:3-4). Accordingly, I find Acheron's argument in this regard to lack merit.

Second, Acheron argues that other provisions of the Agreement, when read together with the Removal Provision, establish that interpretation number two is the correct interpretation because these other provisions confer benefits upon Acheron based upon its ownership of policies and policy interests held by the Trust.  (DE 2602 at 6-8).  Section 2 of the agreement, for example, requires that the Trustee allocate benefits to Acheron, to the same extent as non-Acheron investors, based upon relative face value or number of fractional interests or policies held.  (DE 2602 at 6, DE 2500-2 at § 2).  Also, section 7 of the agreement gives Acheron additional rights when it achieves certain levels of ownership as measured by Acheron's percentage ownership in the face value of the policies held by the Trust.  (DE 2602 at 7-8; DE 2500-2 at § 7).  Thus, says Acheron, because the Trustee's removal of the subject policies would disadvantage Acheron under the terms of the March 2015 Agreement by reducing Acheron's entitlement to distributions or credits, interpreting the Removal Provision to allow such removal would conflict with §2.  Similarly, such an interpretation would conflict with §7 by interfering with Acheron's additional rights through the dilution of its ownership in the face value of Keep Policies held in the Trust.  (DE 2602 at 10). *See also* DE 2693 at 114:1-9 (asserting, during the Status Conference, that Acheron has not removed policies since the March 2015 Agreement due to rights that are triggered by maintaining specified ownership levels).  Acheron therefore insists that it would be counterintuitive and inconsistent for the March 2015 Agreement to contain provisions granting Acheron rights based on their level of ownership interests while also granting the Trustee (through the Removal Provision) the power to dilute those rights by unilaterally reducing Acheron's level of ownership interests.  Moreover, Acheron argues that unilateral removal of the 100% Acheron-owned policies

11

by the Trustee would violate the March 2015 Agreement by discriminating against Acheron and treating Acheron differently than non-Acheron investors.[8]  (DE 2602 at 9; DE 2693 at 115:1-2).

The March 2015 Agreement's conferral of benefits upon Acheron based upon its percentage of ownership of policies held by the Trust fails to support the interpretation that the Removal Provision empowers only Acheron to remove its 100% owned policies.  Acheron's argument makes intuitive sense – why would Acheron negotiate for benefits tied to the extent of their ownership interest yet agree to empower the Trustee to unilaterally reduce that ownership interest?  However, there is no evidence that the Removal Provision is tied to other agreement provisions that give Acheron concessions or rights to be treated the same as other investors.  To the contrary, the evidence indicates that these provisions were negotiated independently and that Acheron has only belatedly discovered their interaction.  Mr. Schreckinger testified that there was limited discussion regarding the removal of policies from the Trust, and that the negotiations pertaining to the Removal Provision were independent of negotiations pertaining to treating Acheron "equally with the ke[ep] policy investors."  (DE 2729 at 149:10-151:14).  Furthermore, the exhibits presented at the Evidentiary Hearing confirm that the provisions tying benefits to ownership were proposed later than – and independent of – the Removal Provision.  *See* DE 2713-4 (email dated January 30, 2015 from Mr. Schreckinger to Trustee's counsel attaching an initial red-lined draft of the March 2015 Agreement reflecting Mr. Schreckinger's insertion of what

---

[8] Acheron requests, in the event that the Court grants the Trustee's Motion to Remove, that the Court's Order preserve Acheron's rights under the March 2015 Agreement, including requiring the Trustee to count any Keep Policies that he involuntarily removes as still owned by the Trust for all purposes when determining Acheron's rights and entitlements under the Agreement. (DE 2602 at n. 19).  Acheron provides no explanation for why, and under what authority, the Court should take such action.  Further, as stated *infra*, I do not find that the Trustee's removal of the subject policies pursuant to the Removal Provision invokes other provisions of the March 2015 Agreement; therefore, I decline to recommend that the Court accommodate this request.

became the Removal Provision and reflecting the absence of language tying rights to Acheron's ownership interests).  The independent negotiation of the Removal Provision aligns with the apparent motivation of Acheron to simply ensure that it could continue to remove policies.  The fact that Acheron later realized the benefit in keeping policies in the Trust, rather than removing them, does not establish an intent to prohibit the Trustee from removing policies.  Therefore, I do not find merit in Acheron's argument that other provisions of the March 2015 Agreement demonstrate that the parties intended the Removal Provision's passive language to give Acheron the exclusive ability to remove policies.

