UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  04-60573-CIV-MORENO/STRAUSS

SECURITIES AND EXCHANGE
COMMISSION,

     Plaintiff,

v.

MUTUAL BENEFITS CORP., *et al.*,

     Defendants.

_____/

## ORDER DENYING ACHERON CAPITAL, LTD.'S MOTION TO VOID OR SUSPEND LIMITED POLICY SERVICES AGREEMENT ("MOTION") (DE 2687)[1]

**THIS CAUSE** is before me upon the Motion (DE 2687) made by Acheron Capital, Ltd., in its capacity as the investment manager for Acheron Portfolio Trust, Avernus Portfolio Trust, Lorenzo Tonti 2006 Trust and STYX Portfolio Trust, (collectively, "Acheron") on June 23, 2020. This matter has been referred to me by the District Court to take all necessary and proper action as required by law pursuant to 28 U.S.C. § 636 and the Magistrate Judge Rules of the United States District Court for the Southern District of Florida ("Referral").  (DE 2631).  Barry Mukamal, as Trustee (the "Trustee") of the Mutual Benefits Keep Policy Trust (the "Trust") has responded ("Response") (DE 2709), and Acheron has replied ("Reply") (DE 2716).  The undersigned has carefully considered the record, the Motion, the Response, and the Reply and is otherwise duly advised.  For the reasons stated herein, the Motion (DE 2687) is **DENIED**.

---

[1] The Court construes the Motion as a motion for non-dispositive relief because it seeks to void or suspend an agreement "*until an evidentiary hearing is held*" on various issues, including an allegation of "the Trustee's continued lack of candor with this Court."  *Id.* at 2 (emphasis added). Acheron remarks that it "does not waive and specifically reserves its right to allege . . . [a violation of contractual rights under a March 2015 agreement with the Trustee"]).  *Id.* at 9.

I.      BACKGROUND

In 2004, the Securities and Exchange Commission commenced an enforcement action against Mutual Benefits Corporation and other Defendants for fraudulently selling fractional viaticated investment interests in life insurance policies.  (DE 1).  *See also SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 738 (11th Cir. 2005).[2]  The entities involved were put into receivership, and Roberto Martinez was appointed as receiver (the "Receiver").  (DE 26).  The Receiver reported in June 2009 that, pursuant to Court approval, investors in the life insurance policies had voted to either: a) sell the policy; or b) retain the policy ("Keep Policies").[3]  (DE 2291 at 3).  The Receiver

---

[2]

> A viatical settlement is a transaction in which a terminally ill insured sells the benefits of his life insurance policy to a third party in return for a lump-sum cash payment equal to a percentage of the policy's face value. The purchaser of the viatical settlement realizes a profit if, when the insured dies, the policy benefits paid are greater than the purchase price, adjusted for time value. Thus, in purchasing a viatical settlement, it is of paramount importance that an accurate determination be made of the insured's expected date of death. If the insured lives longer than expected, the purchaser of the policy will realize a reduced return, or may lose money on the investment.

*Id.*

[3] Approximately 3,138 policies with a face value of $383,580,782 (or 27% of the total) were designated to be sold, and approximately 3,037 policies with a face value of approximately $1,054,421,049 (or 73% of the total) were designated to be retained by investors (the Keep Policies).  *Id.*  At a June 10, 2020 Status Conference ("Status Conference"), Litai Assets, LLC ("Litai"), the Trust's servicer, reported that there were 1,333 total policies still held by the Trust, of which there were 192 policies 100% owned by a non-Acheron investor.  (DE 2693 at 68:11-14).  The parties agreed at the Status Conference that there were 280 policies where Acheron had a 100% interest.  *Id.* at 68:19-69:1.  Furthermore, Litai reported that Acheron had an interest in 1,068 policies, including the 280 that it 100% owned.  *Id.* at 68:15-16.  Accordingly, following is a breakdown of the Trust's policies by ownership type as reported at the Status Conference: (1) 280 policies 100% Acheron-owned; (2) 788 policies in which Acheron holds a fractional interest; (3) 192 policies 100% owned by a non-Acheron investor; and (4) 73 policies with fractional interests owned entirely by non-Acheron investors.  There were approximately 3,900 total policy interests being maintained by the Trust with a face value of approximately $270 million of which $179.5 million or nearly 67% belonged to Acheron (DE 2676-1 at 7).  According to the Trustee, of the approximately 3,900 total policy interests, the Trust was servicing 2,310 interests for victims

also requested, and the Court approved, the creation of a trust to "provide for the continued maintenance and processing of the Keep Policies in accordance with the directives of this Court." (DE 2291 at 5-6, 8; DE 2322).   Thus, on September 25, 2009, the Receiver and the Trustee executed the Mutual Benefits "Keep Policy" Trust Agreement (the "Trust Agreement").  (DE 2540 at 2; DE 2540-1).  The Trust Agreement is between the Receiver and the Receivership Entities as settlor, and the Trustee.  (DE 2540-1 at 1).  Section 7 of the Trust Agreement includes provisions for this Court to address disputes related to the Trust Agreement in accordance with Florida law as follows:

> Section 7.1 <u>Governing Law</u>.  This Trust Agreement shall be governed by and construed and enforced in accordance with the Laws of the State of Florida, without regard to any choice-of-law rules thereof which might apply the Laws of any other jurisdiction.

