**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 04-60573-CIV-MORENO/STRAUSS**

**SECURITIES AND EXCHANGE COMMISSION**,

    Plaintiff,

v.

**MUTUAL BENEFITS CORP.**, *et al.*,

    Defendants.

_____/

## ORDER DENYING ACHERON CAPITAL, LTD.'S AMENDED MOTION TO VOID OR SUSPEND [PRO-TECH] SERVICES AGREEMENT ("MOTION") (DE 2765)[1]

**THIS CAUSE** is before me upon the Motion (DE 2765) made by Acheron Capital, Ltd., in its capacity as the investment manager for Acheron Portfolio Trust, Avernus Portfolio Trust, Lorenzo Tonti 2006 Trust and STYX Portfolio Trust, (collectively, "Acheron") on September 25, 2020. This matter has been referred to me by the District Court to take all necessary and proper action as required by law pursuant to 28 U.S.C. § 636 and the Magistrate Judge Rules of the United States District Court for the Southern District of Florida ("Referral"). (DE 2631). Barry Mukamal, as Trustee (the "Trustee") of the Mutual Benefits Keep Policy Trust (the "Trust") has responded ("Response") (DE 2772), and Acheron has replied ("Reply") (DE 2789). The undersigned has carefully considered the record, the Motion, the Response, and the Reply and is otherwise duly advised. For the reasons stated herein, the Motion (DE 2765) is **DENIED**.

---

[1] The amended Motion merely corrects the title of the Motion. (DE 2765 at n.1). Further, the Court construes the Motion as a motion for non-dispositive relief because it seeks to void or suspend an agreement "pending a hearing," and Acheron remarks that it "does not waive and specifically reserves its right to allege . . . [a violation of] the March 2015 Agreement." *Id.* at 6-7.

I.      BACKGROUND

In 2004, the Securities and Exchange Commission commenced an enforcement action against Mutual Benefits Corporation and other Defendants for fraudulently selling fractional viaticated investment interests in life insurance policies. (DE 1). *See also SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 738 (11th Cir. 2005).[2] The entities involved were put into receivership, and Roberto Martinez was appointed as receiver (the "Receiver"). (DE 26). The Receiver reported in June 2009 that, pursuant to Court approval, investors in the life insurance policies had voted to either: a) sell the policy; or b) retain the policy ("Keep Policies").[3] (DE 2291 at 3). The Receiver

---

[2]

> A viatical settlement is a transaction in which a terminally ill insured sells the benefits of his life insurance policy to a third party in return for a lump-sum cash payment equal to a percentage of the policy's face value. The purchaser of the viatical settlement realizes a profit if, when the insured dies, the policy benefits paid are greater than the purchase price, adjusted for time value. Thus, in purchasing a viatical settlement, it is of paramount importance that an accurate determination be made of the insured's expected date of death. If the insured lives longer than expected, the purchaser of the policy will realize a reduced return, or may lose money on the investment.

*Id.*

[3] Approximately 3,138 policies with a face value of $383,580,782 (or 27% of the total) were designated to be sold, and approximately 3,037 policies with a face value of approximately $1,054,421,049 (or 73% of the total) were designated to be retained by investors (the Keep Policies). *Id.* At a June 10, 2020 Status Conference ("Status Conference"), Litai Assets, LLC ("Litai"), the Trust's servicer, reported that there were 1,333 total policies still held by the Trust, of which there were 192 policies 100% owned by a non-Acheron investor. (DE 2693 at 68:11-14). The parties agreed at the Status Conference that there were 280 policies where Acheron had a 100% interest. *Id.* at 68:19-69:1. Furthermore, Litai reported that Acheron had an interest in 1,068 policies, including the 280 that it 100% owned. *Id.* at 68:15-16. Accordingly, following is a breakdown of the Trust's policies by ownership type as reported at the Status Conference: (1) 280 policies 100% Acheron-owned; (2) 788 policies in which Acheron holds a fractional interest; (3) 192 policies 100% owned by a non-Acheron investor; and (4) 73 policies with fractional interests owned entirely by non-Acheron investors. There were approximately 3,900 total policy interests being maintained by the Trust with a face value of approximately $270 million of which $179.5 million or nearly 67% belonged to Acheron (DE 2676-1 at 7). According to the Trustee, of the approximately 3,900 total policy interests, the Trust was servicing 2,310 interests for victims

also requested, and the Court approved, the creation of a trust to "provide for the continued maintenance and processing of the Keep Policies in accordance with the directives of this Court." (DE 2291 at 5-6, 8; DE 2322). Thus, on September 25, 2009, the Receiver and the Trustee executed the Mutual Benefits "Keep Policy" Trust Agreement (the "Trust Agreement"). (DE 2540 at 2; DE 2540-1). The Trust Agreement is between the Receiver and the Receivership Entities as settlor, and the Trustee. (DE 2540-1 at 1). Section 7 of the Trust Agreement includes provisions for this Court to address disputes related to the Trust Agreement in accordance with Florida law as follows:

