**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 04-60573-CIV-MORENO/STRAUSS**

**SECURITIES AND EXCHANGE COMMISSION**,

    Plaintiff,

v.

**MUTUAL BENEFITS CORP.**, *et al.*,

    Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART MOTION TO COMPEL (DE 2653)[1]

**THIS CAUSE** has come before me upon the Trustee's Motion to Compel Litai to Provide the Trust with Its Data ("Motion to Compel") (DE 2653) made by Barry Mukamal, as Trustee ("Trustee") of the Mutual Benefits Keep Policy Trust (the "Trust"), which has been referred to me by the District Court ("Referral"). (DE 2631). The motion seeks to compel Litai Assets LLC ("Litai"), the Trust's policy servicer, to provide the Trust with its data in usable, industry-standard format. (DE 2653 at 1). I have considered the Motion, the Responses (DE 2670; DE 2667), and the Reply (DE 2695).[2] In addition, I held an evidentiary hearing on October 29, 2020

---

[1] The parties did not consent to my jurisdiction. *See Mayer v. Wall St. Equity Grp., Inc.*, 672 F.3d 1222, 1224 (11th Cir. 2012) (holding that postjudgment proceedings are free-standing litigation, and an order is final in those proceedings "if it disposes of all the issues raised in the motion that initially sparked the . . . proceedings").

[2] Acheron Capital, Ltd., in its capacity as the investment manager for Acheron Portfolio Trust, Avernus Portfolio Trust, Lorenzo Tonti 2006 Trust and STYX Portfolio Trust, (collectively, "Acheron") provided a Response to refute certain assertions relating to Acheron that the Trustee made in the Motion to Compel. (DE 2667). Further, Acheron requests as part of its Response that I strike certain portions of the Motion to Compel. *Id.* Because Acheron does not properly bring its requests to strike as a motion, and because I do not find it necessary to address the Trustee's assertions that are in dispute between the Trustee and Acheron in order to resolve the Motion to Compel, I do not comment further on the Trustee's assertions or on Acheron's Response.

("Evidentiary Hearing") to address what data the Trustee is entitled to and how, if at all, delivery of that data would impinge upon Litai's intellectual property rights. (DE 2804; DE 2813). Further, I heard oral argument from the parties at a status conference held on November 13, 2020 ("Status Conference"). Being otherwise duly advised, for the reasons set forth below, it is respectfully **RECOMMENDED** that the Motion to Compel (DE 2653) be **GRANTED IN PART AND DENIED IN PART**.

I. **BACKGROUND**

In 2004, the Securities and Exchange Commission commenced an enforcement action against Mutual Benefits Corporation and other Defendants for fraudulently selling fractional viaticated investment interests in life insurance policies. (DE 1). *See also SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 738 (11th Cir. 2005).[3] The entities involved were put into receivership, and Roberto Martinez was appointed as receiver (the "Receiver"). (DE 26). The Receiver reported in June 2009, that pursuant to Court approval, investors in the life insurance policies had voted to either: a) sell the policy; or b) retain the policy ("Keep Policies").[4] (DE 2291 at 3). The Receiver

---

[3]
> A viatical settlement is a transaction in which a terminally ill insured sells the benefits of his life insurance policy to a third party in return for a lump-sum cash payment equal to a percentage of the policy's face value. The purchaser of the viatical settlement realizes a profit if, when the insured dies, the policy benefits paid are greater than the purchase price, adjusted for time value. Thus, in purchasing a viatical settlement, it is of paramount importance that an accurate determination be made of the insured's expected date of death. If the insured lives longer than expected, the purchaser of the policy will realize a reduced return, or may lose money on the investment.

*Id.*

[4] There are approximately 3,900 total policy interests being maintained by the Trust with a face value of approximately $270 million. (DE 2676-1 at 7). According to the Trustee, of the approximately 3,900 total policy interests, the Trust is servicing 2,310 interests for victims of the

also requested, and the Court approved, the creation of a trust to "provide for the continued maintenance and processing of the Keep Policies in accordance with the directives of this Court." (DE 2291 at 5-6, 8; DE 2322). Thus, on September 25, 2009, the Receiver and the Trustee executed the Mutual Benefits "Keep Policy" Trust Agreement (the "Trust Agreement"). (DE 2540 at 2; DE 2540-1).

