UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-60573-CIV-MORENO/STRAUSS

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

MUTUAL BENEFITS CORP., *et al.*,

      Defendants.

_____/

## REPORT AND RECOMMENDATION TO GRANT TRUSTEE'S MOTION FOR AN ORDER OF INSTRUCTIONS ("MOTION") (DE 2882)

**THIS CAUSE** has come before me upon the Trustee's Motion filed by Barry Mukamal, as Trustee (the "Trustee") of the Mutual Benefits Keep Policy Trust (the "Trust").[1] (DE 2882). This matter has been referred to me by the District Court to take all necessary and proper action as required by law pursuant to 28 U.S.C. § 636 and the Magistrate Judge Rules of the United States District Court for the Southern District of Florida ("Referral"). (DE 2631). Acheron Capital, Ltd., in its capacity as the investment manager for Acheron Portfolio Trust, Avernus Portfolio Trust, Lorenzo Tonti 2006 Trust and STYX Portfolio Trust, (collectively, "Acheron") filed a response, and the Trustee replied. (DE 2901; DE 2910). The parties also filed proposed orders addressing the Motion. (DE 2918; DE 2929). Additionally, I held a hearing on the Trustee's Motion on April 29, 2021 ("Motion Hearing") at which time Acheron and the Trustee presented oral argument.

---

[1] I granted the Trustee's unopposed *ore tenus* motion to treat the March 15, 2021 status report as a request for instructions from the Court so that Acheron could respond with its objections to the sale of whole policies and with its assertion that it has a right to bid on a policy-by-policy basis given a wind down and liquidation of the Trust. (DE 2886 at 3; DE 2914 at 27: 6-21; 50:5-51:1; 52:1-56:3).

(DE 2925).  Following the Motion Hearing, I ordered the parties to file supplemental briefing pertaining to the Motion (DE 2923), and the parties complied (DE 2927; DE 2928).  I have carefully considered the parties' filings and oral arguments, along with the record in this case. Being otherwise duly advised, it is respectfully **RECOMMENDED** that the Motion (DE 2882) be **GRANTED** as set forth herein.

I.      **BACKGROUND**

        This case arises from an enforcement action by the Securities and Exchange Commission in 2004 involving the fraudulent selling of fractional viaticated investment interests in life insurance policies.  (DE 1).  The entities involved were put into receivership, and Roberto Martinez was appointed as Receiver ("Receiver").  (DE 26).

        A.  **Order Regarding Future Administration and Subsequent Orders**

        On May 5, 2007, the Court entered an Order Regarding Future Administration of Certain Insurance Policies Subject to this Proceeding ("Order Regarding Future Administration"). (DE 1887).  The Order Regarding Future Administration referenced policies that were identified to be sold ("Sell Policies") and policies that investors would retain ("Keep Policies").  *Id.* at 2.

        Several provisions of the Order Regarding Future Administration are pertinent to the instant Motion.  Paragraph 1.C. provides that:

> The interests of all investors in and beneficiaries of each such Policy,[2] however those interests may have been created, transferred, or characterized, including specifically but without limitation investors' interests in the proceeds of a Policy or of its disposition, are and shall continue to be subject to this Court's orders, and, subject to procedures, terms, and conditions this Court establishes from time to time, may be subject to modification, sale, liquidation, forfeiture, or termination as

---

[2] The reference is essentially to policies that "are considered part of the Receivership Estate."  *Id.* at 2.  The Receivership Estate was stated to mean "all property of the estates of the Receivership Entities."  *Id.* at 4.  The property of the Receivership Entities included all insurance policies that the Receivership Entities viaticated, except those policies that had been fully disbursed pursuant to a maturity prior to the Receiver's appointment.  *Id.*

> the Court may expressly determine, prescribe, or permit by order, including specifically but without limitation by the Disposition Orders, as they may be modified or amended from time to time, and by any future orders authorizing, approving, or directing that specified Policies shall be sold, transferred, surrendered, or permitted to lapse.

*Id.* at ¶1.C.  Thus, this provision addresses "the interests" of all investors in Policies of the Receivership, including those investors who purchased fractional interests in Policies from the Receivership Entities.

The order also addresses the sale or transfer of Policies pursuant to: (i) specific procedures for bidding ("Bidding Procedures"); or (ii) future orders allowing the auction or sale of Policies subject to lapse due to nonpayment of premiums ("Auction for Nonpayment").  *Id.* at ¶3.  In particular, the Order Regarding Future Administration recognizes a buyer ("Buyer") of a Policy as the "purchaser or other transferee" of a Policy by virtue of the closing of a sale or transfer resulting from the Bidding Procedures or an Auction for Nonpayment.  *Id.* at ¶3A.  Specifically, the order states that:

> By virtue of the closing of the sale or transfer of such Policy to its purchaser or other transferee (the "Buyer") in compliance with a written agreement with the Receiver and an order of this Court (including any future order that may authorize the Receiver to sell Policies if and when he determines certain specified conditions and circumstances are met, a "Sale Order"), on and as of the effective date of the closing of the transaction: (i) the sole owner of such individual Policy, or sole assignee of the viaticated interest in any group Policy as the case may be, shall be and be deemed to be its Buyer, or if the Buyer assigns a given Policy or Buyer's right to acquire that Policy directly to one other entity as owner (the "Assignee"), and Assignee in fact acquires such Policy within fifteen (15) business days after the Receiver's sale of such Policy closes and before a Buyer's Notice (as defined in paragraph 3.B) is delivered to the Listed Insurer for that Policy, then the sole owner of such Policy shall be deemed to be Assignee (as used hereinafter, unless the context otherwise requires, as to any given Policy the Receiver sells, "Buyer" shall mean Buyer as defined above if no such assignment is effected but shall mean Assignee if such an assignment is effected); and (ii) the Policy's sole beneficiary shall be and be deemed to be its Buyer unless and until such time as the Buyer, as rightful owner, effectively designates one or more new beneficiaries in accordance with the Policy's terms, this Order, and the Sale Order approving the Receiver's sale or transfer of the Policy to the Buyer.

3

*Id.* at ¶3A.  Thus, "Buyer" or an "Assignee" becomes *the sole owner of an individual Policy*. Setting aside the language addressing group Policies, the subject provision applies to individual Policies in terms of the sale of whole individual Policies and does not address "Buyer" and/or "Assignee" in terms of the sale of fractional interests in individual Policies.

On September 26, 2007, the Court granted the Receiver's motion for approval to sell interests in Undersubscribed Keep Policies, or authority to allow such policies to be sold in their entirety, to reduce the face amount of such policies, or to surrender or lapse such policies. (DE 1964; DE 1949).  On March 25, 2008, the Receiver sought the Court's approval to engage a third-party to conduct auctions of fractional interests in Undersubscribed Keep Policies.[3] (DE 2046).  The Receiver's motion included a proposed notice to prospective purchasers of such fractional interests, which warned that "fractional interests are highly speculative" and that "the purchase . . . involves a high degree of risk of loss of investment."  (DE 2046-1 at 2).  Additionally, the proposed notice warned that "the fractional interests may not be transferred" pursuant to securities laws in the absence of an effective registration statement or an opinion of counsel satisfactory to the Receiver and his counsel that registration was not required.  *Id.* at 2.  Further, the proposed notice warned, *inter alia*, that the Receiver retained the ability to sell the entire policy or take other actions that could result in a total loss or reduction of a return on investment relative to the policy staying in force until Maturity, if the policy to which the fractional interest applied became further undersubscribed.  *Id.* at 11.  The motion also included a form of a proposed Asset Purchase Agreement ("APA") for fractional interests.[4]  (DE 2046-2).