Similarly, Acheron's argument that the Trustee's unilateral removal of the 100% Acheron-owned policies would discriminate against Acheron in violation of the March 2015 Agreement fails to demonstrate that the Removal Provision gives Acheron the exclusive right to remove policies.  While the March 2015 Agreement generally seeks to put Acheron on equal footing with non-Acheron investors, this general aim does not preclude more specific terms of the Agreement from establishing ways in which Acheron would be treated differently.  It is clear from the fifth "Whereas" paragraph on the first page of the Agreement (and much of the litigation that has followed) that the Agreement was precipitated by the parties' dispute about the extent to which Acheron should be treated equally to other investors in policies held by the Trust but also that it did not purport to fully resolve that dispute in all respects.

Although certain terms of the March 2015 Agreement do prevent the Trustee from treating Acheron differently than non-Acheron investors (specifically ¶ 2), other provisions clearly treat Acheron differently than other investors.  Indeed, many provisions of the Agreement give Acheron special rights (like the right to participate in negotiations of servicing agreements) that are not available to non-Acheron investors.  While Acheron may view the Agreement as giving them "at

least equal rights" whereby they would only be treated differently from other investors when that meant treating them better than other investors, the Agreement clearly contemplates that there are reasons for treating them distinctly from other investors in some respects.  The Removal Provision itself is one such provision, giving Acheron an ability to remove its 100% owned policies that is not guaranteed to non-Acheron investors.  As discussed below, the Trustee provides a reasonable explanation for treating Acheron differently in this respect from other investors, who were victims of the fraud and lack Acheron's sophistication and resources as a third-party institutional buyer of defaulted interests.  (DE 2611 at 3).[9]  In fact, the Removal Provision's introductory phrase – "To the extent not already permitted" – suggests that the provision was clarifying and cementing a way in which the parties already believed Acheron was different.  The parties having recognized, by agreeing to the Removal Provision, that there is a good reason to treat Acheron distinctly from other investors on this score, it is logical to construe the powers conferred or clarified by the Removal Provision as exempted from the Agreement's more general terms of non-discrimination.

Additionally, as described above, the Removal Provision was negotiated independently from other provisions of March 2015 Agreement.  Therefore, it seems quite plausible that the powers established or clarified in the Removal Provision were separately considered and were either an exception to, or not beholden to, the more general spirit of non-discrimination described elsewhere in the agreement.   Thus, I find that the Trustee's removal of policies pursuant to the

---

[9] The Trustee invites the Court to provide input as to whether non-Acheron investors should be permitted to remove 100% owned policies from the Trust and to describe what circumstances would warrant such removal. (DE 2611 at 3).  Litai's response, comparatively, seeks clarification from the Court as to whether a non-Acheron investor will be granted the same opportunity to remove its 100% owned policy from the Trust.  (DE 2605 at 2).  I decline to opine as to any individual circumstances that are not properly before the Court, but I also deem the parties' actions to this point to be appropriate as to non-Acheron investors.  Therefore, the interpretation of the Removal Provision at issue should not change the parties' past practices relative to non-Acheron investors.

Removal Provision does not implicate Acheron's rights to be treated "equally with the ke[ep] policy investors." Along with the fact that the passive language allows for a broader interpretation than what Acheron advocates for, I therefore conclude that Acheron fails to establish that potential discrimination makes interpretation number two an imperative.