> Section 7.2 <u>Jurisdiction and Venue</u>. The Court shall have jurisdiction of all matters related to this Trust Agreement and all Actions with respect to this Trust Agreement, including without limitation the determination of all controversies and disputes arising under or in connection with the Trust Agreement, unless the Court shall not have subject matter jurisdiction in respect thereof, in which case such legal action, suit or proceeding, as the case may be, shall be brought in the courts of the State of Florida, sitting in Miami-Dade County.

*Id.* at §§ 7.1, 7.2.[4]  Further, the Trust Agreement granted broad powers to the Trustee to take all actions necessary in his judgment to fulfill the purposes of the Trust, including those which are enumerated in Section 3.1.  (DE 2540-1 at § 3.1).  In this regard, the Trust Agreement specifically authorizes the Trustee "[t]o hire such . . . parties as are required by the business of the Trust . . .

---

of the original fraud.  *Id.*  The Trustee estimated that 150 to 300 policy interests are necessary to rationalize the costs of servicing and maintain the viability of the Trust.  *Id.* at 6.

[4] The Trust is thus governed by the provisions of The Florida Trust Code.  *See Demircan v. Mikhaylov*, No. 3D18-1684, 2020 WL 2550067, at *4 (Fla. 3rd DCA May 20, 2020) (stating that The Florida Trust Code was first enacted in 2007 and applies to "all judicial proceedings concerning trusts commenced on or after July 1, 2007"); *see also* Fla. Stat. § 736.0102 (stating that "[t]his chapter may be cited as 'The Florida Trust Code'").

and to delegate to such persons such powers and authorities as the duties of the Trustee permit and as the Trustee, in his discretion, deems advisable [or] necessary in order to carry out the terms of this Trust Agreement." *Id.* at § 3.1(xx).  Under Section 6.7 of the Trust Agreement, "[t]he Trustee [has] the right (but not the duty) at any time to seek instructions from the Court concerning the management or disposition of the Trust Assets." *Id.* at § 6.7.

Concomitant with the formation of the Trust and with Court approval, the Receiver executed a sale of the receivership entity servicing the Keep Policies to Litai Assets, LLC ("Litai"). (DE 2340; DE 2367).  Ultimately, the Trustee and Litai entered into a primary servicing agreement effective September 25, 2009 ("PSA") (DE 2266-3; DE 2491; DE 2627 at 1-2, n. 1).   The PSA was renewed effective November 26, 2014 to expire on April 22, 2020 ("Renewal Agreement"). (DE 2500; DE 2501) and has been further renewed since to expire the later of March 31, 2021 or ten (10) days following this Court's approval of a new primary services agreement (DE 2627; DE 2794; DE 2798).[5]

On March 19, 2015, the Trustee made an agreement (the "March 2015 Agreement") with Acheron.  (DE 2500-2).  The March 2015 Agreement resulted from extensive negotiations between Acheron and the Trustee and was intended to resolve Acheron's concerns as a buyer of defaulting policy interests held by the Trust.[6]  (DE 2500 at 4, 9).  Among other provisions, the March 2015

---

[5]  As described *infra*, under a March 2015 Agreement, the Trustee and Acheron agreed to submit disputes pertaining to new servicing agreements to mediation and arbitration.  (DE 2500-2 at § 3). The extension through the later of March 31, 2021 or ten (10) days following the Court's approval of a new primary servicing agreement  (DE 2794; DE 2798) provides additional time for arbitration "that would result from any objections that Acheron might lodge as to the [T]rustee's selection of a new primary servicer."  (DE 2797 at 6:10-14; 10:9-16).  In fact, arbitration between the Trustee and Acheron is expected to ensue forthwith. *Id.* at 17:19-18:7.

[6] "[W]hen investors in [the life insurance policies held by the Trust] do not pay their *pro rata* share of the premium obligations associated with their interest, the policy is at risk of lapse."  (DE 2500 at 4).  Acheron's purchase of such interest and payment of the premium obligations avoids the lapse of the policy and kept the non-defaulting investors from losing their interests in the policy.