> Section 7.1 <u>Governing Law</u>. This Trust Agreement shall be governed by and construed and enforced in accordance with the Laws of the State of Florida, without regard to any choice-of-law rules thereof which might apply the Laws of any other jurisdiction.
>
> Section 7.2 <u>Jurisdiction and Venue</u>. The Court shall have jurisdiction of all matters related to this Trust Agreement and all Actions with respect to this Trust Agreement, including without limitation the determination of all controversies and disputes arising under or in connection with the Trust Agreement, unless the Court shall not have subject matter jurisdiction in respect thereof, in which case such legal action, suit or proceeding, as the case may be, shall be brought in the courts of the State of Florida, sitting in Miami-Dade County.

*Id.* at §§ 7.1, 7.2.[4] Further, the Trust Agreement granted broad powers to the Trustee to take all actions necessary in his judgment to fulfill the purposes of the Trust, including those which are enumerated in Section 3.1. (DE 2540-1 at § 3.1). In this regard, the Trust Agreement specifically authorizes the Trustee "[t]o hire such . . . parties as are required by the business of the Trust . . .

---

of the original fraud. *Id.* The Trustee estimated that 150 to 300 policy interests are necessary to rationalize the costs of servicing and maintain the viability of the Trust. *Id.* at 6.

[4] The Trust is thus governed by the provisions of The Florida Trust Code. *See Demircan v. Mikhaylov*, No. 3D18-1684, 2020 WL 2550067, at *4 (Fla. 3rd DCA May 20, 2020) (stating that The Florida Trust Code was first enacted in 2007 and applies to "all judicial proceedings concerning trusts commenced on or after July 1, 2007"); *see also* Fla. Stat. § 736.0102 (stating that "[t]his chapter may be cited as 'The Florida Trust Code'").

and to delegate to such persons such powers and authorities as the duties of the Trustee permit and as the Trustee, in his discretion, deems advisable [or] necessary in order to carry out the terms of this Trust Agreement." *Id.* at § 3.1(xx). Under Section 6.7 of the Trust Agreement, "[t]he Trustee [has] the right (but not the duty) at any time to seek instructions from the Court concerning the management or disposition of the Trust Assets." *Id.* at § 6.7.

Concomitant with the formation of the Trust and with Court approval, the Receiver executed a sale of the receivership entity servicing the Keep Policies to Litai Assets, LLC ("Litai"). (DE 2340; DE 2367). Ultimately, the Trustee and Litai entered into a primary servicing agreement effective September 25, 2009 ("PSA") (DE 2266-3; DE 2491; DE 2627 at 1-2, n. 1). The PSA was renewed effective November 26, 2014 to expire on April 22, 2020 ("Renewal Agreement"). (DE 2500; DE 2501) and has been further renewed since to expire the later of March 31, 2021 or ten (10) days following this Court's approval of a new primary services agreement (DE 2627; DE 2794; DE 2798).[5]

On March 19, 2015, the Trustee made an agreement (the "March 2015 Agreement") with Acheron. (DE 2500-2). The March 2015 Agreement resulted from extensive negotiations between Acheron and the Trustee and was intended to resolve Acheron's concerns as a buyer of defaulting policy interests held by the Trust.[6] (DE 2500 at 4, 9). Among other provisions, the March 2015

---

[5] As described *infra*, under a March 2015 agreement, the Trustee and Acheron agreed to submit disputes pertaining to new servicing agreements to mediation and arbitration. (DE 2500-2 at § 3). The extension through the later of March 31, 2021 or ten (10) days following the Court's approval of a new primary servicing agreement (DE 2794; DE 2798) provides additional time for arbitration "that would result from any objections that Acheron might lodge as to the [T]rustee's selection of a new primary servicer." (DE 2797 at 6:10-14; 10:9-16). In fact, arbitration between the Trustee and Acheron is expected to ensue forthwith. *Id.* at 17:19-18:7.

[6] "[W]hen investors in [the life insurance policies held by the Trust] do not pay their *pro rata* share of the premium obligations associated with their interest, the policy is at risk of lapse." (DE 2500 at 4). Acheron's purchase of such interest and payment of the premium obligations avoids the lapse of the policy and kept the non-defaulting investors from losing their interests in the policy.

Agreement gave Acheron the right to actively participate in the negotiation of any new servicing agreements and the right to refuse to approve any new servicing agreements that were not on commercially reasonable terms or otherwise violated portions of the March 2015 Agreement. (DE 2500-2 at § 3). The March 2015 Agreement also provided for the Trustee and Acheron to submit disputes over the approval of new servicing agreements to mediation and arbitration. *Id.* Disagreements between the Trustee and Acheron nonetheless continued, which prompted Acheron's filing of a separate lawsuit against the Trustee. *See Acheron Portfolio Trust, et al., v. Barry Mukamal, as Trustee of the Mutual Benefits Keep Policy Trust*, Case No. 18-25099-CIV-MORENO initiated December 5, 2018 (the "Acheron Litigation").