The Trust Agreement is between the Receiver and the Receivership Entities as settlor, and the Trustee. (DE 2540-1 at 1). "The purpose of the Trust is to take custody of the Trust Assets and maintain and administer the Trust Assets for the benefit of the Keep policy Investors. . .." *Id.* at § 2.2. Section 7.2 of the Trust Agreement provides for Jurisdiction and Venue as follows:

> The Court shall have jurisdiction of all matters related to this Trust Agreement and all Actions with respect to this Trust Agreement, including without limitation the determination of all controversies and disputes arising under or in connection with this Trust Agreement, unless the Court shall not have subject matter jurisdiction in respect thereof, in which case such legal action, suit or proceeding, as the case may be, shall be brought in the courts of the State of Florida, sitting in Miami-Dade County.

*Id.* at § 7.2. "Court" is defined as Case No.: 04-60573 CIV-MORENO in the United States District Court for the Southern District of Florida. *Id.* at 1; § 1.1. Furthermore, Section 6.7, titled "Reliance by Trustee," provides, in part, that "[t]he Trustee shall have the right (but not the duty) at any time to seek instructions from the Court concerning the management or disposition of the Trust Assets." *Id.* at § 6.7.

Section 3 of the Trust Agreement confers broad powers on the Trustee to administer the Trust including "the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Trust." *Id.* at § 3.1(a). Furthermore, "without

---

original fraud. *Id.* At a June 10, 2020 status conference, Litai reported that there were 1,333 total policies still held by the Trust. (DE 2693 at 68:11-14).

3

limiting the generality of [ ] Section 3.1(a)," the Trust Agreement specifically confers certain powers and duties, including the power and duty "[t]o enter into and perform the obligations of the Trustee under the Servicing Agreement . . . and to monitor the performance of the Servicer of the duties to be performed by Servicer pursuant to the Servicing Agreement." *Id.* at § 3.1(b)(iii). Additionally, the Trust Agreement specifically confers to the Trustee the power and duty "to periodically review the books, records, bank statements and *electronic data of the Servicer that pertain to the payment of premiums associated with the Keep Policies and the payments in satisfaction of obligations to the Keep Policy Investors and* to periodically review *such reports with respect to such payments as requested of the Servicer under the Servicing Agreement from time to time*." *Id.* at § 3.1(b)(vii) (emphasis added). The Trust Agreement also confers upon the Trustee the power and duty "[t]o negotiate and enter into a servicing agreement with a substitute servicer in the event of termination or expiration of the Servicing Agreement, or make such other arrangements as the Trustee deems appropriate in the circumstances to administer the Keep Policies." *Id.* at § 3.1(b)(xvi).

Concomitant with the formation of the Trust and with Court approval, the Receiver executed a sale of the receivership entity servicing the Keep Policies to Litai. (DE 2340; DE 2367). Ultimately, the Trustee and Litai entered into a servicing agreement effective September 25, 2009 (DE 2266-3; DE 2491; DE 2627 at 2, n. 1) that has since been renewed (DE 2500-1; DE 2626-1; DE 2794; DE 2798) to extend servicing through the later of (a) March 31, 2021 or (b) ten (10) days after the date that the Court enters an Order approving a new servicing agreement (collectively, the "Servicing Agreement"). Consistent with the terms of the Trust Agreement, the Servicing Agreement provides, in part, that "[t]he Trustee shall have the right to examine and audit . . . information of the Servicer . . . to the extent relating to [among other things] . . . premiums or

4

other amounts payable by the Trust. Such examination and audit shall take place during normal business hours or at such other times as may be reasonable under applicable circumstances, upon reasonable advance notice." (DE 2266-3 at § 8.3).

Various disputes have arisen between the Trustee and Litai, including Litai repeatedly complaining that the Trustee seeks to "itself or have others replicate [its] system, and start a competing servicing company." (DE 2550 at 4). *See also* DE 2652 at 29 ("The essence of [the] dispute is the Trustee's desire to get a copy of Litai's proprietary software and database system so that it may replicate the system and replace Litai."); DE 2821 at 20:7-21:18 (asserting that the Trustee has replicated Litai's system to explain why the Trustee wants the data "as it is stored" in Litai's system); DE 2684-2 at ¶¶8-14 (stating concerns by Litai's sole owner and manager that the Trustee is seeking to surreptitiously acquire Litai's trade secrets).[5] On October 16, 2020, the Trustee filed notice that he had selected Q Capital Strategies, LLC ("Q Capital") as primary servicer upon expiration of the Servicing Agreement. (DE 2795). The parties—the Trustee, Litai, and Acheron—agreed upon an extension of the Servicing Agreement to allow time for the Trustee and Acheron to arbitrate disputes related to a new servicing agreement with Q Capital. (DE 2797 at 6:20-10:16; DE 2794; DE 2798).