---

[3] The Court approved the motion on April 28, 2008.  (DE 2072).

[4] The form of APA attached to the Receiver's motion differs somewhat from language that appears in later executed APAs between Acheron and the Receiver and Acheron and the Trustee.  *Compare*

The Receiver filed a notice on February 20, 2009 referencing auction sales of Policies, including sales of fractional interests in Policies, approved by the Court on January 5, 2009 ("Notice").  (DE 2236 at 1).  The Notice stated that "the provisions in [the order approving the sales] providing that such sales are *free and clear of any 'Encumbrance . . . '* are *not intended in any way to modify or abridge* the terms of the Court's [*Order Regarding Future Administration* or a subsequent order]."[5]  (DE 2236 at 1-2) (emphasis added).

---

DE 2046-2 at §§ 4.2-4.3 with DE 2901 at p. 27, § 4.3 and with DE 2901 at p. 56, § 1.  In particular, the later-executed APAs specifically exclude the Court's Order Regarding Future Administration (DE 1887) from being considered an "Encumbrance":

> 4.3    Title to Acquired Assets.  Seller is conveying good and valid title to the Acquired Assets free and clear of any Encumbrances.  Provided, *however*, that *the terms and conditions set forth in the Court's Order Regarding Future Administration* of Certain Insurance Policies Subject to this Proceeding entered on April 30, 2007 (D.E. 1887) *shall not be deemed an "encumbrance"* for purposes of this section.  All of Seller's and each Receivership Entity's claims, options, privileges, right, title and interest in to, and under the Acquired Assets, including all beneficial interests in the Policies, will be sold, conveyed, assigned, transferred and delivered to Buyer at Closing, free and clear of all Encumbrances.

(DE 2901 at p. 27, § 4.3) (emphasis added).

> "Encumbrance" means any lien (statutory or otherwise), claim Liability, interest, beneficial interest, right, pledge, option, charge, hypothecation, security interest, right of first refusal, mortgage, deed of trust or other encumbrance of any kind or any right or interest of any party; provided, *however*, that *the terms and conditions set forth in the Court's Order Regarding Future Administration* of Certain Insurance Policies Subject to this Proceeding entered on April 30, 2007 (D.E. 1887) *shall not be deemed an "encumbrance"* for purposes of this section.

(DE 2901 at p. 56, § 1).  In the APAs between Acheron and the Trustee, § 4.3 entitled "Title to Acquired Assets" omits excluding the Court's Order Regarding Future Administration from being considered an "encumbrance" because the Order is excluded from the definition of Encumbrance in § 1.  *Id.* at p. 60, § 4.3 (emphasis added).

[5] The Court's Order Granting Receiver's Motion to Approve Auction Sales of Policies (including fractional interests in policies) stated that the sale was "not precluded by or contrary to any prior order issued by this Court," which would include the Order Regarding Future Administration. (DE 2215 at ¶8).  Furthermore, the Order stated that the transfer of the "Acquired Assets" would be "free and clear of all Encumbrances (as defined in the Purchase Agreement)."  *Id.* at ¶5.

### B.  The Trust Agreement

On April 2, 2009, the Receiver filed a motion seeking, *inter alia*, the Court's approval of a form of Trust Agreement entitled the Mutual Benefits "Keep Policy" Trust Agreement (DE 2266; DE 2266-5), which motion the District Court granted (DE 2267).  On July 28, 2009, the Receiver filed a submission explaining, *inter alia*, that he proposed Barry Mukamal, C.P.A., to serve as Trustee and that the Trustee would "take[ ] control of . . . the nominal ownership interests in the Keep Policies" among other duties and responsibilities.  (DE 2315 at 10).  The Receiver and the Trustee executed the Trust Agreement ("Trust Agreement") on September 25, 2009.  (DE 2540-1).  The Trust Agreement defines Policy Administration Orders and includes in that definition the Order Regarding Future Administration.  *Id.* at § 1.1.  By executing the Trust Agreement, the Receiver, *inter alia*, "transfer[red] . . . to the Trustee all of the Receiver's rights, powers and privileges under the Policy Administration Orders."  *Id.* at § 2.3.

Under Section Three of the Trust Agreement, the Trustee has broad powers and duties, which specifically include, but are not limited to:

> To hold the status of owner and "nominal beneficiary" with respect to all Keep Policies, as is presently held by the Receiver pursuant to the Policy Administration Orders, and to hold and execute, in his discretion, all of the rights, powers and privileges of the Receiver under the Policy Administration Orders;

> To enter into and perform the obligations of the Trustee . . . consistent with the Policy Administration Orders . . .; [and]

> In the event that the Servicing Agreement is terminated or expires and the continued servicing of the Keep Policies becomes unfeasible, to authorize and direct the sale, surrender, or lapse of the Keep Policies, and to distribute the proceeds, if any, of the Keep Policies, upon such sale, surrender or lapse, to the Keep Policy Investors in such manner as the Trustee determines to be appropriate.

*Id.* at § 3(a), (b)(ii), (b)(iii) and (b)(xvii).  Section Eight of the Trust Agreement entitled "Termination" provides, in part, that the "Trust Agreement shall terminate upon the final

disposition of all Keep Policies, whether by maturity, sale, surrender, or lapse." *Id.* at § 8. Thus, the Trust Agreement contemplated that the Trustee would have the power to sell, surrender or lapse Keep Policies in connection with a wind down and termination of the Trust under circumstances such as those that exist here, i.e., where the Trust lacks resources to continue the servicing of the Keep Policies.[6]

### C. The 2015 Agreement

On March 19, 2015, the Trustee made an agreement (the "2015 Agreement") with Acheron. (DE 2500-2). The 2015 Agreement resulted from extensive negotiations between Acheron and the Trustee and was intended to resolve Acheron's concerns as a buyer of defaulting policy interests held by the Trust.[7] (DE 2500 at 4, 9). Relevant to the instant dispute, Section Four of the 2015 Agreement states:

> 4.    Sale of Policies. **The Trustee acknowledges that he will not seek to sell a policy in which Acheron owns an interest** (and for which Acheron has timely paid all administrative fees, premium obligations and any other expenses for which Acheron is responsible as an owner of an interest in such policy) **without first extending to Acheron the opportunity to buy other interests in the policy** pursuant to the Disposition Services routinely conducted by the Servicer, **except in**

---

[6] *See also* DE 2310 at 28:23-29:5 (reflecting the Receiver's counsel's statement to the Court that "[i]f the Trust is unsustainable because, for instance, not enough administrative fees can be collected that will keep the trust fund replenished, then the trust[ee] will have to address whether it can identify another servicer that can do it cheaper. And, if not, it has the authority to determine how to dispose of the policies including selling them if it is financially infeasible to service them.").