Third, Acheron asserts that the Removal Provision "merely confirms the past practice of the parties whereby Acheron, at its own expense, could remove 100% Acheron Policies from the Trust." (DE 2602 at 4-6). Further, the past practice of only Acheron removing the policies was confirmed by the Trustee not objecting to the Trust maintaining 100% Acheron Policies after execution of the March 2015 Agreement. (DE 2602 at 4; DE 2727 at 4; DE 2729 at 187:17-188:5, 189:13-14). Acheron contends that the Removal Provision was intended to ensure its continued ability, at its option, to remove policies, in accordance with the parties' past practice, because Acheron became aware that the Trustee had refused to allow removal of other investors' 100% owned policies. (DE 2602 at 4; DE 2693 at 108:19-117:23; DE 2729 at 19:13-16). At the Status Conference, Acheron argued that the parties' past practice explains the Removal Provision's introductory language: "To the extent not already permitted." (DE 2693 at 116:17-21; 117:21-23). In fact, it is undisputed that prior to January 24, 2020: 1) Acheron had always been able to remove policies when it wanted; 2) the Trustee never insisted upon Acheron removing a policy; and 3) after the March 2015 Agreement, Acheron decided not to remove policies, and (until January 2020) the Trustee did not object. (DE 2729 at 37:17-38-6; 41:22-42:20; 43:5-44-4; 49:10-14; 187:22-188:5; 189:13-14; DE 2602 at 4). Therefore, Acheron argues that the parties' past conduct both before and after the March 2015 Agreement establishes that the Removal Provision was purely intended to give Acheron alone the power to remove its 100% owned policies. (DE 2602 at 2-5).

Acheron's argument regarding past practices is unavailing.  From the testimony presented at the Evidentiary Hearing, it is clear: (1) that prior to the March 2015 Agreement, Acheron had removed 100% owned policies without issue (DE 2729 at 53:16-54:5);  (2) that Acheron's goal in proposing the Removal Provision was to ensure that it would continue to be able to do so (DE 2729 at 117:6-11; 117:23-118:10; 122:2-7; 128:22-129:6); and (3) that Acheron left policies in the Trust after the March 2015 Agreement without objection from the Trustee (DE 2729 at 49:10-14). But neither the parties' conduct prior to the March 2015 Agreement, the Trustee's acquiescence in maintaining the 100% Acheron policies after the March 2015 Agreement, nor the testimony about the course of negotiations over that Agreement, establish that the Trustee lacked the ability to remove Acheron's 100% owned policies or that Acheron sought to preclude the Trustee from forcing such removal.

While it is undisputed that the Trustee did not direct removal of Acheron's 100% owned policies prior to January 24, 2020 (DE 2729 at 42:1-20), the Trustee testified that he did not have reason to remove them prior to this time.  (DE 2729 at 42:22; 43:16-17).  Prior to the March 2015 Agreement, Acheron routinely removed the policies.  (DE 2728 at 5; DE 2729 at 37:10-38:6; 53:16-54:5; 92:5-93:21).  Furthermore, the Trustee testified that it was standard in the industry for a third-party purchaser of an entire policy to take it over as the owner and administer it themselves. (DE 2729 at 54:12-15).  Thus, the Trustee did not even have cause to think about exercising his own power to remove prior to the March 2015 Agreement because there was no need.  (DE 2729 at 53:21-54:19).

After the March 2015 Agreement, the Trustee exercised his business judgment in deciding to remove the subject policies only after the severe deterioration of the relationship with Acheron. (DE 2729 at 44:1-45:9).  In fact, the Trustee testified that, as of January 2020, he determined that

he had "ceased having a good working relationship with Acheron."  (DE 2729 at 43:18-23).
Although Acheron sued the Trustee in 2018, the Trustee was still hoping then to resolve their
differences (DE 2729 at 44:24-45:4), and it was reasonable for him to believe that unilaterally
causing the removal of Acheron's 100%-owned policies would only exacerbate the deterioration
of the parties' relationship (as evidenced by the parties' increasingly litigious relationship since
January 2020).  In January 2020, it became obvious to the Trustee that he would be unable to
"come to an agreement which balanced the interests of the Trust with [Acheron's] interests."  (DE
2729 at 44:17-21).  Further, the Trustee avowed that, given there are no economic benefits,
procedural benefits, or operational benefits to the Trust for maintaining the subject policies in the
Trust, he concluded in January 2020 that the Trust should not continue carrying the burden and
liability of administering the 100% Acheron-owned policies.  (DE 2729 at 44:22-43:22; 56:13-
57:22).  Given the Trustee's explanation, I do not find that the Trustee's acquiescence in
maintaining the policies in the Trust following the March 2015 Agreement establishes that the
parties intended the Agreement to give only Acheron the ability to remove the 100% Acheron-
owned policies.  Indeed, the Trustee's decision not to remove the 100% Acheron-owned policies
between March 2015 and January 2020 does not imply that the Removal Provision gave him no
option to do so any more than Acheron's decision not to remove those same policies during the
same time period (contrary to their pre-agreement practice) implies that the Removal Provision
gave it no option to do so.