Agreement gave Acheron the right to actively participate in the negotiation of any new servicing agreements and the right to refuse to approve any new servicing agreements that were not on commercially reasonable terms or otherwise violated portions of the March 2015 Agreement. (DE 2500-2 at § 3).  The March 2015 Agreement also provided for the Trustee and Acheron to submit disputes over the approval of new servicing agreements to mediation and arbitration.  *Id.* Disagreements between the Trustee and Acheron nonetheless continued, which prompted Acheron's filing of a separate lawsuit against the Trustee.  *See Acheron Portfolio Trust, et al., v. Barry Mukamal, as Trustee of the Mutual Benefits Keep Policy Trust*, Case No. 18-25099-CIV-MORENO initiated December 5, 2018 (the "Acheron Litigation").

On February 25, 2019, the Trustee filed Trustee's Motion to Authorize Retention of Broker and to Obtain Updated Life Expectancy Reports ("Broker Motion").  (DE 2539).  The Broker Motion sought to authorize the retention of a broker to assist with marketing and sale of policy interests because the Trustee sought to expand its options for selling defaulting policy interests beyond Acheron, the historical sole purchaser of these interests.  *Id.* at 1-4.  As part of the sales and marketing of these policy interests, the Trustee requested that the Court authorize him to obtain updated life expectancy reports ("LE's")[7] on the Trust's policies to enhance the marketability of the policy interests.  *Id.* at 6.  On June 4, 2019, the Court specifically granted "[t]he Trustee's request to authorize the Trustee to obtain updated life expectancy reports on the Trust's policies, selected in his business judgment."  (DE 2576 at ¶2).

---

*Id.*  As a result of its purchases, Acheron became the owner of more than two-thirds of the investment interests held by the Trust.  (DE 2676-1 at 7).

[7] As the Trustee explains, "a 'life expectancy report' is a report prepared by a life expectancy provider reflecting the estimated number of months the insured is expected to live, based on the medical records of the insured and experiential data relevant to the condition of the insured." (DE 2709 at 3).

On the same date that the Trustee filed the Broker Motion, the Trustee filed a motion to approve a back-up servicing agreement ("Back-Up Servicing Agreement") with Q Capital Strategies, LLC ("Q Capital"), that this Court approved ("Back-Up Order").  (DE 2538; DE 2551).  On April 12, 2019, Acheron appealed the Back-Up Order.  (DE 2561).  On May 21, 2020, the Eleventh Circuit issued its Mandate vacating the Back-Up Order ("Mandate").  (DE 2650).  In particular, the Mandate found that the District Court "grant[ed] the Back-Up Motion without considering Acheron's rights under the [March 2015] Agreement . . . 'to participate actively in any negotiations that involve the servicing of any policies in which Acheron has an interest.'"  *Id.* at 13.

Acheron's Motion seeks to void or suspend the Limited Policy Services Agreement ("Services Agreement") (DE 2710-1 at 1) that the Trustee entered into with Q Capital effective September 23, 2019 on the basis that Acheron did not have an opportunity to participate actively in the negotiation of the Services Agreement pursuant to the March 2015 Agreement.  Further, Acheron requests a hearing to determine: a) if the Trustee concealed or misrepresented his intentions in seeking approval from the Court for acquiring life expectancy reports ("LE's") and a broker to market certain Trust policies (the "Broker Motion") (DE 2539); b) if the Trustee identified, or determined to hire, Q Capital for services relating to obtaining LE's prior to filing the Broker Motion; c) if the Trustee violated the Eleventh Circuit's Decision (DE 2650) that vacated and remanded the District Court's grant of the Trustee's motion to engage a back-up servicer ("Back-Up Motion") (DE 2538); and d) if the Trustee wasted Trust assets by engaging Q Capital to perform services that Acheron alleges were already being performed by Litai.  (DE 2687 at 1, 8-9).

6

The Trustee responds: 1) that the Broker Motion approved by this Court confirmed the Trustee's authority to engage a broker and obtain updated LE's in order to enhance marketability of the Trust's policies, 2) that the Services Agreement is not a Servicing Agreement, and 3) that Acheron did not appeal the June 4, 2019 Order (DE2576) approving the Broker Motion and thus waived its rights, if any, to participate in the negotiation of the Services Agreement.[8] (DE 2709 at 3, 5, and 10-12). Moreover, the Trustee asserts that Acheron has not identified any commercially unreasonable or discriminatory terms in the Services Agreement. *Id.* at 12-13. Therefore, the Trustee contends that there is no basis to void or suspend the Services Agreement. *Id.* at 13. I agree that there is no basis to void or suspend the Services Agreement for the reasons that follow.