On February 25, 2019, the Trustee filed Trustee's Motion to Authorize and Approve Back-Up Servicing Agreement and to Direct Litai Assets LLC to Cooperate with Back-Up Servicer ("Back-Up Motion"). (DE 2538). On March 15, 2019, the District Court granted the Back-Up Motion ("Back-Up Order"). (DE 2551). Acheron appealed. (DE 2561). On May 21, 2020, the Eleventh Circuit issued its Mandate vacating the Back-Up Order ("Mandate"). (DE 2650). In particular, the Mandate found that the District Court "grant[ed] the Back-Up Motion without considering Acheron's rights under the [March 2015] Agreement . . . 'to participate actively in any negotiations that involve the servicing of any policies in which Acheron has an interest.'" *Id.* at 13.

Acheron's Motion seeks to void or suspend the Professional Services Contract for Fractional Policy Billing and Tracking System Including Hosting and Maintenance between the Trustee and Proactive Technologies, LLC, effective as of January 13, 2020 (DE 2772-1) (the "Pro

---

*Id.* As a result of its purchases, Acheron became the owner of more than two-thirds of the investment interests held by the Trust. (DE 2676-1 at 7).

5

Tech Contract") *pending an evidentiary hearing*. (DE 2765 at 1-3). Specifically, Acheron requests that the Court hold an evidentiary hearing "to determine if the Trustee: (a) concealed the [Pro Tech Contract] from the Court; (b) violated the 11th Cir. Decision by failing to disclose and turnover the Pro Tech Servicing Agreement to Acheron; (c) wasted Trust assets by separately retaining Pro Tech to perform services that were already being performed by Litai as part of its primary servicing function; and/or (d) has a conflict of interest because he has used Trust assets to develop software so that his self-owned consulting firm can act as a servicer for the Trust." *Id.* at 6.

The Trustee responds: 1) that he is "authorized pursuant to the Trust Agreement to 'hire such counsel, accountants, appraisers, auditors and such other parties as are required by the business of the Trust' and 'to enter into such other arrangement with third parties as are deemed by the Trustee to be useful in carrying out the purposes of the Trust'"; 2) that the "Trust Agreement does not require the Trustee to seek Court approval of all such engagements, agreements or arrangements"; 3) that the Pro Tech Contract was entered into prior to the Eleventh Circuit's rulings; and 4) that the contract is not a servicing agreement because it "does not provide for Pro Tech to perform any servicing functions with respect to the Trust's policies" but rather "to develop, maintain and support the software." (DE 2772 at 2-4, n.1; n.3). Because the Trustee entered into the agreement pursuant to authority under the Trust Agreement, the Trustee argues that Acheron is effectively seeking injunctive relief by asking the Court to void or suspend the contract, "without filing any complaint alleging a legal and factual basis for such relief." *Id.* at 5. I agree.

II.     DISCUSSION

Although Acheron asserts that, under the terms of the March 2015 Agreement, it "has an explicit contractual right to participate in the negotiation of [the Pro Tech Contract]," its Motion does not make any claims pertaining to those rights. (DE 2765 at 2). Neither does Acheron's

6

Reply assert claims for violation of its contractual rights. (DE 2789). Rather, Acheron emphasizes that its Motion "raised a conflict of interest" concern "to the extent the agreement contemplated or allowed for the Trustee or his consulting firm to take over a portion of the policy servicing function." *Id.* at 2.

As to the conflict of interest concern, which is where Acheron seems to place the most emphasis, the Trustee clarified at a Status Conference held on October 13, 2020, that Q Capital—not the Trustee or his consulting firm—would use the software and stated in a hearing on October 30, 2020 that the servicing agreement proposed by Q Capital incorporates the value of the software. (DE 2797 at 26:4-33:22; DE 2813). In fact, the Trustee has repeatedly stated that he does not intend for he or his firm to operate the software. (DE 2786 at 35:1-36:12; DE 2813). As such, there is no conflict of interest, and the Court sees no need for a further hearing on the issue.[7]