The Trustee's Motion to Compel seeks "a complete copy of any and all Trust data, containing appropriate links to policy and investor documents from the inception of the Trust to the present date, in an industry standard format, such as SQL, updated at the Trustee's request." (DE 2653 at ¶33). The Trustee, however, is agnostic as to the actual format. *See* DE 2695 at ¶2

---

[5] Litai has also stated that, if "the Trustee agrees not to do that . . . then, Litai will allow the Trustee access [to the system]." (DE 2652 at 29). Litai has also clarified that it was "not eager to keep servicing" because it was not profitable to do so. (DE 2693 at 222:1-6).

5

(stating that the Trustee seeks the data to "be exported in any commercially reasonable industry standard format, such as .BAK or SQL"); *see also* DE 2821 at 161:16-17; 163:8-9 ("We will take it in any industry acceptable format. . . . What we are looking for is [ ] information that could be imported into another system that can be utilized."). Additionally, the Trustee moves the Court "for a determination that the Trust is entitled to full and unrestricted access to its Data, for all periods of time, compelling Litai to provide the Trust with its data upon request." *Id.* at 19.

Litai contends that the Trustee is demanding Litai's trade secrets and that the Trustee must file a separate civil action to compel Litai, a nonparty, to produce anything. (DE 2684 at 2). Litai also asserts that the Trustee would necessarily need to bring a claim for breach of the Servicing Agreement as a separate lawsuit. *Id.* at 3. Furthermore, Litai asserts that its proprietary servicing system, Premium Billing and Tracking System, ("PBTS") and PBTS's databases qualify as trade secrets. *Id.* at 1, 5. Litai additionally asserts that it *has* provided the Trustee with the data underlying its proprietary database schema, that the schema itself is what Litai purchased from the Receiver and further developed, and that the Trustee could replicate what the Receiver did in creating PBTS and "hire a third party to develop and test their own system . . . [rather than] stand on Litai's shoulders by taking control of the relational databases belonging to Litai."[6] *Id.* at 7-8. Moreover, at Litai's suggestion, the Court held an Evidentiary Hearing "[t]o determine whether the requested information constitutes a trade secret." *Id.* at 8-9. The Trustee agreed to an evidentiary hearing to the extent that it was necessary to reach the issue of Litai's trade secrets in order to resolve the Motion to Compel. (DE 2795 at 7).

---

[6] The Trustee testified at the Evidentiary Hearing that Aaron Smith, principal of Proactive Technologies, LLC, who was involved with the receivership preceding the formation of the Trust, was retained as a consultant for the Trust and developed software for "[t]he fractional component of the servicing system." (DE 2821 at 190:18-191:24).

6

## II. DISCUSSION

### A. Court's Authority to Grant Relief Sought

The Court has authority to grant the Motion to Compel because the relief sought will enable the Trustee to carry out his fiduciary duties under the terms of the Trust Agreement, for which this Court has retained oversight responsibilities. *See* DE 2540-1 at § 6.3 (conferring upon this Court exclusive authority to appoint a Successor Trustee under specified circumstances; *see also id.* at § 6.7 (providing for the Trustee to seek instruction from this Court). Under the Trust Agreement, the Trustee has a fiduciary duty to administer the Trust Assets for the benefit of the Trust's beneficiaries. (DE 2540-1 at § 2.2; § 3.1(a)). The Trustee alleges specifically that "data relating to Trust operations, investors, and policies . . . is necessary for the Trustee to fulfill his fiduciary duties." (DE 2653 at 1). Furthermore, the Trustee contends that Litai demanded a confidentiality agreement for access to the Trust's data that precludes the Trustee from using the Trust's data unless Litai remains the servicer. *Id.* at 1-2; n 45. While it is unnecessary for the resolution of the Trustee's Motion to Compel to recite in detail specific examples of why the Trustee is seeking data (DE 2653 at 2-5; 8-9; 11-14), the Trustee describes a need for "*electronic data of the Servicer that pertain to the payment of premiums associated with the Keep Policies and the payments in satisfaction of obligation to the Keep Policy Investors*." Such a request is consistent with his duties and powers under the Trust Agreement. As such, I find that the Trustee is entitled to receive the data he is requesting. The Trustee, in fact, confirmed at the Evidentiary Hearing that he seeks the data, in part, to automate and streamline processes pertaining to internal audit functions. (DE 2821 at 203:1-204:3). Additionally, the data must necessarily be delivered in a usable, industry-standard format. If it is not in such format, then it is the same as the Trustee not getting the data at all because the Trustee will be precluded from carrying out his fiduciary duties due to a lack of data