[7] Acheron began purchasing fractional interests in undersubscribed policies in 2009 from the Receiver and has continued purchasing fractional interests in such policies from the Trustee. (DE 2925 at 9:16-20). As of April 1, 2021, the Trust was servicing 1,289 policies, and Acheron has an interest in 1,064 of those policies with a face value of $155 million. (DE 2925 at 9:22-25). Acheron owns 100% of 290 of the 1,064 policies. (DE 2925 at 10:3-5). Hundreds of the remainder of the 1,064 policies are 70 percent or more owned by Acheron. (DE 2925 at 10:10-12). Acheron reported paying more than $40 million for its purchases. (DE 2925 at 10:13-15). Acheron's purchases of the defaulting interests and payment of the premiums allowed the policies to continue rather than lapse. (DE 2925 at 10:16-25). The Trustee reported that, in exchange for the $40 million Acheron paid to acquire interests in policies and to fund them, Acheron has "received already over – approximately $250 million in death benefit[s]." (DE 2925 at 66:21-24).

> **the event of a liquidation of the Trust and sale of the entire portfolio of policies owned by the Trust.  In the event of such a sale, Acheron will have the right to bid upon any sale of a policy in which it has an interest and the right to top any bid submitted by another party.**

(DE 2500-2 at §4) (emphasis added) ("Section Four").

The instant Motion seeks confirmation of the Trustee's authority to sell the entire portfolio of "Keep Policies" owned by the Trust as part of the Trust's wind down and termination.  (DE 2918 at 4; DE 2910 at 1, 15; DE 2914 at 27:6-21; 50:5-51:1; 52:1-56:3).  Acheron argues that, under the APAs, the Trustee gave up the right to sell Acheron's fractional interests in policies.  (DE 2901 at 2).  Specifically, Acheron argues that, through the APAs, it "acquired the right to receive the death benefits payable under a policy."  (DE 2901 at 5; DE 2929 at 13, n.4).

Acheron also argues that, under the separate and independent 2015 Agreement, the parties restricted the manner in which the Trustee can sell policies in which Acheron has an interest in the event of a liquidation of the Trust.  (DE 2901 at 2-3, 10)  Specifically, Acheron contends that the 2015 Agreement requires that the policies be sold on "either: (i) a policy by policy [basis], or (ii) if a portfolio sale, [that] a policy per policy price . . . be determined by the buyer or the auctioning party equal in the aggregate to the total bid made" so that "Acheron can then have a 'last look' on a policy per policy (not portfolio) basis."  (DE 2901 at 2-3; 10-11, 14; DE 2928 at 7; DE 2929 at 4, 6).

## II.   <u>LEGAL STANDARDS</u>

Under Florida law, "[t]he intent of the parties to the contract should govern the construction of a contract." *Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd.*, 593 So.2d 195, 197 (Fla. 1992) (citation omitted); *see also Royal Oak Landing Homeowner's Ass'n, Inc. v. Pelletier*, 620 So. 2d 786, 788 (Fla. 4th DCA 1993).  "[T]he language itself is the best evidence of the parties' intent, and its plain meaning controls." *Hahamovitch v. Hahamovitch*, 174 So. 3d 983, 986 (Fla.

2015) (internal quotation marks and citation omitted).   Indeed, courts ensure that "plain and unambiguous contract terms receive their plain and unambiguous meanings[,] and . . . [that] contractual provisions are . . . interpreted in the context of the entire agreement." *Rivercrest Cmty. Ass'n, Inc. v. Am. Homes 4 Rent Properties One, LLC*, 298 So. 3d 106, 111 (Fla. 2d DCA 2020). "Where a contract is clear and unambiguous, courts cannot indulge in construction or interpretation of its plain meaning.   And, when a contract is silent on a matter, the court cannot impose contractual rights and duties under the guise of construction." *Blok Builders, LLC v. Katryniok*, 245 So. 3d 779, 784 (Fla. 4th DCA 2018) (internal quotation marks and citations omitted). Furthermore, "[i]t is never the role of a trial court to rewrite a contract to make it more reasonable for one of the parties or to relieve a party from what turns out to be a bad bargain." *Barakat v. Broward Cty. Hous. Auth.*, 771 So. 2d 1193, 1195 (Fla. 4th DCA 2000).

"The goal in construing the contract language is to reach a reasonable interpretation of the entire agreement in order to accomplish its stated purpose and meaning." *Hatadis v. Achieva Credit Union*, 159 So. 3d 256, 259 (Fla. 2d DCA 2015) (citing *Murley v. Wiedamann*, 25 So. 3d 27, 29 (Fla. 2d DCA 2009)); *see also Am. Home Assur. Co.*, 593 So. 2d at 197 ("To determine the intent of the parties, a court should consider the language in the contract, the subject matter of the contract, and the object and purpose of the contract.").   Therefore, "where one interpretation of a contract would be absurd and another would be consistent with reason and probability, the contract should be interpreted in the rational manner." *Hatadis*, 159 So. 3d at 259 (quoting *BKD Twenty–One Mgmt. Co. v. Delsordo*, 127 So.3d 527, 530 (Fla. 4th DCA 2012)).   Also, courts "will not interpret a contract in such a way as to render provisions meaningless when there is a reasonable interpretation that does not do so." *Moore v. State Farm Mut. Auto. Ins. Co.*, 916 So. 2d 871, 877 (Fla. 2d DCA 2005) (citation omitted).   Furthermore, "a provision specifically dealing with a

particular subject controls over another provision only generally dealing with that subject." *Island Manor Apartments of Marco Island, Inc. v. Div. of Fla. Land Sales, Condominiums & Mobile Homes*, 515 So. 2d 1327, 1330 (Fla. 2d DCA 1987) (citing *Raines v. Palm Beach Leisureville Community Association*, 317 So.2d 814 (Fla. 4th DCA 1975).  In addition, "[l]anguage used in business documents . . . should be interpreted as reasonable persons, knowledgeable about the business or industry, would likely interpret them." *Hussmann Corp. v. UPS Truck Leasing, Inc.*, 549 So. 2d 215, 217 (Fla. 5th DCA. 1989) (citing, in part, *Nat'l Merch. Co. v. United Serv. Auto. Ass'n*, 400 So. 2d 526, 531 (Fla. 1st DCA 1981) ("Commercial transactions and contracts should be interpreted in light of custom or trade usage.")).  Moreover, courts may look to the parties' post-agreement conduct to discern intent.  *Hirsch v. Jupiter Golf Club LLC*, 232 F. Supp. 3d 1243, 1252–53 (S.D. Fla. 2017) (citations omitted).