Furthermore, the evidence regarding the negotiations over the Removal Provision indicates
that there were no discussions about prohibiting the Trustee from removing 100% Acheron-owned
policies from the Trust.  Rather, Acheron's focus was on ensuring that it could take its 100%-
owned policies out, not on ensuring that it could keep those policies in.  Acheron's counsel, Mr.

Schreckinger, confirmed that there were no discussions regarding the Trustee being restricted from removing these policies during the negotiations of the March 2015 Agreement and explained the circumstances that led him to draft the initial version of the Removal Provision.  (DE 2729 at 124:10-132:15; 142:20-143-15; 145:1-149-8).  In particular, Mr. Schreckinger testified that, at a joint meeting between the parties and their counsel, the provision was discussed:

> Mr. Schreckinger:  [W]e had actually discussed the hundred percent provision at the February 3rd [2015] meeting, and we discussed – we discussed Acheron's right to remove policies and the Trustee had agreed to that, and we asked for the right to be able to control the cash in the policies while they remained in the Trust, and the Trustee's response was while the policies remained in the Trust, he had a fiduciary duty to control the cash and make the decisions. . . . [H]e said, look, you can remove the policies if you don't like what I'm doing with them. . . .
>
> Ms. Soto:  And did the Trustee tell you if you don't, I want the same right to take out the policies?
>
> Mr. Schreckinger:  That was never discussed, no.

(DE 2720 at 131:17-132:13).  Although no other representative for Acheron testified at the Evidentiary Hearing, Mr. Schreckinger stated that he drafted what became the Removal Provision after the Trustee's counsel told him that, while Acheron's policy removals had been accommodated in the past, "the Trust wasn't structured to permit an investor to remove the one hundred percent owned policy."  (DE 2729 at 128:22-129:6).

        In fact, the Trustee confirmed at the Evidentiary Hearing that "the Trust was not designed for ke[ep] policy investors to be able to trade in or sell their interests independently." (DE 2729 at 39:20-21).  As the Trustee explained, these investors are "not in a position to obtain their own servicing," and investors could potentially violate laws protecting the privacy of insureds by making direct contact with them.  (DE 2729 at 39:24-40:7).  Also, because the Trust was created for the benefit of the original victims of the fraud, the Trustee does not believe he could unilaterally remove policies from the Trust that such investors 100% own.  (DE 2729 at 40:17-41:2).  However,

as previously discussed, the Trustee views a third-party purchaser, such as Acheron, as being different from these other investors because "Acheron wasn't a victim of the fraud" and is a sophisticated investor that has maintained a contract with Litai for servicing other policies not held by the Trust. (DE 2729 at 41:3-14). Therefore, the Trustee has not believed that the same restrictions – either against a non-Acheron investor removing their 100%-owned policies or against the Trustee removing a non-Acheron investor's 100% owned policies – apply with regards to Acheron. Moreover, the Trustee testified that he would expect a third-party purchase of a whole policy such as Acheron "to take the policy with them out of the Trust." (DE 2729 at 41:19-21). Accordingly, it is clear that both parties approached negotiations over the Removal Provision intending to cement their pre-existing understanding of how Acheron should be treated differently from other non-Acheron investors regarding the removal of 100%-owned policies.

According to the Trustee, the focus of the negotiations with respect to the March 2015 Agreement was Acheron's concerns about policy management and fees after the Trustee had executed a renewal servicing agreement that limited administrative fee subsidies to original victims of the fraud, which excluded Acheron. (DE 2729 at 26:18-28:16). In this context, the Trustee stated that he was not concerned with Acheron's inclusion of language that ultimately became the Removal Provision because the language was consistent with his understanding "that either party could remove a hundred percent owned [Acheron policy] from the Trust." (DE 2729 at 32:1-34:5). Furthermore, the Trustee confirmed that there were never any discussions during the negotiations of the March 2015 Agreement that the Trustee would be restricted from removing policies from the Trust. (DE 2729 at 34:6-9).

From all of the evidence presented, it appears that the context of the negotiations for the Removal Provision was Acheron seeking to confirm its right to remove its 100% owned policies.