## II.   DISCUSSION

While Acheron's Motion affirmatively alleges a right to participate in negotiation of the Services Agreement pursuant to the March 2015 Agreement, the motion does not clearly purport to enforce those rights. (DE 2687 at 1-2). Rather, Acheron asks the Court to conduct a hearing to investigate Acheron's allegations of Trustee misconduct that relate to the Services Agreement. *Id.* at 2 and 8-9. It is unclear whether Acheron is requesting a hearing in order to have a mini-trial about the Trustee's potential violation of the March 2015 Agreement. Given the lack of clarity, for the sake of thoroughness, I address the Motion as follows. First, to the extent that Acheron asserts that the Services Agreement violates the March 2015 Agreement between the Trustee and Acheron, Acheron must bring that claim as a separate lawsuit. Second, to the extent that Acheron alleges that the Trustee has misled the Court, I find those allegations to be without merit. Third, to the extent that Acheron seeks to enjoin the Trustee from proceeding with Q Capital for the

---

[8] The Trustee also explains that Litai was unwilling to perform additional services for marketing policies without additional compensation and that Litai had expressed doubts about whether LE's should be obtained. (DE 2709 at 6).

provision of LE's on the basis that the Services Agreement is a servicing agreement, I agree with the Trustee that the Services Agreement is not a servicing agreement. Therefore, I conclude that Acheron is not entitled to injunctive relief because it is unlikely to succeed on the merits of any claim that is based on alleging that the Services Agreement is a servicing agreement. *See Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014) (stating that "[a] preliminary injunction is appropriate [only] if the movant demonstrates all of these elements: (1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest").

A.    Acheron Must Bring a Separate Action for Violation of the March 2015 Agreement

Acheron's Motion "specifically reserves [Acheron's] rights to allege that the Trustee's entry into the [Services Agreement] violated the March 2015 Agreement because it was done without Acheron's knowledge or participation." (DE 2687 at 9). Yet Acheron's primary objection to the Services Agreement, and it's primary argument for the relief it seeks, is this same alleged violation of the March 2015 Agreement. It also alleges that the Services Agreement is commercially unreasonable. *Id.* Acheron cannot have it both ways, seeking relief due to a violation of the March 2015 Agreement while reserving the right to allege the same violation in a presumably separate lawsuit. In fact, by reserving rights, Acheron appears to acknowledge that such a breach of contract claim rightly belongs in a separate lawsuit where the parties would more properly go through the full process of a detailed complaint, answer, discovery, and trial or other proceedings to decide the dispute.

8

To the extent that Acheron does seek to allege a breach of the March 2015 Agreement, this motion – indeed this case – is not the proper mechanism to do so. Acheron previously filed in this case a First Intervenor Complaint alleging breach of the March 2015 Agreement, among other claims (DE 2526), which action was dismissed without prejudice for Acheron "to file a new complaint [that would] be randomly assigned to a judge" (DE 2527). Acheron then brought the Acheron Litigation as a separate action. Likewise, here the dispute potentially presents a breach of contract claim, which is more properly considered though a separately filed complaint. The Court has considered a similar challenge by Acheron against the back-up servicing agreement with Q Capital into which the Trust entered following the Court's approval (DE 2551) of the Back-Up Motion (DE 2538).[9] However, unlike with the Back-Up Motion and Order, through which this Court approved the Trust entering into a back-up servicing agreement, the Trustee did not seek (and did not require) Court approval for the Services Agreement. Therefore, Acheron must file a separate compliant to pursue any relief to which it believes it is entitled as a result of the Trustee entering into the Services Agreement.

   B.     Allegations of Trustee Misconduct are Without Merit

Beyond its substantive arguments suggesting that the Services Agreement violates the March 2015 Agreement, Acheron predicates its request for injunctive relief and a hearing by alleging that the Trustee misled the Court by not disclosing that it would obtain LE's through Q Capital rather than Litai, that the Trustee violated the Eleventh Circuit's decision that vacated and remanded the Back-Up Order, and that the Trustee wasted Trust assets by engaging Q Capital to

---

[9] Although I set an evidentiary hearing on Acheron's objections to the Back-Up Motion and allowed the parties to take discovery in preparation for that hearing, I ultimately denied the Back-Up Motion as moot without ever deciding the merits of Acheron's challenge, in light of the Trust's selection of Q Capital as a primary servicer, and consequent abandoning of its back-up servicing agreement with Q Capital. (DE 2801).

provide LE's rather than Litai.  None of these allegations warrant a hearing, and I do not otherwise credit them for the reasons that follow.

1.    <u>The Trustee Did Not Mislead the Court</u>

First, as to misleading the Court, the Trustee was not required to disclose which vendor would provide LE's.  Acheron's apparent preference for Litai, rather than Q Capital, to provide LE services is of no moment.  The Trustee has broad authority under the Trust Agreement to administer the Trust and hire service providers.  See DE 2540-1 at § 3.1.  Additionally, the Trustee is not required to seek Court approval for his decisions pertaining to the management and disposition of Trust Assets, including the retention of service providers to assist him in obtaining LE's.  *Id.* at § 6.7.