---

[7] As to whether the Trustee's non-disclosure of the Pro Tech Contract to Acheron prior to September 2020 violated the 11th Cir. Decision, that issue implicates the parties' dispute as to whether the Pro Tech Contract is a servicing agreement for which the March 2015 Agreement confers upon Acheron certain rights. As discussed *infra*, resolution of that dispute would require Acheron to bring separate litigation. In addition, the Court does not see a need to hold a hearing on the other issues raised by Acheron—concealing the agreement and wasting assets. As the Trustee argues, he did not consider the Pro Tech Contract to be a servicing agreement. (DE 2772 at 4). Given the Trustee's determination, he did not disclose the Pro Tech Contract when, as Acheron points out, "the Court . . . request[ed] [a] description and explanation of all servicing agreements." (DE 2765 at 5). Because, as discussed below, Acheron needs to file a separate lawsuit to enforce rights it believes were violated under the March 2015 Agreement, I do not decide the parties' dispute as to whether the Pro Tech Contract is a servicing agreement. However, I do not take issue with the Trustee's determination to not disclose the Pro Tech Contract as a servicing agreement in the status report ("Status Report") that the Trustee filed at the Court's direction. (DE 2753). On the same date that the Trustee provided his response to the Court's inquiry about servicing agreements and declined in his Status Report to identify the Pro Tech Contract as such, the Trustee filed a Response to a motion to compel by Litai identifying the contract. *See* DE 2752 at 8 (stating that Trustee's counsel engaged ProTech in January 2020 "to develop new investor management software to address the Trust's requirements for managing fractional interests"). Furthermore, I note—as Acheron and the Trustee note—that the Pro Tech Contract was entered into prior to the Eleventh Circuit's Mandate recognizing Acheron's right to actively participate in negotiations of servicing agreements. (DE 2765 at n.2; DE 2772 at 5). Thus, I conclude that the Trustee did not conceal the contract. Moreover, relative to the Trustee wasting assets, as I have stated previously before the parties, I do not intend to substitute my judgment for that of the

Furthermore, the Trustee is correct that Acheron's Motion provides no legal basis for voiding or suspending the Pro Tech Contract. As previously stated, while Acheron's Motion affirmatively alleges a right to participate in negotiating the Pro Tech Contract pursuant to the March 2015 Agreement, the motion does not purport to enforce those rights (and, as explained below, would need to file a separate lawsuit to do so). Even so, Acheron asks the Court to essentially enjoin the Trustee from proceeding under the Pro Tech Contract. Acheron does not base such request, however, on legal grounds. The Supreme Court has stated "that district courts properly exercise their equitable jurisdiction where the remedy in equity could alone furnish relief, and the ends of justice require the injunction to be issued." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 335 (1999) (internal quotation marks and citation omitted). In other words, if there is no adequate remedy at law, then equitable relief such as that requested here by Acheron could be available under certain conditions. *Id.* at 340. Acheron has not pursued any remedy at law let alone pled that a remedy at law is inadequate. Therefore, I conclude that Acheron's Motion to void or suspend the Pro Tech Contract must be denied.

Moreover, to the extent that Acheron does seek to allege a breach of the March 2015 Agreement, this motion – indeed this case – is not the proper mechanism to do so. Acheron previously filed in this case a First Intervenor Complaint alleging breach of the March 2015 Agreement, among other claims (DE 2526), which action was dismissed without prejudice for Acheron "to file a new complaint [that would] be randomly assigned to a judge" (DE 2527).

---

Trustee's judgment in matters relating to the administration of the Trust. The Trust Agreement confers broad powers upon the Trustee to administer the Trust. (DE 2540-1 at § 3.1). As the Trustee has explained it, "the unique characteristics of this particular trust . . . requires an investor management system," and the software developed under the Pro Tech Contract is such a system that "is superior to that which currently exists . . . [having] functions that [the Trustee has] always wanted installed . . . but [that he] wasn't able to get." (DE 2797 at 32:6-22). The Trustee is empowered to make such judgments. Accordingly, I do not find it prudent for the Court to expend any further time on Acheron's allegations of concealment and waste.

8

Acheron then brought the Acheron Litigation as a separate action. Likewise, here the dispute is potentially a breach of contract claim, which is more properly considered through a separately filed complaint. The Court has considered a similar challenge by Acheron against the back-up servicing agreement with Q Capital (DE 2551) that it entered into following the Court's approval of the Back-Up Motion (DE 2538).[8] However, unlike with the Back-Up Motion and Order, through which this Court approved the Trust entering into a back-up servicing agreement, the Trustee did not seek (and did not require) Court approval for the Pro Tech Contract. Therefore, Acheron must file a separate complaint to pursue any relief to which it believes it is entitled as a result of the Trustee entering into the Pro Tech Contract.

CONCLUSION

Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Acheron's Motion to void or suspend the Pro Tech Contract is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 10th day of November 2020.

*Jared Strauss*
Jared M. Strauss
United States Magistrate Judge

Copies furnished via CM/ECF to:

Counsel of record

---

[8] In light of the Trust's selection of Q Capital as a primary servicer, and consequent abandoning of its back-up servicing agreement with Q Capital, I denied the Back-Up Motion as moot without ever deciding the merits of Acheron's challenge. (DE 2801).