7

that he can use to do so. Therefore, I conclude that the Trustee is entitled under the Trust Agreement to receive the Trust's data from Litai in a usable, industry-standard format.

Furthermore, Litai's argument that the Trustee must bring a separate lawsuit fails because Litai has not proffered a valid objection to justify why it should not deliver the data. Litai, in fact, has acknowledged that "there is no dispute that the Trust owns the data." (DE 2821 at 18:1-5; DE 2821 at 170:3-4). Litai, however, claims in its Response that it cannot deliver the data because "[t]he Trustee . . . is a potential competitor to [Litai], and seeks this Court's assistance in obtaining Litai's trade-secret[s] . . . so that he may form (or solicit) another entity to replace Litai." (DE 2684 at 1). To the extent that Litai objects to the fact that the Trustee has sought another entity to replace Litai, I find that the Trust Agreement authorizes the Trustee's actions in this regard. *See* DE 2540-1 at § 3.1(b)(xvi). Thus, the Trustee replacing Litai as the servicer is not a valid reason to withhold providing the Trust with its data.

At the Evidentiary Hearing, Litai focused on arguing: 1) that the Servicing Agreement does not require Litai to provide the Trustee with a complete set of the Trust's data; 2) that the purpose for which the Trustee purports to the need the data has changed multiple times; 3) that the Trustee has acknowledged that the data Litai has been providing is sufficient; 4) that the Trustee is asking for the data in .BAK or SQL (as it is stored in in PBTS) because he has replicated Litai's PBTS; and 5) the Trustee has produced no evidence as to what constitutes an industry-standard format. (DE 2821 at 18:1-20:19). Having determined that the Trustee is entitled to the data it seeks, and that the Trustee should not be required to file a separate lawsuit to get the data because Litai has shown no valid reason for not providing it, I do not further address Litai's first argument.

As to the second argument, I find that it lacks merit as a reason to withhold providing the Trust with the data. The reasons that the Trustee offers for needing the data are varied, and the

most recent need relates to terminating the relationship with Litai and transferring servicing to Q Capital. *See e.g., id.* at 178:20-182:21. In particular, responding to the Court's inquiry, the Trustee testified that presently the Trust's data "would be going into Q Capital's policy system, with the fractional component, which is an add-on to that system". *Id.* at 181:22-182:5. However, the various stated purposes for the data are of no moment to, and have no impact on, the Trustee needing all of the Trust's data in order to fulfill his fiduciary obligations. Moreover, it is understandable that, as the circumstances of the Trust's relationship with Litai have continuously evolved over the more than two years during which the parties have been disputing various issues surrounding data access, the Trust's precise reasoning and arguments have evolved as well. Accordingly, Litai second argument fails.

As to the third argument, Litai misconstrues the Trustee's testimony that "with the data that Litai has been providing, it can service the policies and the fractional interests in the data format it has now" and equates the adequacy of data for servicing with the adequacy of data for other purposes—such as for internal audit purposes, or for investigations related to investor inquiries, as the Trustee testified. *Id.* at 19:18-22; 203:1-204:3; 173:5-174-23; 185:15-22. The Trustee clarified that "[r]ight now, there is enough information to make sure [the] policies don't lapse," but he expressed an inability to confidently "validate the current ownership [of policies] based on what [he] currently [has]." *Id.* at 175:16-18. In fact, the Trustee expressly disagreed that the data Litai has provided thus far has been adequate. *Id.* at 172:2-6. Also, the Trustee has represented that he does not even know the extent of the information that is contained in Litai's PBTS pertaining to the Trust's files, which would logically be necessary to understand for the purpose of designing automated internal audit functions. *Id.* at 162:3-4; 186:23-187:1. Therefore, I do not find that Litai has proven the sufficiency of the data that it has already been providing.