"Florida law . . . recognizes the parol evidence rule.  Evidence of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid contract. This rule applies when the parties intend that a written contract incorporate their final and complete agreement." *Ungerleider v. Gordon*, 214 F.3d 1279, 1282 (11th Cir. 2000) (citation and internal quotation marks omitted).  "[A] phrase in a contract is 'ambiguous' only when it is of uncertain meaning[] and may be fairly understood in more ways than one." *Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 991 (11th Cir. 2012) (internal quotation marks and citation omitted).  "[A]mbiguity does not exist[, however,] merely because a contract can possibly be interpreted in more than one manner.  Indeed, fanciful, inconsistent, and absurd interpretations of plain language are always possible.  It is the duty of the trial court to prevent such interpretations." *Am. Med. Int'l, Inc. v. Scheller*, 462 So. 2d 1, 7 (Fla. 4th DCA 1984).

## III.   **DISCUSSION**

For reasons explained herein, I find that the APAs do not restrict the Trustee's ability to sell whole policies in which Acheron holds fractional interests. Further, I do not find that the 2015 Agreement confers upon Acheron the right to a "last look" nor that the agreement requires liquidation of the Trust's policies on a policy to policy basis. With the above legal principles in mind, I discuss each of the subject agreements in turn.[8]

---

[8] Although it does not change the ultimate outcome of my recommendation here, I credit Acheron's argument that "the Court has not adjudicated . . . the issues raised [by the Trustee's Motion]—that is, the interplay between Acheron's contractual right[s] . . . and the Trustee's proposed plan to end the Trust." (DE 2901 at 3). The Trustee argues that, pursuant to the District Court's rejection of Acheron's objection to a Report and Recommendation, this Court has decided already that he has the right to sell whole Keep Policies upon liquidation of the Trust *notwithstanding the Acheron entities' contractual rights*." (DE 2910 at 7) (emphasis added). On July 27, 2020, I issued a Report and Recommendation recommending approval of the Trustee's wind down motion and denial of Acheron's wind down motion ("Wind Down R&R"). (DE 2723). The Wind Down R&R included a footnote that stated:

> At the Status Conference, Acheron indicated that, if the Trustee sold entire policies in which Acheron maintained an interest *prior to a termination of the Trust*, it would preserve its rights to raise this as a breach of the March 2015 Agreement because that agreement extended rights to Acheron to acquire further fractional interests in policies where it had already acquired some interest. (DE 2693 at 84:23-86:5; DE 2500-2 at § 4). The March 2015 Agreement allows the Trustee, though, to sell whole policies if he is terminating the Trust. (DE 2500-2 at § 4). In the event of such whole policy sales, Acheron may bid on the whole policy against other potential buyers and is entitled to the opportunity to top any other bids. *Id.* Thus, Acheron will likely be required to pay significantly more than what it initially paid for its fractional interest in a policy in order to preserve its opportunity to realize the face value of the underlying policy upon maturity. Given the likelihood that Acheron has contributed to paying the premiums for the underlying policies, and considering the initial amount that Acheron paid to purchase its fractional policy interests, adding a payment for the current market value of a whole policy in order to salvage this previous investment will significantly reduce Acheron's return on investment.

(DE 2723 at 11, n.14) (emphasis added). Acheron objected to the Wind Down R&R "to the extent it address[ed] issues relating to the possibility of future sales of Keep Policies." (DE 2736 at 8). In particular, Acheron stated that it continued to reserve all rights under the 2015 Agreement and the APAs, including Section 9.2 of the APAs, which "restricts the assignment of any rights or the

A.      **The APAs**

Acheron's argument that the Trustee is precluded from selling Acheron's fractional interests in policies (by selling whole or entire policies) fails because Acheron's purchases of fractional interests were made subject to the Order Regarding Future Administration (DE 1887). (DE 2901 at p. 27, § 4.3; p. 56, § 1) (stating that "the terms and conditions set forth in the Court's Order Regarding Future Administration of Certain Insurance Policies Subject to this Proceeding entered on April 30, 2007 (D.E. 1887) shall not be deemed an 'encumbrance'"). As explained in Footnote 4 *supra*, the term "Encumbrance" in the APAs does not include the Order Regarding Future Administration.

The Trustee is authorized by the Trust Agreement to liquidate the Trust's assets, comprised primarily of the insurance policies held by the Trust, in the event that the continued servicing of the Trust's assets becomes infeasible. DE 2540-1 at §§ 3(a), (b)(ii), (b)(iii), (b)(xvii); 8. On March 15, 2021 the Trustee indicated that sale of the Keep Policies held by the Trust should occur by the fourth quarter of 2021 in connection with the Trust's wind down to avoid substantially increasing

---

delegation of any obligations by the Seller without prior written consent of Acheron." (DE 2736 at 8-9). In adopting the Wind Down R&R and addressing Acheron's objections, the District Court found, *inter alia*, that: (i) "[t]he parties do not dispute that the purpose of the Keep Policy Trust was to administer the policies through maturity, if possible, for the benefit of the Keep Policy Investors until termination is proper," and (ii) "the March 2015 Agreement (D.E. 2500-2 at § 4) allows the Trustee to sell whole policies if he is liquidating the Trust or selling the entire portfolio of policies." (DE 2825 at 3, 5). Further, the District Court quoted the language in Section Four and found that "the Magistrate Judge [did not err] in this statement contained in the March 2015 Agreement." *Id.* at 5. Thus, I conclude that the District Court did not decide Acheron's contractual rights at issue given the Trustee's sale of whole policies in a wind down scenario. Rather, the District Court simply found that the 2015 Agreement made provision for the Trustee to sell whole policies in the event of a liquidation. Accordingly, I proceed by addressing Acheron's objections to the Trustee's Motion based upon its asserted contractual rights.

the Administrative Fee[9] that investors in the Keep Policies would need to pay in order to sustain the continued administration of the policies.  (DE 2882 at 5).  Thus, the Trustee has determined that the conditions for termination of the Trust and for sale of the Keep Policies held by the Trust are present, and the Trustee is empowered to wind down the Trust and liquidate the Trust's assets by the terms of the Trust Agreement.

The APAs at issue preserve the ability of the Trustee to sell the Keep Policies held by the Trust.  While the APAs assign title to Acheron of the policy interests sold "free and clear of any Encumbrances," the Order Regarding Future Administration is excluded from being considered an Encumbrance.  (DE 2901 at p. 27, § 4.3; p. 45, § 1).  Said otherwise, the terms and conditions of the Order Regarding Future Administration *are* encumbrances on the policy interests that Acheron purchased from both the Receiver and the Trustee.[10]

Acheron, however, argues that it is not subject to the terms and conditions in the Order Regarding Future Administration that allow for the sale of its fractional interests in policies. Acheron's response acknowledges that the Order Regarding Future Administration notes that "investors' interests are subject to modification, sale, liquidation, forfeiture or termination as the

---

[9] Litai Assets, LLC ("Litai"), the Trust's Servicer, charges an annual administrative fee ("Administrative Fee") for each fractional interest serviced.  *See* DE 2809 -14 at § 12.1.1 (setting the initial Administrative Fee at $300 per year for each fractional interest pursuant to the Servicing Agreement dated September 15, 2009).  At the May 19, 2021 status conference, the Trustee estimated that Litai's current Administrative Fee of $515 per fractional interest could go as high as $800 per fractional interest, perhaps more, depending upon how much acceleration occurs in default rates. (DE 2939).  The Trustee reported that the Administrative Fees have been completely subsidized for the last two years.  *Id.*  Because the funds to continue the subsidy will run out by this year end, the Trustee expressed concern that default rates would accelerate, which could substantially increase the Administrative Fee for those investors who would choose to continue to pay servicing fees and premium costs to maintain their interests in Keep Policies.  *Id.*

[10] The APAs making the purchase of fractional interests subject to the Order Regarding Future Administration (DE 1887) is consistent with the Court's understanding as confirmed by the Receiver in his Notice discussed *supra*.  (DE 2236 at 1).