The Removal Provision's introductory language – "To the extent not already permitted" – is consistent with this finding but is also consistent with clarifying the Trustee's belief that Acheron was (and should be) different from other investors whose policies could not be removed.  As Mr. Schreckinger testified, his focus in proposing the Removal Provision on Acheron's behalf was to confirm its right to remove policies.  But there is no evidence that Mr. Schreckinger or anyone else on Acheron's behalf sought a right to remain in the Trust or expressed an intent to restrict the Trustee from removing Acheron's policies from the Trust.  The evidence indicates that Acheron, at best, did not contemplate the Trustee's right to remove the policies at the time the parties negotiated the Removal Provision.  (DE 2729 at 151:21-152-16).  The testimony confirms that the parties did not even discuss the Trustee's right or ability to remove.  But, as the Trustee testified, the passive language in the Removal Provision was acceptable to him because it did not restrict rights to remove that he believed he had.

Therefore, I do not find the parties' intent with respect to the Removal Provision to be consistent with interpretation number two.  While Acheron establishes that the provision addressed its desire to preserve an ongoing ability to remove its 100% owned policies from the Trust, Acheron fails to explain why the provision's passive language would give only Acheron the right to remove these policies.  Nor does Acheron present any evidence of an intent to ensure that it could keep its 100% owned policies in the Trust.  To the contrary, the Trustee testified that he did not intend that the provision should so restrict him.  Therefore, I do not find that the evidence supports the interpretation that Acheron, solely, has the right to remove policies from the Trust.

C.    Whether the Trustee Solely has a Unilateral Right to Remove or Not Remove

Although the Trustee's counsel made an argument for interpretation number three at the Status Conference (DE 2693 at 96:12-98:24), such interpretation is not supported by the record.

20

As described below, the most natural reading of the passive language is that both parties could initiate removal. And, as previously discussed, the testimony and other evidence establishes that Acheron sought the ability to remove their 100% owned policies in response to an express concern. The testimony and other evidence also clearly demonstrate that the Trustee knew this was Acheron's purpose in proposing the Removal Provision and that the Trustee agreed to accommodate Acheron's continued ability to remove its policies from the Trust. Accordingly, the Trustee's argument as to interpretation number three is without merit.

      D.    <u>Whether Both Parties Enjoy a Unilateral Right to Remove</u>

In his reply, the Trustee argues that section 6 of March 2015 Agreement permits either Acheron or the Trustee to remove the 100% Acheron-owned policies from the Trust. (DE 2611 at 1). The Trustee's argument, however, as previously stated, has evolved. At the Evidentiary Hearing, and now in his post-hearing brief, the Trustee asserted that he always had the unilateral right to remove policies purchased by a third-party purchaser such as Acheron. (DE 2728 at n. 4). Therefore, the Trustee contends that it was unnecessary for the March 2015 Agreement to bestow upon the Trustee a right to remove the 100% Acheron-owned policies. *Id.* Rather, according to the Trustee, consistent with interpretation number four, the provision confirmed the Trustee's pre-existing right to remove just as it confirmed Acheron's pre-existing right to remove.[10] *Id.*

---

[10] Interpreting the Removal Provision as confirming the Trustee's pre-existing right to remove creates a potential issue: if the Court later determines that Acheron is a Keep Policy Investor and beneficiary of the Trust, the Trustee's belief that he had a pre-existing right to remove may be proven wrong. (DE 2693 at 106:3-107:14). Indeed, such a determination could also indicate that Acheron did not have a pre-existing right to remove. However, I find that the ultimate determination as to whether Acheron is a beneficiary or Keep Policy Investor is superseded by the March 2015 Agreement as to removal of the 100% Acheron-owned policies from the Trust. Indeed, the March 2015 Agreement controls and what matters is the parties' intent in making that Agreement. Therefore, leaving aside the Trustee's assertions as to a pre-existing right and without finding that such a right existed, I proceed in the analysis by discussing the parties' intent relative to the Removal Provision.

Here, as previously explained, the evidence supports that the parties intended the Removal Provision to confirm Acheron's right to continue to remove policies from the Trust. The issue that remains, however, is whether the Removal Provision also gives the Trustee the ability to remove policies from the Trust. I find that it does for the reasons that follow.