Furthermore, because the Trustee was not required to disclose or obtain the Court's approval to hire Q Capital for LE services, it does not matter—as Acheron alludes—that the Trustee may have already decided to hire Q Capital at the time he brought the Broker Motion.  Moreover, if Acheron wanted to assert a right to participate in the negotiation of services for LE's, then it should have asserted that right regardless of which vendor would be providing the services.  In fact, I agree with the Trustee that, even presuming Acheron had a right to object to the Services Agreement, it waived that right by not asserting it at the time this Court granted the Trustee request confirming his authority to obtain the LE reports.  (DE 2709 at 11-12).  *See Ash v. Landrum*, 819 F. App'x 770, 771 (11th Cir. 2020) (citing *Farrow v. West*, 320 F.3d 1235, 1248 n.21 (11th Cir. 2003) for the proposition that "a party who fails to object to a magistrate judge's order in a non-dispositive matter waives the issue and cannot raise it on appeal").  As the Trustee notes, Acheron did not take an appeal of the Order (DE 2576) granting the Trustee authority to obtain LE's ("Order Authorizing LE's"), even though it did take an appeal of the Back-Up Order that granted the

Trustee authority to enter into a back-up servicing agreement with Q Capital.  (DE 2709 at 11; *see also* DE 2538; DE 2551).

More importantly, regardless of whether Acheron filed or did not file an objection, Acheron has been aware at least since the date of the Order Authorizing LE's that the Trustee would be pursuing the preparation of LE reports.  It is not apparent that Acheron took any steps following entry of that order to assert its right to participate in whatever negotiations would necessarily have followed in the course of the Trustee's attempt to obtain the authorized LE reports.  Therefore, I conclude that, given the time that has passed since the Order Authorizing LE's was issued on June 4, 2019, Acheron has waived its rights, if any, to object to the Trustee obtaining LE's through Q Capital or any other vendor.

In addition, I do not find, contrary to Acheron's assertion of possible underhandedness (DE 2716 at 6), that the Trustee's footnote in the Broker Motion—regarding the cost of Litai providing LE's to investors who want them—was anything more than support for what the Trustee was reporting to the Court as far as the expected cost for obtaining LE's.  Acheron argues *inter alia* that, "intentional or not," the Trustee's reference to Litai in the Broker Motion "conveyed the impression that the Trustee was going to use Litai . . . to obtain the necessary releases and health records from insureds" in order to obtain LE's.  *Id.*  I disagree.  The Broker Motion merely references Litai in a footnote to the following statement: "The Trustee anticipates that the cost of obtaining [LE's] to be approximately $400-$850 per policy."  (DE 2539 at 6).  The footnote supporting the Trustee's estimate of cost  states: "The Trustee notes that by prior order, the Court has authorized Litai to obtain updated life expectancy reports as an 'Optional Service' at the request of investors, at a cost to the investor of $250/hour plus reimbursement of costs."  *Id.* at n. 6.  The reference to Litai clearly supports the Trustee's estimate of the cost for obtaining LE's.

Thus, the Trustee was merely communicating the basis for its estimate to the Court of what the cost would be of obtaining LE's.  Therefore, I conclude that the Broker Motion does not convey any intent to use Litai to obtain LE's and that the Trustee did not misrepresent in the Broker Motion that the Trustee would use Litai for services relating to the provision of LE's.  Rather, Acheron seems to have assumed, without making any inquiry, that the Trustee was going to use Litai. Acheron's incorrect assumption is not a basis for voiding or suspending the Services Agreement nor holding a hearing on purported Trustee misconduct.

Also, I do not find that Acheron's dispute with the Trustee about the confidentiality of the Services Agreement demonstrates the Trustee's "concealment" of the Services Agreement from the Court.  (DE 2687 at 7-8).  Acheron takes issue with Q Capital's inadvertent disclosure of the Services Agreement to Acheron and the Trustee's insistence that Acheron comply with a non-disclosure agreement in order to obtain a copy of the Services Agreement.  (DE 2687 at 7-8; DE 2709 at 7-9).  On June 5, 2020, Acheron filed a motion to seal ("Motion to Seal") (DE 2661) copies of the Services Agreement and a Mutual Confidentiality and Compliance Agreement between the Trust and Q Capital, which it claims counsel for the Trust delivered to it on June 4, 2020.  On June 7, 2020, I denied Acheron's Motion to Seal because Acheron had not explained why the agreements were relevant to a June 10, 2020 Status Conference—only asserting that they "[were] relevant."  (DE 2664).  Acheron filed a renewed motion to seal on June 23, 2020 (DE 2688) and a corrected motion to seal on June 24, 2020 (DE 2689) at or about the same time that it filed the instant Motion (DE 2687).  After obtaining a response from the Trustee (DE 2700) to Acheron's corrected motion to seal (DE 2689) and Acheron's reply (DE 2703),  I denied Acheron's corrected motion to seal and ordered the Trustee to file a copy of the Services Agreement (DE 2708), which the Trustee did on July 8, 2020 (DE 2710).  Given that: 1) the Trustee was not