9

As to the fourth argument, the Trustee testified that "[he has] not replicated PBTS, [and he has] no intention of replicating PBTS." *Id.* at 178:6-14.  The Trustee has also testified that he wants the data in "SQL, Excel, any industry format that will accurately and fully transfer the data." *Id.* at 196:10-13.  I credit the Trustee's testimony that he has not replicated PBTS.  Additionally, even if the Trustee had replicated PBTS, Litai would need to seek redress, if available, in separate litigation, and that fact would still not negate the Trustee's entitlement to the Trust's data in a usable, industry standard format.  Therefore, I find Litai's fourth argument without merit.

Likewise, Litai's fifth argument – that the Trustee produced no evidence of what an industry standard format is – would not (even if true) excuse Litai from providing the Trust its data in an industry standard format.  However, as discussed below, I find that both Litai and the Trustee produced evidence regarding industry standard formats for exporting and delivering data in bulk. Accordingly, because such delivery appears feasible, I conclude that a lack of identification of an industry standard format is not an obstacle to Litai delivering the Trust's data.

Moreover, to the extent that Litai is concerned about its trade secrets despite assurances from the Trustee that he does not seek such trade secrets (DE 2695 at ¶2), Litai did not prove that its trade secrets are implicated for reasons that I next address.

### B. Whether Delivery of Trust Data Infringes on Litai's Intellectual Property Rights

Litai failed to demonstrate at the Evidentiary Hearing that delivering the Trust's data to the Trustee infringes on its intellectual property rights because, although Litai proffered some indication that the PBTS schema[7] may be unique and complex, it failed to establish all elements

---

[7] The Trustee's expert explained schema at the Evidentiary Hearing as a "roadmap" that informs relationships between sets of data in a database and defines, or serves to validate, the values that are permitted to exist in specific fields, i.e., alphanumeric versus only numeric. (DE 2821 at 40:1-42:13).  Litai's expert explained schema as necessary to building a database that backs a database application and referred to it as a data model.  *Id.* at 90:7-9.  Specifically, Litai's expert testified

10

of a trade secret. Furthermore, the Trustee does not concede that PBTS is a trade secret. Rather, the Trustee asserts that the Schedule of Purchased Assets described the PBTS and its databases as "proprietary." (DE 2695 at 6).

"Florida law defines a trade secret as information ... that: (a) [d]erives independent economic value ... from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 (11th Cir. 2020) (citing Fla. Stat. § 688.002(4)). "Whether something is a trade secret is a question typically resolved by a fact finder after full presentation of evidence from each side." *Id.* (internal quotation marks and citations omitted). Moreover, the design of a software program may constitute a trade secret. *XTec, Inc. v. Hembree Consulting Servs., Inc.*, 183 F. Supp. 3d 1245, 1257 (S.D. Fla. 2016) (citations omitted).

Here, however, the evidence submitted did not address whether competitors would benefit from knowledge of the schema of the PBTS's database and whether software programming to monitor and track fractional viaticated investment interests in life insurance policies is "readily ascertainable." Even presuming that PBTS is unique (DE 2684-2 at ¶24) and complex (DE 2821 at 102:19-23), with a substantial investment in its development (DE 2684-1 at ¶10), Litai presented no evidence to support why a competitor or potential competitor could not readily ascertain and develop its own proprietary system to track and monitor fractional interests in life insurance policies. In fact, the Trustee claims to have done just that – as Litai suggested in its Response

---

that "[d]ata modeling is the process of mapping a particular set of real[-]world entities and business processes" to answer the question: "how do I represent [the] data in a database?" *Id.* at 91:12-14.

11

(DE 2684 at7-82) – and developed "[t]he fractional component of the servicing system." (DE 2821 at 190:18-191:24). Thus, from my view, whether PBTS's schema constitutes a trade secret remains an open question. Moreover, I find it unnecessary to conclude whether Litai's PBTS or database schema rises to the level of a trade secret because Litai itself made the issue moot by acknowledging at the Evidentiary Hearing that it could deliver the Trust's data in a usable, industry-standard format in a manner that did not infringe upon its alleged trade secrets.

The Evidentiary Hearing addressed, in part, "what does an industry standard format entail." (DE 2821 at 7:15). The parties' experts testified regarding this, and several possible formats for exporting and delivering data were discussed. (DE 2821 at 26:17-82:15; 83:14-112:2).