Court may expressly determine."  (DE 2901 at 6).  Indeed, Paragraph 1.C. of the Order Regarding Future Administration by its plain language subjects "[t]he interests of all *investors* in and beneficiary of each such Policy" to the Order.  (DE 1887 at ¶1.C) (emphasis added).  As previously noted, the APAs through which Acheron purchased fractional interests from both the Receiver and the Trustee preserved this limitation on the interests Acheron purchased.

Acheron argues, however, that it is a "Buyer" and not an "investor" under the terms of the Order Regarding Future Administration such that the Order Regarding Future Administration protects its right to hold its interests until policy maturity.  At the Motion Hearing, Acheron asserted that the Order Regarding Future Administration recognized three types of interest holders: investors, buyers and subsequent acquirers.  (DE 2925 at 20:23-21:13).  Acheron argued  that it is a "Buyer" or "subsequent acquirer" under that Order rather than an "investor."  (DE 2925 at 20:22-24; 21:19-22:3).  Acheron argued that it is not an investor because the Order Regarding Future Administration defines "investor" on page three of the Order as a purchaser from the Receivership Entities, and Acheron did not purchase its interests from the Receivership Entities. *Id.* at 21:3-7, 19-21.  Acheron reasoned that, because it is not an investor under the Order, the Order does not "speak[] to the resale of Acheron's assets."  (DE 2925 at 23:5-8).  Rather, Acheron points to the Order Regarding Future Administration's statement that: "**[i]t is the intention of this Order that Policies the Receiver sells or transfer[s] to a Buyer pursuant to a Sale Order be preserved to the fullest extent possible <u>for the benefit of the Buyer</u> and its legal successors and lawful assigns[.]**" (DE 2901 at 7 referencing DE 1887 at ¶15) (emphasis in original).

Therefore, Acheron argued that the APAs preclude the Trustee from selling wholesale policies in which Acheron has purchased fractional interests.  (DE 2925 at 28:1-8; 32:1-33:8).  Rather, Acheron posited that the Trustee must sell policies *subject to* Acheron's interests because,

pursuant to the APAs, the Receiver and the Trustee made "a bigger exchange than they had with the original investors," and Acheron has a right to maintain its fractional interests until policies mature.  *Id.* at 28:6-8.

Acheron's argument that it is a "Buyer" rather than an "investor" under the Order Regarding Future Administration – with the consequent implication for how its interests must be treated – is incorrect.  As the Trustee correctly argues, Acheron purchased "Fractional Interests," which are defined by the APAs as being interests in policies owned by the Receivership or the Trust (DE 2901 at pp. 22-25, §§ 1, 2.1 and pp. 55-58 at §§ 1, 2.1).  As previously noted, the Order Regarding Future Administration discusses "Buyer" or an "Assignee" in terms of acquiring an entire individual Policy and not in terms of acquiring fractional interests in an individual Policy. *Id.* at ¶3A.  Therefore, nothing in the Order Regarding Future Administration defines Acheron as a "Buyer" by virtue of its purchase of fractional interests in policies owned by the Receiver (and later transferred to the Trust) or in policies owned by the Trustee.

In addition to the fact that the Order Regarding Future Administration only refers to "Buyers" in the context of those purchasing entire policies, I find that it is most logical to consider Acheron an investor in a Policy under the terms of the Order Regarding Future Administration. As to Acheron's argument that it does not fit the Order's definition of "investor," Acheron misconstrues the order.  "Investor" is not a defined term.  Page three of the Order notes in a parenthetical discussing a motion by the Receiver for the Court to issue directives to insurance companies that "[f]ollowing common usage of the Receivership Entities and in the viatical industry, the term 'investors' is used to mean persons who purchased from the Receivership Entities an interest, usually an undivided fractional interest."  (DE 1887 at 3).  The parenthetical explanation, however, falls short of defining "investor" for purposes of the entire Order.  Paragraph

1.C. of the Order states that "[t]he interests of *all* investors in and beneficiaries of each such Policy, however those interests may have been created  . . . are and shall continue to be subject to this Court's orders." *Id.* at ¶1.C. (emphasis added).  Thus, under Paragraph 1.C., Acheron qualifies as an investor.  Additionally, if Acheron was a "Buyer" or "subsequent acquirer" under the Order such that it was exempt from the provisions subjecting its interests to modification, etc., then the language in the APAs exempting the Order Regarding Future Administration from being considered an "Encumbrance" would be superfluous.  *See Moore*, 916 So. 2d at 877 (stating that courts do not "render provisions meaningless when there is a reasonable interpretation that does not do so").  Indeed, there would be no point of the APAs specifically excluding the Order from being considered an encumbrance if it was not to allow the Order to be an encumbrance.

I conclude, therefore, that the APAs do not assure Acheron that it can retain its interests through to policies' maturity.  Nothing in the APAs specifically confers upon Acheron the right to maintain its fractional interests until policies mature, and the Court is not permitted to rewrite the APAs to find that Acheron has such a right.[11]  *Barakat*, 771 So. 2d at 1195.  Rather, the APAs specifically identify the Order Regarding Future Administration in terms of being an encumbrance, and Acheron purchased its fractional interests subject to that encumbrance.  Thus, I conclude that

---

[11] Acheron also argues that there are riders permitting the splitting of ownership of policies and argues that the Trustee should disclose and impliedly work to split policies so that Acheron could separate the part that it owns into a separate, whole policy that Acheron 100 percent owns. (DE 2901 at 14).  Then, Acheron could remove such 100 percent-owned policy from the Trust. The Trustee argues that such "splitting" is based upon a triggering event such as a divorce, change in tax law, etc., which would not be applicable in the present circumstances.  (DE 2910 at 13). Moreover, the Trustee asserts that he is not aware of any such rider that would permit splitting here and warns that he does not have an obligation to undertake the onerous task of reviewing all the policies for the possibility of splitting, let alone the time and expense to implement splitting. Because Acheron does not identify a specific right to such splitting in the APAs nor even a specific type of rider that would permit splitting, I do not find that the Trustee has an obligation to split the ownership of policies.