One, the language does not expressly confer removal ability only upon Acheron. Rather, I agree with the Trustee's argument that the most natural way to read the passive voice's lack of a particular subject – especially when surrounded by other sentences clearly identifying which of the two parties would be doing what – is that the Provision allows either party to accomplish the contemplated removal. The fact that Acheron is to pay for any costs of removal and notify the Trustee that it has effectuated a transfer with a replacement servicer does not even imply, let alone make clear, an intent to restrict the Trustee from unilaterally removing policies. It simply makes clear that the party that purchased and would continue being the beneficial owner of the policies would bear the cost of assuming that ownership. Likewise, the requirement for the Trustee to cooperate with or assist Acheron in removing policies does not indicate an intent to preclude the Trustee from removing policies. Cooperation would be required regardless of which party unilaterally initiated removal (particularly if taking action unilaterally were symptomatic of acrimonious dealings). Rather, as previously explained, at most, these requirements indicate that Acheron may not have considered the Trustee's power to remove while the Trustee, as he testified, assumed that the language allowed him to remove. What these active-voice sentences in the Removal Provision indicate, however, is that the parties knew how to make clear who does what and when. The fact that the "removing" activity is not specifically assigned to either party makes the natural reading of the Provision inclusive of both parties.

Furthermore, nothing about the verb "remove" or its use in the Removal Provision indicates that it is most naturally associated with one party versus another. As a counter-example, a court found it obvious that an insurance policy's passive voice in describing a "car" as something "*designed for* use mainly on public roads" referred to the design intent of the designing manufacturer and not the intent of the user of the golf cart at issue (emphasis added). *State Farm Mut. Auto. Ins. Co. v. Baldassini*, 909 F. Supp. 2d 1363, 1367–68 (S.D. Fla. 2012), *aff'd*, 545 F. App'x 842 (11th Cir. 2013). Thus, the court there found that a design manufacturer "designs." Here, unlike in *Baldassini*, I cannot narrow the verb (remove) to apply to just one party because it is not a verb that clearly applies to only one party. The word "remove" is equally applicable to someone (like Acheron) leaving a place or situation as it is to someone (like the Trustee) causing or requiring someone else to leave that place or situation. *See remove, v.*, *The Oxford English Dictionary*, http://oed.com/view/Entry/162313 (last visited September 03, 2020) (comparing definition 1 and definition 3). For all these reasons, I conclude that the natural and unstrained reading of the Removal Provision comports with interpretation number four – that either party may remove.

Two, the Trustee testified that he intended for the Removal Provision to permit him to remove policies as well as Acheron and explained that he did not object to the Removal Provision as drafted by Acheron because, as he understood it, it preserved his ability to remove the policies as well as Acheron's. (DE 2729 at 33:23-34:5; 34:10-13; 49:21-22; 54:6-19). I credit the Trustee's testimony as a reasonable explanation for why he did not explicitly discuss his ability to remove under the Removal Provision with Acheron during the negotiations. While it certainly would have been clearer had the Removal Provision explicitly stated that either party could cause the removal of the policies, because the passive voice could naturally and reasonably be read to give (or

preserve) both parties the ability to remove the 100% owned policies, the Trustee would have had little reason to amend the language that Acheron itself had proposed.

Moreover, the Trustee's assumption that Acheron had no right to insist that policies remain in the Trust once Acheron owned 100% of the interests was reasonable because it is consistent with both the purpose of the Trust and the nature of Acheron's acquisitive transactions. As the Trustee argued at the Evidentiary Hearing (and elsewhere), the primary purpose of the Trust is to serve the victims of the Mutual Benefits fraud by providing the centralized coordination and singular titular ownership necessitated by the fractionalized nature of viatical investments. (DE 2729 at 39:20-41:21). If investors did not need a singular entity to serve as the "owner" of the fractionalized policies and a servicer to provide the coordination to ensure that premiums and benefits were paid from and to a multitude of fractionalized owners in proportion to their share, there would be no need for the Trust. Acheron does not need the protection of the Trustee as a fiduciary and does not require the coordination of servicing once it owns 100% of the interests in a given policy. Indeed, but for the provisions in the March 2015 Agreement that depend on the percentage of Acheron's overall ownership interest (which, again, the evidence clearly showed was negotiated independently and after the Removal Provision), there is little apparent reason why Acheron (a sophisticated, third-party investor) would keep its 100% owned policies in the Trust. As Trustee's counsel argued at the Evidentiary Hearing, it is odd to imagine someone purchasing a car but leaving it in the seller's garage. *Id.* at 175:7-12. While the situation here is obviously more complicated, it is logical to assume – based on the nature of Acheron's purchase transactions – that they would simply take ownership of their 100% owned policies, having no need for the protections and mechanics of the Trust. For the same reason, it would have been logical for the Trustee to assume that he could initiate the removal of Acheron's 100% owned interests (even if