required to obtain Court approval to contract with Q Capital for LE services; 2) that there was only approximately a one-month period between when Acheron sought to file the Services Agreement and when the Trustee ultimately filed the Services Agreement; 3) the Trustee timely filed the Services Agreement in accordance with the Court's directive; and 4) the Trustee was making efforts to comply with a confidentiality agreement with Q Capital, I do not find that Trustee concealed the agreement from the Court.  Accordingly, for all of the aforementioned reasons, Acheron's arguments that the Trustee misled the Court relative to the Broker Motion fail.

2.      The Trustee Did Not Violate the Eleventh Circuit's Mandate

Acheron argues that the Trustee violated the Eleventh Circuit's Mandate by failing to disclose the Services Agreement to Acheron.  This argument is predicated on the belief that the Services Agreement constitutes a Servicing Agreement within the scope of the parties' March 2015 Agreement.  Thus, Acheron asserts, once the Eleventh Circuit made clear that the March 2015 Agreement gave Acheron the right to actively participate in the negotiation of all servicing agreements, not just primary servicing agreements, the Trustee had an obligation to disclose the Services Agreement to Acheron.  However, as detailed below, I find that the Services Agreement is not, in fact, a Servicing Agreement.  Therefore, I do not find fault with the Trustee's decision not to voluntarily disclose the Services Agreement to Acheron following the Eleventh Circuit's Mandate.

3.      The Trustee Did Not Waste Trust Assets

The Trustee contends that, under the Services Agreement, the cost of LE's "is comparable to, and indeed more favorable to the Trust, than the compensation structure Litai offered to Keep Policy Investors to separately contract for . . . LE reports."  (DE 2709 at 7).

13

Acheron's Reply does not even address the Trustee's assertion in this regard.  Accordingly, I do not question the Trustee's assertion and find that the Trustee did not waste trust assets.

       C.       <u>There is No Legal Basis to Enjoin the Trustee Because the Services Agreement is Not a Servicing Agreement</u>

 I agree with the Trustee that the Services Agreement is not a Servicing Agreement. Therefore, it does not fall into the provisions of the March 2015 Agreement requiring that the Trustee allow Acheron to participate in its negotiation.  Because I do not believe Acheron can prevail on the merits of a claim that is based on the Services Agreement being construed as a Servicing Agreement, I find that Acheron is not entitled to enjoin the Trustee from proceeding under the Services Agreement.  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (listing what a moving party must demonstrate for a Court to grant injunctive relief, including a substantial likelihood of success on the merits and cautioning that such relief is extraordinary and not to be granted absent the moving party meeting its burden as to the prerequisites).

      As an initial matter, Acheron does not even argue that the industry considers obtaining LE's to be a "core servicing function" and indeed does not define "servicing" either generally or in the context of the March 2015 Agreement.  Rather, Acheron asserts that "obtaining LE Reports is plainly part of policy servicing [in this instance]" while also asserting that "[o]btaining LE Reports is a service *typically* provided by the policy portfolio servicer."  (DE 2687 at 3 and 5) (emphasis added).  Yet Acheron does not go so far as to assert that only a servicer can provide LE Reports.  The basis for Acheron's contention that the Services Agreement is a servicing agreement is that: 1)  it is "called a 'Policy Services' agreement"; 2) it "obligates Q Capital to perform multiple traditional servicing activities already being performed by Litai"; 3) most of the services Q Capital is to provide "are identical to services that are performed by Litai"; and 4) there is "risk

of multiple and uncoordinated contacts with insureds that violate [applicable] laws." *Id.* at 3-8. Acheron's arguments are unpersuasive as set forth below.

First, the fact that the Services Agreement is called a "Policy Services" agreement is of no moment. Acheron equates "services" to "servicing," and they are not equivalent. A vendor may provide "services" without providing "servicing."