The Trustee's expert, Mr. Venn, testified regarding the standard format in the life settlement industry as follows:

> There are several formats that are used to exchange data between different counter-parties. Some counter-parties use a format that we ourselves publish, which we call the ClariNet import/export template, which can then be ingested by their own user platform.
>
> Others have their own internal templates that they will use, which will contain a similar structure; common headings, a data dictionary is required, and perhaps have that offered in an Excel format. Excel is probably most commonly used for the exchange of information. I have seen Access used as well, as I mentioned, a relational based format; I have also seen SQL used as means for conveying that information.

*Id.* at 26:17; 34:6-17. Mr. Venn also testified that his company publishes "another expression, another medium, which is what is called XML, an XML format that includes the relations between the different data points within that base." *Id.* at 35:13-16. As to the import or export process, Mr. Venn testified that:

> The process . . . for importing would require us to convert whatever is presented to us in a format that can be ingested by our SQL based platform; and for export, the reverse.

12

> So, we will convert our SQL tables, the relational database, into the data file that people want to see, and it could take the form of an Excel sheet, it could take the form of XML, or it could take the form of CSV, Comma Separated Values, which is another template that's used by some market participants.
>
> Everyone with a database or any form of information platform has to undergo this to move information from one platform to another . . .
>
> If we weren't able to exchange that information and to explain to the recipient of that information what it is they are getting, the industry couldn't operate.

*Id.* at 37:19-38:3; 39:6-8 and 20-23. On cross-examination, Mr. Venn stated that, with respect to formats used to transfer data without also transferring proprietary information, he was aware of the use of SQL backups or BAK files, Excel sheets, Access databases, and CSV. *Id.* at 71:16-23. With respect to schema, Mr. Venn testified that, while helpful to ensure that exported data is correct, it is not necessary to export schema for data exchange purposes. *Id.* at 44:11-14 and 21-23. Rather, Mr. Venn emphasized the importance of ensuring that:

> [Y]ou have the capacity to validate the data that was in there, to make sure that what you have been given isn't complete garbage; but aside from that, whether the field can be constrained to 255 characters or 250 characters is probably not material in the context of the information itself. What you are more concerned about is if the information is correct.

*Id.* at 44:14-20.

In addition, Litai's counsel inquired as to whether Mr. Venn was familiar with JSON, or JavaScript Object Notation, as a format for exporting data, and Mr. Venn affirmed that he had some familiarity with JSON and had used it. *Id.* at 77:1-78:3.

Litai's expert, Mr. Steinbrook, affirmed in his testimony that there are several different acceptable "data dictionary" formats, which he attributed Mr. Venn's testimony to address, and Mr. Steinbrook explicitly stated that these formats "[do] not need to be a .SQL or a .BAK file; it can be an Excel spreadsheet, it can be XML, it could even be JSON." *Id.* at 83:8-21; 103:11-104:19. In particular, Mr. Steinbrook testified that JSON had become "one of the most ubiquitous

13

formats to exchange data across multiple industries." *Id.* at 108:17-109:17. Mr. Steinbrook further testified that "JSON would certainly be a very appropriate format for Litai to use as an export format to define a set of fields and nested relationships that would be distinct from its own proprietary database format." *Id.* at 110:1-7. In response to inquiry by the Court, Mr. Steinbrook testified that, while JSON is not the only acceptable format, it is a very reasonable format for delivery of the Trust's data and "may make [the data delivered] even more understandable than Excel." *Id.* at 116:5-117:10. In fact, Mr. Steinbrook suggested the JSON format to Litai. *Id.* at 154:2-9.

Given the testimony at the Evidentiary Hearing regarding several possible formats for delivery of the Trust's data, it is unnecessary for the Court to opine as to a specific format that Litai should use to deliver the Trust its data. However, I note that JSON appears to satisfy the definition of usable, industry standard format because, as Litai's expert testified, it is widely used and understandable. *See* DE 2821 at 117:14-118:4 (testimony by Mr. Steinbrook that JSON is a data export format that provides "sufficient insight into the relationships between the objects, such that someone could[,] or a database could[,] then make sense of that data without giving the greater relationship insight that . . . could be proprietary"). Furthermore, the Trustee has stated that the JSON format could potentially be usable and acceptable; however, the Trustee was first presented with information about JSON at the Evidentiary Hearing and was not in a position to fully evaluate it as of the November 13, 2020 Status Conference. (DE 2828 at 11:15-12:2; 27:6-12). Although I decline to designate a specific format for Litai's delivery of the Trust's data, it appears that usable, industry standard formats are available to Litai for delivery of the Trust's data without compromising its alleged intellectual property rights. Accordingly, I conclude that Litai's delivery of the Trust's data does not impinge on its intellectual property rights.