the fractional interests Acheron purchased pursuant to the APAs are "subject to modification, sale, liquidation, forfeiture, or termination as the Court may expressly determine, prescribe, or permit by order . . . and by any future orders authorizing, approving, or directing that specified Policies shall be sold, transferred, surrendered, or permitted to lapse."  (DE 1887 at ¶1.C.).  The Court specifically approved by order the Trust Agreement, which empowers the Trustee to "authorize and direct the sale, surrender, or lapse of the Keep Policies" having determined that the Servicing Agreement will be terminated because "the continued servicing of the Keep Policies [has] become unfeasible."  (DE 2266; DE 2267).  Therefore, I find that the APAs affirm rather than preclude the Trustee's ability to sell the Keep Policies in their entirety, including those Keep Policies in which Acheron has purchased fractional interests.[12]

**B.**     **The 2015 Agreement**

I find for reasons set forth below that the 2015 Agreement does not require the Trustee to sell or value the policies on a policy by policy basis when liquidating the Trust nor is the Trustee required to provide Acheron with a right to a "last look."[13]  As the Trustee argues, construing the

---

[12] As the Trustee correctly argues, "[Nothing] in the APA's require 'Acheron's approval' before policies are sold to a third party, as claimed in the Acheron Response."  *Id.* at 7-8.  Indeed, "[b]y effectuating a sale, the Trustee is exercising the authority granted to him by the Trust Agreement approved by Court Order to which the Fractional Interests are subject, not 'delegating his obligations under the APAs.'"  (DE 2910 at 10).

[13] On April 30, 2021, I directed the Trustee and Acheron to file supplemental briefing.  (DE 2923). I directed Acheron to "explain and support how the language in Section Four mandates a policy by policy bid process where Acheron is afforded a last look as Acheron contends (and precludes other procedures that afford Acheron an opportunity to submit bids and actively participate in an auction)."  *Id.* at 4.  I directed the Trustee to "explain and support why the language in Section Four does not mandate a policy by policy bid process but instead may be read to require that Acheron top bids as others submit them in an auction process rather than on a "last look" basis." *Id.*  Thus, I focus on the parties' arguments in the supplemental briefing because I directed the parties to provide authoritative support for their positions on construing Section Four as such support was missing in the parties' previous briefings.

plain language of Section Four in accordance with contract construction principles does not support Acheron's position that the Trust's liquidation must be conducted on a policy by policy basis nor in a manner to provide Acheron with last look rights on individual policies. (DE 2927 at 2). "Acheron attempts to graft upon ['the right to bid upon any sale of a policy in which it has an interest,' and 'the right to top any bid submitted by another party'] a 'policy by policy' requirement and 'last look' right that are not contained in the document."[14]   *Id.* at 7 (citing *Huntington v. Lemon Tree I-Condominium*, 874 So. 2d 1, 4-5 (Fla. 5th DCA 2005) (stating that "courts will approve the reasonable, logical and rational interpretation")).   Indeed, the Trustee correctly argues that the Court is not permitted to add such terms ("policy by policy" and "last look") to the contract to afford Acheron the rights that it seeks.[15]  (DE 2927 at 2) (citing *Intervest*

---

[14] A re-review of Section Four of the 2015 Agreement illuminates Acheron's attempt to add in requirements and rights that are not explicitly stated in the provision:

> 4.   <u>Sale of Policies</u>. **The Trustee acknowledges that he will not seek to sell a policy in which Acheron owns an interest** (and for which Acheron has timely paid all administrative fees, premium obligations and any other expenses for which Acheron is responsible as an owner of an interest in such policy) **without first extending to Acheron the opportunity to buy other interests in the policy** pursuant to the Disposition Services routinely conducted by the Servicer, **except in the event of a liquidation of the Trust and sale of the entire portfolio of policies owned by the Trust.  In the event of such a sale, Acheron will have the right to bid upon any sale of a policy in which it has an interest and the right to top any bid submitted by another party.**

(DE 2500-2 at §4) (emphasis added).

[15] Acheron contends that Section Four confers upon it a "Right to Bid" on a policy if it already has an interest in that policy and a "Right to Top Any Bid" *on a policy* where a bid is submitted by another party on a policy in which Acheron owns an interest (DE 2928 at 2-3; 6).   Acheron maintains that these rights are separate in that the Right to Top Any Bid is an additional right to the Right to Bid, and that Acheron may choose to exercise the Right to Top Any Bid without exercising its Right to Bid.  *Id.* at 6.  Nonetheless, Acheron insists on reading the phrase "on a policy"—which is stated only in the description of the Right to Bid and implies exercise of that right on a singular policy (as opposed to plural policies)—into the Right to Top so as to force the sale of policies, or the valuation of policies, to be on a policy by policy basis.  Acheron argues that, because both rights are set out in the same sentence, the Right to Top Any Bid refers back to the

*Const. of Jax, Inc. v. Gen. Fed. Ins. Co.*, 133 So. 3d 494, 497 (Fla. 2014) (stating that courts "may not rewrite contracts [to] add[   ] meaning that is not present") and *Blok Builders, LLC*, 245 So. 3d at 784 (stating that "where a contract is silent on a matter, the court cannot impose contractual rights and duties under the guise of construction")).

In contrast, the Trustee's proposed interpretation of Section Four does not involve a strained reading of the language nor additions to the provisions. The Trustee analyzes the whole of Section Four to make the point that the parties intended to set forth Acheron's rights in the event of the Trust's liquidation without identifying the specific terms and conditions of a sales process. Even so, under the Trustee's proposed construction, Acheron's conferred rights are given full effect.[16] (DE 2927 at 3-7). As the Trustee notes, Section Four is comprised of two (2) sentences. (DE 2927 at 3). The first sentence contains two (2) clauses: (i) a prohibition against the Trustee selling a policy in which Acheron owns an interest "without first extending to Acheron the opportunity to buy the other interests in the policy pursuant to the Disposition Services routinely conducted by the Servicer" and (ii) an exception stating that the first clause applies "except in the

---

Right to Bid on "a" policy, which is the only other reference to "bid." (DE 2928 at 7) (citing *Niz-Chavez v. Garland*, 141 S. Ct. 1474 (2021) for the proposition that a "statute's reference to 'a' notice means a single notice, not some variation of that"). I find, however, that this is a strained reading of the provision, especially when Acheron acknowledges the Right to Bid and Right to Top Any Bid are separate rights allowing it to exercise one and not the other.