he could not do so for non-Acheron investor's, as original victims of the fraud, in similar circumstance).

Three, as I have discussed already, the record evidence indicates that Acheron focused only on securing its right to remove (not on any right to remain) and perhaps did not contemplate the Trustee's right to remove.  Therefore, given that Acheron did not establish an intent contrary to the Trustee's testimony, I find that interpretation number four is consistent – or at least not inconsistent – with the evidence of record and that the parties' intended that both Acheron and the Trustee could remove the Acheron 100% owned policies from the Trust.[11]

Finally, even if the evidence did not otherwise weigh in favor of interpretation number four, Acheron was the primary drafter of the provision and should bear the consequences of the Removal Provision's ambiguous language.  *Arriaga*, 305 F.3d at 1247-48 (citing *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000) (finding that, in a suit between a private utility company and a municipality, where the City's attorney acknowledged drafting the agreement, any ambiguity would be construed against the City)).  Here, Acheron's attorney acknowledged drafting and proposing the Removal Provision with the passive language at issue, which passive language was incorporated into the final agreement.  (DE 2729 at 121:9-124:11; DE 2713-4 at 3).  Therefore, I conclude that Acheron is the drafter of the ambiguous language.  Further, as in *City of Homestead*, any ambiguity remaining after other rules of construction are applied is construed against Acheron under Florida law.  760 So. 2d at 84.  This makes particular sense where, as here, the Trustee's professed interpretation of the passive language comported with his intent and pre-existing belief (that he had, and would continue to have, the right to remove the

_____

[11] Had the Trustee specifically broached its right to remove during the negotiations, perhaps Acheron would have objected.  However, based on the evidence Acheron presented (or, more specifically, did not present) at the Evidentiary Hearing, it is impossible for the Court to know.

100% owned policies), and thus the Trustee had no reason to discuss or propose clarifying the language. In short, the Trustee should not be penalized for failing to correct Acheron's mistake when Acheron's drafted language gave him no reason to believe there was a need for clarification.

Although Acheron cites *Sch. Bd. of Broward County, Fla. v. Great Am. Ins. Co.*, 807 So.2d 750, 752 (Fla. 4th DCA 2002) for the proposition that the construe-against-the-drafter rule does not apply to negotiations between sophisticated parties (DE 2727 at 6), I find that *Arriaga* cites *Sch. Bd. of Broward County, Fla.* simply for the proposition that such rule is a rule of "last resort." 305 F.3d at 1248. In contrast, *Arriaga* cites *City of Homestead* for the general rule and does not limit the rule's application to sophisticated parties. 305 F.3d at 1247-48. As explained above, the plain language of the provision, the plain language of the sentences surrounding the provision, the parties' prior and subsequent course of conduct, and evidence of the course of the negotiations do not fully clarify the Removal Provision. Thus, to the extent the preceding points do not conclusively show that interpretation four is correct, we have arrived at the last resort. Consistent with *Arriaga's* application of the rule, I therefore conclude that the passive language in the Removal Provision should be construed against Acheron to permit the Trustee to remove the policies at issue to the extent that any ambiguity remains.

IV.      <u>CONCLUSION</u>

Accordingly, it is hereby

**ORDERED AND ADJUDGED** that the Trustee's Motion to Remove (DE 2591) is **GRANTED.** The parties shall cooperate to accomplish removal of Acheron's 100% owned policies that are held by the Trust, in conformance with the March 2015 Agreement's Removal Provision, as soon as practicable.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 3rd day of September 2020.


                                    *Jared Strauss*
                                    **Jared M. Strauss**
                                    **United States Magistrate Judge**

Copies furnished to counsel via CM/ECF

27