Second, Acheron fails to show that the services provided by Q Capital under the Services Agreement are "traditional servicing activities." Acheron declares in a conclusory manner that the Services Agreement requires Q Capital to perform traditional servicing activities and discusses specific services that "Q Capital is (or may be required to)" perform. (DE 2687 at 6). Acheron argues that these services reveal that the nature of the Services Agreement is that of a servicing agreement. (DE 2716 at 2). The services it points to include "contacting insureds, establishing and updating a policy database and providing periodic reports to the Trustee." (DE 2716 at 2, 4-5; DE 2687 at 6). Further, Acheron argues that, because "[o]btaining updated life expectancy reports does not even rise to the level of a core service required of Q Capital under the [Services] Agreement" (DE 2716 at 5), the Services Agreement is not really about obtaining life expectancy reports but rather about providing (or preparing to provide) traditional servicing. In particular, Acheron argues in its Reply that services specified by the "Scope of Policy Services" incorporated as Schedule 2 of the Services Agreement—the importing of policy information into Q Capital's system, giving access to this system to Trust representatives, conducting public records checks of insureds, maintaining and updating the database and providing reports to the Trust—are services "associated with general policy portfolio administration." (DE 2716 at ¶9.)

However, discussion of these services in the Services Agreement does not suggest that the Services Agreement is aimed at something other than obtaining life expectancy reports nor

demonstrates that the Services Agreement is meant to be a servicing agreement in disguise. As the Trustee explains:

> [T]he [Services Agreement] provides for the Trustee to provide Q Capital with the policy files relating to policies for which updated [LE's] are requested, for Q Capital to load that information into its system, for Q Capital to communicate with healthcare providers, and to the extent necessary, the insured, to obtain updated medical records, for Q Capital to commission updated LE reports from licensed underwriting firms at the Trustee's request,[10] and for Q Capital to periodically report to the Trustee.

(DE 2709 at 6). Thus, Acheron points to the activities that support the provision of LE's to make the argument that the activities constitute "traditional servicing activities" without crediting the fact that these services are in the context of providing LE's.

The Compensation section of the Services Agreement portrays the agreement's true nature as an agreement limited to providing LE's rather than an agreement to provide "general policy portfolio administration." For example, the Policy Service Fees are specified to be at a rate of $200 per hour with no more than 2.5 hours spent on any one "Applicable Policy" without prior approval. (DE 2710-1 at § 2.3(a)). Thus, Q Capital's fees, under the Services Agreement, align closely with what the Trustee communicated to the Court in the Broker Motion—that the cost of obtaining LE's would be "approximately $400-$850 per policy." (DE 2539 at 6). Q Capital's $200 hourly rate also compares closely to Litai's reported hourly rate of $250 (plus reimbursement of costs). *Id.* at n.6. As for out-of-pocket expenses, the Services Agreement provides that:

> 2.5 <u>Out-of-Pocket Costs and Expenses</u>. As described in Section 2.3(c), Client shall be fully responsible for reimbursement of any and all out-of-pocket costs and expenses reasonably incurred by Q Capital in connection with the Policy Services to be performed hereunder. By way of example, and without limitation, such out-of-pocket costs and expenses may include: (i) costs incurred in making and processing requests to be sent to Insureds for execution of updated forms to provide names and contact information for each of the Insured's healthcare providers and to provide a current written consent signed by the Insured for release of applicable

---

[10] Neither Q Capital nor Litai are licensed to prepare LE reports. (DE 2709 at n. 5).

> medical records, (ii) costs incurred in obtaining updated medical records, (iii) third-party fees, and any related out-of-pocket costs and expenses, to obtain updated or additional Life Expectancy reports, (iv) postage, packaging and shipping expenses, and (v) travel expenses (if any) as reasonably necessary or as requested by Client. Q Capital shall not incur any out-of-pocket costs or expenses in excess of [Five Hundred ($500.00)] per Insured without the prior consent of Client.

(DE 2710-1 at § 2.5).  Because Q Capital's compensation pursuant to the Services Agreement aligns with the Trustee's reported cost of obtaining LE's, and because the costs and expenses section of the Services Agreement identifies services specifically related to providing LE's, I conclude that the Services Agreement is an agreement to provide LE's and not an agreement to provide general portfolio administration services.  Therefore, Acheron's argument to the contrary fails.

Moreover, the "Scope of Policy Services" addendum to the contract as well as other sections describing services should not be viewed in isolation.  The idea that the Trustee used this agreement as a surreptitious means to establish servicing with Q Capital makes little sense when the Trustee was approved to enter into a Back-Up Servicing Agreement with Q Capital.[11]  Acheron has repeatedly argued that the Back-Up Servicing Agreement was a disingenuous means of the Trustee facilitating a later move of primary servicing from Litai to Q Capital.[12]  But even if that were so, there would be no further reason for the Trustee to have a **<u>second</u>** agreement to accomplish the same purpose.

---

[11] This Court approved the Trustee entering into a Back-Up Servicing Agreement on March 15, 2019 (DE 2551), and the Trustee provided Acheron a copy of the proposed backup servicing agreement with Q Capital on March 19, 2019 (DE 2646 at 8; DE 2651 at 7).