### C. **Parameters of Delivery**

Having decided that Litai must deliver the Trust's data, I proceed by discussing the various and immediate disputes that the parties now have about JSON and why a total data set must be delivered well in advance of the end of the servicing relationship between the Trust and Litai. Given that the parties agreed at the Evidentiary Hearing as to what comprises the Trust data and that Litai agreed to cooperate in exporting the Trust's data to facilitate transfer of the data to a new servicer, I ordered the parties to confer and file a status report as to their ability to agree on an export format for Litai's delivery of the Trust's data. (DE 2814). The parties were unable to agree. (DE 2816; DE 2817). In particular, at a Status Conference on November 13, 2020, the Trustee expressed that the parties were in dispute as to several issues: 1) the JSON sample that Litai provided, comprised of data on three policies, was insufficient to evaluate the JSON format; 2) Litai is unwilling to provide JSON schema; 3) Litai is proposing only one bulk data transfer at the termination of its servicing contract; and 4) Litai will not agree to a neutral third-party to oversee the data export process. (DE 2828 at 10:9-12:24; 29:17-30:5; 31:7-33:19; 34:5-38:1; 41:2-45:24; 46:2-47:2).

First, as to sample size, Litai disputed that the sample is inadequate because 15,000 lines of data was provided. *Id.* at 67:11-17. Litai argued that the Trustee had inadequate technical expertise and inadequate technical advisement. *Id.* at 68:3-7. Further, Litai objected to engaging in more work at this time to send data in JSON format while the arbitration remains pending between Acheron and the Trustee regarding a new servicing agreement with Q Capital. *Id.* at 67:18-68:2; 68:22-69:6. The Trustee, on the other hand, contended that the small data sample of only three policies does not reflect appropriate testing of a bulk transmission. *Id.* at 33:21-38:1. Therefore, the Trustee claimed an inability to evaluate the adequacy of receiving the Trust's data

15

in this format. *Id.* Further, the Trustee argued that the variety of different policies in the Trust, each with different features and with over ten years of potential history, requires a robust sample to adequately evaluate a data export. *Id.* The Trustee asserted that he would accept the monthly reports that Litai currently provides to the Trust in JSON format, but Litai will not agree to provide the monthly reports in JSON format. *Id.* I conclude that, especially in the context of the bulk data delivery that Litai proposes, testing of bulk data delivery is necessary to ensure the adequacy of the bulk delivery of the data. Therefore, I find Litai's claims that a sample of three, five, or even ten policies is adequate to lack merit.

Second, Litai claimed that it is unnecessary to build a JSON schema to provide an export of the Trust's data in JSON format. It further argued that building such schema is time-intensive and expensive, although Litai did not have an estimate to provide as to what the expense would be. *Id*. at 63:17-66:25. The Trustee asserted that it needs the schema for purposes of data validation. *Id.* 31:7-33:19. Litai countered that the Trustee could build the schema rather than force the time and expense of such undertaking upon Litai. *Id.* at 64:13-66:25. Given Litai's argument that the schema is not needed to transfer the data in a usable, industry standard format (and the lack of any evidence presented to the contrary), that providing such schema would burden Litai with additional expense, and that the Trustee could create the schema to validate the data, I agree that Litai should not be required to provide JSON schema if delivering data in JSON format.

Third, in response to the Court's inquiry as to why Litai should not provide a bulk transmission sooner than the termination date of the contract in order to allow time for testing and assessment, Litai claimed that: (1) such a request by the Trustee is unrelated to transitioning to a new servicer; (2) there is no basis to order Litai to provide the data at any time; (3) providing an export is a lot of work, and; (4) Litai would need a minimum of ten weeks' preparation time. *Id.*

16

67:11-71:16. Litai acknowledged, albeit not with specificity or enthusiasm, that transfers of servicing that typically involve the use of a data container for the data exchange require that the data container be provided in advance of the termination of servicing by a current servicer. *Id.* at 72:18-74-5. The Trustee specifically asserted that 60 days would be needed for two submissions of the Trust's monthly data in the JSON format, prior to termination of servicing, in order for the Trustee to evaluate whether a bulk transmission of the Trust's data in JSON format at termination of servicing would be sufficient. *Id.* at 36:17-38:1. I conclude that relying on a single, bulk transfer of data at the end of the servicing relationship with Litai presents an unreasonable risk in a transfer of servicing scenario. Therefore, I recommend that Litai provide a bulk transfer of data to the Trust for testing purposes in advance of the termination of the Servicing Agreement.