[16] Acheron argues that "[t]he part of Section Four that generally addresses the sale of the entire portfolio without any further elaboration does not control or override Acheron's Right to Bid and Right to Top Any Bid in the way the Trustee asserts; it is the other way around – those specified rights control how such a generally referenced sale should be conducted, that is, subject to Acheron's Right to Bid and Right to Top Any Bid." (DE 2928 at 5) (citing *Aucilla Area Solid Waste Admin. v. Madison Cty.*, 890 So. 2d 415, 416-17 (Fla. 1st DCA 2004) (stating that "a contract provision specifically dealing with a particular subject matter controls over a provision generally dealing with that same subject matter")). Acheron is correct to the extent it argues that the sale of the entire portfolio in a liquidation of the Trust does not override Acheron's rights. Nevertheless, contrary to Acheron's argument, the Trustee's proposed construction gives effect to Acheron's rights consistent with their plain meaning.

event of a liquidation of the Trust and sale of the entire portfolio of policies owned by the Trust." *Id.* Notably, the first clause references a specific sales process—Disposition Services routinely conducted by the Servicer—in connection with Acheron's "opportunity to buy" when the Trustee sells a policy outside of a liquidation scenario. *Id.*

The second sentence of Section Four identifies the rights that Acheron has "in the event of such a sale," which is a reference to rights to be conferred in the event of a liquidation of the Trust and sale of the entire portfolio of policies owned by the Trust." *Id.* The Trustee, like Acheron, identifies that, under Section Four's second sentence, Acheron has two distinct rights: (1) "the right to bid upon any sale of a policy in which it has an interest," and (2) "the right to top any bid submitted by another party." *Id.* at 3-4. The second sentence of Section Four does not reference a specific sales process.

The Trustee argues correctly that the "opportunity to buy," which relates to a specific sales process in the first sentence of Section Four, is to be construed as having a different meaning than the "right to bid" and the "right to top any bid" in the second sentence. *Id.* at 4 (citing, *inter alia*, *Kel Homes, LLC v. Burris*, 933 So. 2d 699, 703 (Fla. 2d DCA 2006) (stating that "the use of different language in different contractual provisions strongly implies that a different meaning was intended")). Applying rules of contract interpretation, I conclude from the difference in the two sentences that parties intended that the right to bid and the right to top would not specify the sales procedures or process by which Acheron must be provided its right to bid and right to top. *Rivercrest Cmty. Ass'n, Inc.*, 298 So. 3d at 111; *Blok Builders*, LLC, 245 So. 3d at 784. Based on the lack of reference in the second sentence to specific sales procedures, which immediately follows a sentence that identifies a specific sales process, it appears that parties were intentionally silent in the second sentence as to the specific manner by which Acheron's rights would be

conferred.  Thus, Acheron's argument that its right to bid and right to top *must be read* to mandate a "policy by policy" sales process fails on this basis.

With respect to the Right to Bid, Section Four may be read to give Acheron this right without addition or modification as herein described.  The Trustee submits that the *right to bid on a policy* that is conferred upon Acheron in the first clause of the second sentence simply prohibits the Trustee from selling to a third-party a policy in which Acheron holds an interest before affording Acheron the right to offer to pay a specified price for the policy.[17]  (DE 2927 at 4-6, n. 2).  "Bid" means "a buyer's offer to pay a specified price for something that may or may not be for sale." (DE 2927 at 4) (quoting *Black's Law Dictionary* (11th ed. 2019) and *Newman v. 911 Alwyn Owners Corp.*, 2015 WL 1839917, at *4 (N.Y. Sup. Ct. 2015)).  As the Trustee observes, soliciting a bid entails making a request for offers, which the soliciting party is free to accept or reject.  (DE 2927 at 4).  *See United States v. Conrad*, 619 F. Supp. 1319, 1321 (M.D. Fla. 1985) (stating that "a bid constitutes an offer"); *Blossom v. Milwaukee & C.R. Co.*, 70 U.S. 196, 206 (1865) (holding that "every bidding at an auction is nothing more than an offer on one side until it has received the assent of the auctioneer as the agent of the owner").  Therefore, the Trustee argues that the clause serves to prevent him from excluding Acheron from making a bid by conducting a private third-party sale.  (DE 2927 at 5).  Interpreting the clause in this manner does not require the addition of any details concerning a sales process because it is providing Acheron an opportunity to make a bid on individual policies once the Trustee determines it necessary to

---

[17] Acheron acknowledges the Trustee's "private sale" explanation by asserting that "Acheron does not have a *contractual right* as part of the liquidation of the Trust to object to a private sale of a policy in which it does not own an interest." (DE 2928 at 3) (emphasis in original).  The reverse is also true – Acheron does have a right to object to the private sale of a Policy in which it does own an interest because its right to bid under Section Four prevents the Trustee from selling such a Policy in a private sale without giving Acheron a right to bid.

liquidate the Trust and sell the entire portfolio of policies owned by the Trust.  Accordingly, I find that the plain language of Section Four of the 2015 Agreement as written gives Acheron the right to make a bid *on a policy* in which it already owns an interest, which the Trustee would be free to accept or reject.

With respect to Acheron's right to top, I agree with the Trustee that it is a right to top the bids of those prospective buyers responding to the Trustee's invitation to bid in an auction.[18] (DE 2927 at 5-6) (citing Black's Law Dictionary (11th ed. 2019) (defining an auction as "[a] public sale of property to the highest bidder; a sale by consecutive bidding, intended to reach the highest price of the article through competition for it")).  For reasons that follow I find that an auction sales process is inferred by the parties use of the word "bid" in describing Acheron's rights in the second sentence of Section Four.

First, a review of dictionary sources indicates that "bid" is strongly associated with "an auction."  The Oxford English Dictionary Online defines "bid" in two senses:  "a. [t]he offer of a price, the amount offered; *spec.* at an auction", and "b. **to make a bid for**: to make an attempt to secure; to 'have a try' at getting."  *Bid*, *OED Online*, Oxford University Press, March 2021, www.oed.com/view/Entry/18727 (last accessed May 17, 2021) (emphasis in original).  The Law Dictionary, a free online legal dictionary featuring Black's Law Dictionary Free Online Legal Dictionary 2nd Ed., defines "bid" as "[a]n offer by an intending purchaser to pay a designated price for property which is about to be sold at auction."  *The Law Dictionary*, https://thelawdictionary.org/bid/ (last visited May 17, 2021).  Both sources associate the word "bid" specifically with an auction.  Thus, I find it reasonable and logical that the parties intended

---

[18] "[T]he business of selling goods by auction is, according to some authorities, as old as the law of sale." *Perry Trading Co. v. City of Tallahassee*, 128 Fla. 424, 431–32, 174 So. 854, 857 (1937).

an auction sales process when deciding to use the word "bid" to describe Acheron's rights in the second sentence of Section Four. *Hussmann Corp.*, 549 So. 2d at 217 (finding that "[l]anguage used in business documents . . . should be interpreted as reasonable persons, knowledgeable about the business or industry, would likely interpret them").