[12] See (DE 2546) (stating that "it appears that the Trustee intends to retain Q Capital to provide much more than a simple 'backup' database"); (DE 2651 at 9) (discussing "Trustee's concealed intention to have Q Capital act as primary servicer"); (DE 2763 at 30:21-24) (stating that Acheron's "position has been, since day one, that the only reason why Q Capital was put in as a backup servicer was to observe and prepare to be the primary servicer"); (DE 2687 at 9) (alleging that "the [Services] Agreement was just *another* . . . attempt by the Trustee to pre-position Q Capital as the primary servicer for the Trust") (emphasis added).

Third, Acheron's argument regarding duplicative services fails to demonstrate how the Services Agreement is an agreement for servicing. Acheron complains that the Services Agreement provides for Q Capital to duplicate services being performed by Litai and presumes that the Trustee should have "request[ed] that Litai either forward the information *already in its possession* to the preparer of the [LE's] and/or obtain missing information from the insureds that [Litai] ha[d] a longstanding relationship with." (DE 2687 at 6) (emphasis in original). Acheron's complaint, however, merely indicates a preference for Litai over Q Capital as a matter of efficiency. Acheron makes no argument to support how efficiency is a basis for classifying the Services Agreement as a servicing agreement, and I do not otherwise conclude that efficiency should be a basis for determining that the Services Agreement is a servicing agreement.

Moreover, even if efficiency was a basis for categorizing services for LE's as servicing, which it is not, the Trustee responds that using Q Capital is less costly than using Litai. Indeed, as discussed previously, the Trustee asserts that the cost for obtaining LE's under the Services Agreement is comparable to, if not more favorable than, the cost that Litai offers under separate contract to Keep Policy Investors. (DE 2709 at 7). Moreover, the fact that investors sought to contract for LE services separately with Litai militates against such services being servicing activities; rather, it demonstrates that LE services are services separate from servicing that *may* be provided by a primary servicer. For all of the foregoing reasons, I find that Acheron's argument regarding duplicative services fails to show that the Services Agreement is a servicing agreement.

Fourth, Acheron's argument that the risk of multiple contacts with insureds makes services related to providing LE's servicing functions fails. Specifically, Acheron contends that the agreement with Q Capital for LE's "is [for] a service typically provided by the portfolio servicer because it requires the tracking of, and communications[] with[,] the insureds." (DE 2687 at 3).

Acheron argues that the activity of "contacting the insured to obtain the various releases, consents and information necessary to prepare an LE Report is usually done by the policy servicer" because of "the risk of multiple and uncoordinated contacts with insureds that would violate [applicable] laws."[13]  *Id.*

Even considering the risk of multiple contacts, however, Acheron does not explain why LE's can *only* be provided by the portfolio servicer.  Furthermore, the Trustee explains that the "risk that insureds would be contacted multiple times on behalf of the Trust in violation of applicable law . . . [is] easily addressed through routine coordination between Litai and Q Capital." (DE 2709 at 12).  In fact, although Acheron argues that the Services Agreement does not require or refer to coordination between Q Capital and Litai regarding the contact of insureds (DE 2716 at 7), the Services Agreement does require the Trustee to provide "all available details concerning the last contact made with each Insured."  (DE 2710-1 at § 4.2(a)).  Thus, I conclude that the Services Agreement contemplated the risk associated with multiple contacts and set forth procedures to mitigate this risk.  Accordingly, for the reasons stated, Acheron fails to demonstrate that LE services are necessarily provided solely through a portfolio servicer such that these services would constitute "servicing."

---

[13] Acheron notes that this Court previously amended the PSA to allow Litai to provide LE's, for a fee, to investors in the Trust's policies as support for the proposition that LE's should be provided by the primary servicer.  (DE 2687 at 3).  *See* DE 2476 (motion filed on August 20, 2012 by an outside investor on behalf of all beneficiaries of the Trust requesting modification of the PSA to allow investors to contract with Litai for LE's).  The amendment of the PSA in this regard merely makes the point, however, that providing LE's is not a core servicing function.  If providing LE's was a core servicing function, it would have been a service that was provided under the PSA from inception.  As previously stated, the separate contracting demonstrates that services for LE's are services separate from servicing that *may* be provided by a primary servicer.

III.    <u>CONCLUSION</u>

For all of the above reasons, I find that Acheron's arguments fail to merit either an order voiding or suspending the Services Agreement or an evidentiary hearing.  Accordingly, Acheron's Motion (DE 2687) is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 10th day of November 2020.

**Jared M. Strauss**
**United States Magistrate Judge**

Copies furnished via CM/ECF to:

Counsel of record