Fourth, in response to the Court's inquiry about why a neutral third-party – an "observer" – was required to oversee Litai's export of the Trust's data, the Trustee explained that there is a lack of trust between himself and Litai. He further elaborated that there is risk that the data export will not be complete because the data is not going to be provided in native format but rather is going to go through a translation. *Id*. at 41:2-43:5. Therefore, although the Trustee did not propose a third-party observer in his Motion to Compel, he asserted that a special master or a neutral subject-matter expert is necessary to observe the export and ensure that it includes all of the Trust's data. *Id.* Litai countered that this is unnecessary because: 1) "[t]he exported data will not be any more or less accurate than the data in PBTS itself"; 2) the data that Litai has been providing monthly has been sufficient for the Trustee to perform his duties; 3) the Trustee "has no basis to audit or monitor what processes Litai adds to its own proprietary system"; and 4) Litai has agreed to provide a sworn certification that the data is being provided completely and without alteration in addition to a likelihood of a Court directive. (DE 2817 at 2-4). I agree with Litai that an observer

17

is unnecessary given a sworn certification from Litai and an Order from the Court directing Litai to deliver the data to the Trust. Furthermore, although the Trustee has argued that the data may not be delivered it its native format, and thus could be subject to manipulation, the Trustee's position has been that it is indifferent as to the format as long as the data is in a usable, industry standard format. Therefore, because the request was not included in the Trustee's motion, I decline to recommend that the Court grant the Trustee's request for an observer.

As I have previously stated to the parties, there is a difference between identifying the format and method of providing the Trust its data that is most efficient or convenient to the Trust and identifying the format and method that is sufficiently workable to enable the Trust to receive its data and move forward. (DE 2821 at 189:19-190:9). The recommendation set out below seeks to balance the parties' respective interests and account for the present context for the Motion to Compel – the impending transfer of servicing to a new servicer. Given Litai's agreement to cooperate to affect a transition of servicing, and the evidence and arguments presented as described above, I conclude that the Trustee's Motion to Compel should be granted. I further conclude that the recommendation set forth below provides the Trustee with the specific relief sought in his motion in a manner sufficient to accomplish a transition of servicing and enable the Trustee to continue to fulfill his fiduciary duties.

### III.    CONCLUSION

Accordingly, I respectfully **RECOMMEND** that the Trustee's Motion to Compel (DE 2653) be **GRANTED IN PART AND DENIED IN PART**. Specifically, it is recommended that:

1. The Motion to Compel be **GRANTED** to the extent it seeks to require Litai to provide the Trust with the Trust's data in a usable, industry standard format for the purpose of transferring servicing to a new servicer;

2. Litai be **ORDERED** to provide the Trust's data in a usable, industry standard format that it chooses for the purpose of transferring the Trust's policy servicing to a new servicer, and that such order require Litai to provide a bulk transmission of the Trust's data within ten (10) weeks of the Court's Order to allow for adequate testing of the bulk transfer process prior to the termination of the Servicing Agreement;

3. Should Litai choose to provide the Trust's data in JSON format, Litai be required to provide a JSON data dictionary but not be required to provide a JSON schema absent any further showing from the Trustee that a lack of JSON schema makes the data unusable;

4. Litai be required to certify under oath that the Trust data is being provided completely and without alteration;

5. Litai's transfer of the Trust's data in a usable, industry standard format not be subject to third-party oversight absent evidence that Litai is not adhering to its certification regarding completeness and lack of alteration;

6. The Trustee and Litai be required to file a monthly joint status report addressing their progress in the testing of Litai's data export prior to termination of the Servicing Agreement; and

7. The Motion to Compel be otherwise **DENIED**.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and

shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 25th day of November 2020.

Jared M. Strauss
United States Magistrate Judge

Copies furnished via CM/ECF to:

Hon. Federico A. Moreno

Counsel of record