Second, finding that the parties intended an auction process is consistent with finding that the parties were intentionally silent as to the specifics of a sales process. As the Trustee argues, the owner of the property to be auctioned holds the right to prescribe the terms and conditions of the auction sale. (DE 2927 at 6) (citing *Jones v. Tenn. Val. Auth.*, 334 F. Supp. 739, 743 (M.D. Fla. 1971) (addressing rule in government context)). Thus, in the context of "the right to top any bid submitted by another party," the Trustee's invitation to bid and prospective buyers' bids establish the terms of an auction sale. The Trustee also argues that Acheron's reading of a last look into the right to top renders the words "by another party" meaningless with respect to the term "any bid" if Acheron does not have to participate in the auction or bid process. (DE 2927 at 5-6). I agree. If Acheron is not a party to the auction process, i.e., a party to the sales process that is defined by the Trustee's invitation to bid and prospective purchasers' bids, then Acheron cannot submit a bid to top a bid submitted *by another party*. Because the right to top is afforded by Acheron's participation in an auction process, which is spelled-out by the Trustee's invitation to bid and other party's bids, the parties would not necessarily describe the details of such an auction process in Section Four. Accordingly, I find that the plain language of Section Four indicates that the parties contemplated that Acheron's right to top would be afforded to it through an auction process.

Additionally, the Trustee's proposed construction of Section Four is consistent with his fiduciary obligations to maximize the value of the Trust's assets, which provides further support

for the Trustee's proposed interpretation.  *Id.* at 7-8.  The main purpose of auction sales is to obtain the best financial returns for the owner of property sold.   Thus, finding that the parties contemplated an auction process consistent with the Trustee's fiduciary obligation to maximize the value of the Trust's assets for the benefit of beneficiaries is logical.[19]  *Limehouse v. Smith*, 797 So. 2d 15, 17 (Fla. 4th DCA 2001).  Therefore, the Trustee's position that the parties used the term "bid" in anticipation of an auction sales process, the fact that the definition of "bid" is strongly associated with an auction process, and the fact that Acheron can be afforded its rights in an auction process without adding language or meaning to Section Four of the 2015 Agreement weighs heavily in favor of concluding that Acheron has the right to bid on individual policies now that the Trustee has invoked his power under the Trust Agreement to liquidate the Trust and that Acheron has a separate right to top any bid submitted by another party during an auction of the policies.

---

[19] I do not credit Acheron's argument that it made the better bargain in negotiating the 2015 Agreement because it was in a better bargaining position.  *See* e.g., DE 2925 at 57:20-22 (stating that "part of contract interpretation is also the recognition that . . . sometimes it's a harsh deal"); DE 2928 at 8 (citing *Niz-Chavez*, 141 S. Ct. at 1486 for the proposition that "raw consequentialist calculation plays no role" in the court's analysis and *Beach Resort Hotel Corp. v. Wieder*, 79 So. 2d 659, 663 (Fla. 1955) for the proposition that "courts may not rewrite a contract . . . in order to relieve one of the parties from the apparent hardship of an improvident bargain").  The Trustee's argument that his proposed interpretation of Section Four is consistent with a Trustee's fiduciary duties is distinct support for the Trustee's position and does not involve a "consequentialist" approach to the analysis.  Indeed, the Trustee has an obligation to use his discretion to administer the affairs of the Trust in good faith, from proper motives and within the bounds of reasonable judgment.  *See DeMello v. Buckman*, 916 So. 2d 882, 887 (Fla. 4th DCA 2005).  Acheron's interpretation of the contracts at issue, however, would evince concern that both the Receiver and the Trustee did not use good judgment in structuring the sales of fractional interests with Acheron.  According to Acheron's proposed construction, Acheron is in the driver's seat as to how policies may be sold (subject to Acheron's interests) and to whom policies may be sold.  Furthermore, pursuant to Acheron's reading, any bidding on policies in which Acheron has an interest seems merely for the purpose of setting a price for Acheron's consideration (due to a purported "last look" right).  (DE 2925 at 55:18-64:12).  Thus, Acheron's position, in addition to being a strained reading, is antithetical to the purposes of the Trust whereas the Trustee's proposed construction is not.

Furthermore, Acheron's assertion that its "right to top" is equivalent to a right to a "last look" is not supported by the plain language of Section Four; rather it amounts to an unreasonable interpretation and a stretch on Acheron's part to acquire a right not provided for by the plain language. *Intervest Const. of Jax, Inc.*, 133 So. 3d at 497; *Hatadis*, 159 So. 3d at 259. A "right to top" and a right to a "last look" are not synonymous, and the 2015 Agreement explicitly says "right to top" not "last look." A "last look" right involves giving a bidder the right to match any bid submitted at an auction *after* the auction is completed. (DE 2927 at 7) (citing *In re Wintz Cos.*, 230 B.R. 840, 846-47 (8th Cir. B.A.P. 1999) (discussing a last-look procedure in terms of matching rights); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 312, n.8 (3d Cir. 2010) (inferring that an undefined last look "affords a bidder the ability to make the final bid with knowledge of all previous bids"). Thus, in a last look scenario, Acheron is not *a party* to the auction.

On the other hand, a right to top any bid submitted by another party is satisfied, according to the Trustee, by Acheron actually participating in a traditional auction process. (DE 2927 at 7). *See also Corp. Assets, Inc. v. Paloian*, 368 F.3d 761, 764–65 (7th Cir. 2004) (discussing an auction process where bidders could "top" a high bid that was submitted in advance of the auction). The Trustee argues that a topping bid is a means of ensuring the realization of fair value. (DE 2927 at 7) (citing *Highfields Capital, Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 59-60 (Del. Ch. 2007) (discussing that an arms-length sale of a company could result in fair value where no structural impediments prevent a topping bid)). Therefore, the right to top is consistent with the fiduciary duties of the Trustee to maximize value in a liquidation event for the benefit of the Trust's beneficiaries. (DE 2927 at 7-8).

Moreover, as previously noted, Acheron's reading of a last look renders the words "by another party" meaningless with respect to the term "any bid" if Acheron does not have to participate in the auction or bid process.  (DE 2927 at 5).  Thus, not only does Acheron's reading of its "right to top" require the addition of language and meaning that the plain language of Section Four does not support but Acheron's interpretation also renders other terms meaningless.  I find that the Trustee makes a compelling argument that the more reasonable and rational interpretation is that the right to top any bid submitted by another party means that Acheron has the right to provide a topping bid during the auction process and does not have the right to a last look.  *Hatadis*, 159 So. 3d at 259.

## IV.   CONCLUSION

Accordingly, I respectfully **RECOMMEND** as follows:

1.  That the Trustee's Motion for an Order of Instructions (DE 2882) be **GRANTED**;

2.  That the Court find that the Trustee is empowered to sell whole Keep Policies as part of his wind down and liquidation of the Trust notwithstanding Acheron's fractional interests in many of the Policies;

3.  That the Court find that the Trustee is not required to sell the Keep Policies on a policy-by-policy basis nor that the Trustee is required to value the Keep Policies on a policy-by-policy basis in order to sell the Policies as part of the Trust's wind down and liquidation; and

4.  That Acheron retains rights to object to other aspects of the liquidation of the Trust as the Trustee makes those determinations and moves the Court for approval of those additional steps in the wind down process.

The Parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge.  Failure to file objections timely shall bar the Parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the Parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

**DONE AND SUBMITTED** in Fort Lauderdale, Florida, this 22nd day of May 2021.

Jared M. Strauss
**United States Magistrate Judge**

Copies furnished via CM/ECF to:

Hon. Federico A. Moreno

Counsel of record