**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

CASE NO. 04-60573-CIV-MORENO/STRAUSS

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

MUTUAL BENEFITS CORP., *et al*,

     Defendants.

_____/

**TRUSTEE'S MOTION TO APPROVE PROCEDURES FOR SALE**
**OF POLICIES IN CONNECTION WITH TRUST TERMINATION**

Barry Mukamal, as Trustee ("Trustee") of the Mutual Benefits Keep Policy Trust ("Trust'), submits this motion to approve proposed procedures for the sale of the remaining "Keep Policies" of the Trust in connection with the anticipated termination of the Trust. In support, the Trustee states:

**BACKGROUND**

**The Receivership and the Trust**

This case began in 2004 as an S.E.C. receivership action brought against Mutual Benefits Corporation ("MBC"), which was unlawfully selling fractional interests in viaticated insurance policies. The Court appointed Roberto Martinez as receiver to take control of and administer the assets of MBC, which consisted primarily of these viaticated polices in which thousands of investors had been fraudulently induced to purchase fractional interests. During the course of the receivership, the Receiver, at the Court's direction, gave investors the option of electing to "sell" or "keep" the policies in which they had acquired interests. After a time-consuming "voting" process, policies in which a majority of the investors (by dollar amount) voted to "sell" were designated for sale, and policies in which a majority of the investors voted to "keep" were retained, with the investors

becoming responsible for their pro rata share of the premiums and administrative fees associated with the continued maintenance of the policies.

In 2009, as the receivership was reaching its conclusion, the Receiver created the Mutual Benefits Keep Policy Trust as a means of continuing to hold and maintain the "Keep Policies." When the Trust was created, it held 2,403 policies with a total face value of $886 million, Over the past twelve years, the Trustee has distributed more than $542 million in death benefits as policies have matured. As of January 1, 2022, the Trust continues to hold 955 policies with a total face value of approximately $192 million in which there are 1,931 fractional investment interests held by Keep Policy Investors.[1]

### The Wind-Down Motion and Request for Instructions Regarding Trust Termination

On February 24, 2020, after more than a decade of operating the Trust, the Trustee filed the Trustee's Motion to Authorize the Initiation of Trust Wind Down and Termination ("Trustee Wind Down Motion") (DE#2609), indicating his intention to initiate an orderly wind down and eventually liquidation of the Trust through a process that was expected to take 18-36 months. As indicated in the Trustee Wind Down Motion, the anticipated wind down of the Trust was driven by the fact that the cost of administering the Trust, its policies and assets was anticipated to become prohibitively expensive due in large part to the increased litigation costs incurred by the Trust as a result of litigation by third-party purchasers of policy interests from the Trust (i.e., the "Acheron Parties," discussed further below). *Id.* at 3.

---

[1] The "Acheron Parties" (discussed further below) hold 712 fractional investment interests in the Keep Policies as a result of acquisitions from the Trustee when the original Keep Policy Investors "forfeited" their interests by failing to pay their share of the premiums and administrative fees associated with the interests.

2

The Trustee Wind Down Motion further noted that the Trust Agreement expressly contemplated and addressed the ultimate termination of the Trust, and expressly directed the manner by which the Trust's primary assets, the "Keep Policies," would be liquidated:

> This Trust Agreement shall terminate upon the final disposition of all Keep Policies, whether by maturity, sale, surrender, or lapse, and the distribution of all other Trust Assets in accordance with the terms of the Servicing Agreement.

Trust Agreement at Section 8.

> [T]he Trustee shall have the following powers and duties: … ***In the event that the Servicing Agreement is terminated or expires and the continued servicing of the Keep Policies becomes unfeasible, to authorize and direct the sale, surrender, or lapse of the Keep Policies, and to distribute the proceeds, if any, of the Keep Policies upon such sale, surrender or lapse, to the Keep Policy Investors in such manner as the Trustee determines to be appropriate***.

*Id.* at Section 3.1(b)(xvii) (emphasis added).

The Trustee Wind Down Motion was filed after extensive discussions regarding the anticipated timing and process of the Trust's ultimate liquidation between the Trustee and Acheron Capital, Ltd. ("Acheron Capital") and related entities (collectively the "Acheron Parties"), a group of foreign investment entities which have acquired "Fractional Interests" interests in "Undersubscribed Keep Policies" from the Receiver, and then the Trustee, when the original investors fail to pay their share of the premium and administrative fees. The Acheron Parties had filed a motion ("Acheron Wind Down Motion") (DE#2593) seeking the immediate liquidation of the Trust, with the policies effectively to be turned over to the Acheron Parties' control, with a limited, fixed, non-market tested "buy-out" option for investors who did not wish to participate in an investment controlled by the Acheron Parties. The Court on July 27, 2020 entered a Report and Recommendation to approve the Trustee Wind Down Motion and deny the Acheron Wind Down Motion, determining that the Trust Agreement "uncontrovertibly authorizes the Trustee to take the steps he proposes." (DE#2723 at 18, 20). On November 16, 2020, Judge Moreno adopted the Report and Recommendation (DE#2825).

After the Court ruled on the Trustee Wind Down Motion, the Trustee continued to explore and evaluate mechanisms for the Trust's ultimate liquidation. On March 15, 2021, the Trustee filed a Status Report (DE#2882) reflecting his intention, after extensive evaluation, and consistent with the express authority provided in the Trust Agreement regarding Trust liquidation, to proceed with the liquidation of the Trust's remaining policies through a sale of the portfolio in an auction process following the selection of a "stalking horse" bid that would set the floor and parameters for further bidding. The Status Report also laid out the steps intended to be taken by the Trustee in connection with the proposed sale, in order to maximize the value of the portfolio for the benefit of all investors.

In response to objections from the Acheron Parties, the Court agreed to treat the March 2021 Status Report as a request for instructions from the Trustee. After extensive briefing, the Court issued a Report and Recommendation that the request for instructions be granted (DE#2941). After further objections from the Acheron Parties, Judge Moreno entered an Order adopting the Report and Recommendation, determining that "the Trustee is empowered to sell whole Keep Policies as part of his wind down and liquidation of the Trust," and that "the Trustee is not required to sell the Keep Policies on a policy-by-policy basis nor that the Trustee is required to value the Keep Policies on a policy-by-policy basis in order to sell the Policies as part of the Trust's wind down and liquidation." (DE#2967). Acheron Capital's appeal of the Court's Order granting the request for instructions was recently dismissed.

**Steps Toward Wind Down**

Since the continued servicing of the Keep Policies by the Trust has become unfeasible, the Trustee is expressly authorized under the Trust Agreement to "direct the sale, surrender, or lapse of the Keep Policies, and to distribute the proceeds, if any, of the Keep Policies, upon such sale, surrender or lapse, to the Keep Policy Investors in such manner as the Trustee determines to be

appropriate," (Trust Agreement, Section 3.a(b)(xvii)). The Trustee's decision to proceed in the fashion described herein is driven by his duty to maximize the value of the Trust's assets upon their liquidation for the benefit of the Trust's beneficiaries, consistent with the express purpose of the Trust being "to take custody of the Trust Assets and maintain and administer the Trust Assets for the benefit of the Keep Policy Investors." (Trust Agreement, Section 2.2).

On April 27, 2021, the Trustee, with Court approval, sent a Notice to Keep Policy Investors Regarding Intent to Sell Policies and Wind Down the Mutual Benefits Keep Policy Trust. (DE#2919) The Notice described the Trustee's intention to proceed with the wind down and termination of the Trust through the sale of the remaining policies, and to distribute the net sale proceeds to the investors. Since sending the Notice, the Trustee and his personnel have had frequent communications with Keep Policy Investors to address questions and comments regarding the Notice and the anticipated wind down. The Trustee has regularly updated the Court and parties regarding the wind-down process through his monthly Wind Down Status Reports. Where feasible, the Trustee has attempted to address particular comments and concerns expressed by Keep Policy Investors.

With respect to policies for which 100% of the beneficial interests are held by a single Keep Policy Investor, the Trustee has solicited and negotiated proposals for the continued servicing of such policies outside of the Trust, in contemplation of the possibility of transferring the policies to the Keep Policy Investors who wish to retain such policies subject to certain conditions including the Keep Policy Investor's engagement of a third-party servicer for the policy. The Trustee has prepared a "Policy Transfer Agreement" which sets forth the terms and conditions upon which the Trustee, in satisfaction of any interest a Keep Policy Investor may have in the Trust, will agree to transfer the policy in which the Keep Policy Investor holds 100% of the interests. The Trustee has given notice

5

to the "100% Investors" of the opportunity to request the transfer of the policy, has requested that all conditions be satisfied within thirty days (by January 21, 2022), and has filed a motion requesting that the Court approve these proposed procedures, which are not expressly authorized or contemplated by the Trust Agreement. (DE#3056).

With respect to policies for which there is no longer any premium due under the policy terms because the insured is over 100 years old, the Trustee has advised of his intention to put such policies in a separate "tranche" at auction so that the value of such policies, in light of their relatively unique circumstances, is reflected in the bidding. That process is incorporated into the procedures described in this motion.

As for certain other requests, such as that Keep Policy Investors who hold fractional investment interests in Keep Policies be provided an "option" to "keep" their fractional interests, or be provided an opportunity to buy the policy, the Trustee has determined, after extensive consultation and discussion, that such requests are not viable and are inconsistent with the Trustee's fiduciary obligations. The Trustee has addressed those issues in prior filings, *see, e.g.*, DE#3033, 3051, and will do so further in the "Discussion" section of this Motion.

In 2015, the Court approved an agreement between the Trustee and Acheron Capital (the "March 2015 Agreement") which among other things provides Acheron Capital with certain rights in the event of a liquidation of the Trust and a sale of the entire portfolio of policies owned by the Trust. (DE#2500-2, DE#2501). The procedures set forth herein are also in recognition and satisfaction of any contractual rights of Acheron Capital in connection with the proposed sale.

## SUMMARY OF RELIEF REQUESTED

By this Motion, the Trustee requests that the Court: (1) authorize the Trustee to implement the procedures described herein for the sale of the remaining Keep Policies held by the Trust; (2)

authorize the Trustee to enter into an Asset Purchase Agreement with a prospective buyer (or buyers) for the sale of the Keep Policies; (3) approve the bidding procedures for submission of higher and better offers for the purchase of the Keep Policies, including the means of providing notice of the bidding procedures; (4) approve the form of notice to be provided to interested parties; and (5) schedule a final hearing to approve the sale of the Keep Policies to the highest and best bidder (or bidders) submitted at auction in accordance with the procedures described herein.

## THE ASSETS BEING SOLD

In accordance with the Trust Agreement and this Court's Orders, the Trustee will be selling all of the Trust's right, title and interest in and to the Keep Policies. The purchaser will acquire complete ownership of and all beneficial interests in the Keep Policies, and all interests of the Trust, the Trustee, and any other person or entity (including Keep Policy Investors and purchasers of fractional interests in Keep Policies sold pursuant to the Trustee's authority under the Trust Agreement) in the Keep Policies will be extinguished.

Keep Policy Investors and other holders of fractional interests acquired from the Receiver or the Trustee[2] hold those interests subject to the Court's Orders regarding the administration of the Keep Policies and the Trust, including, without limitation, the Order Regarding Future Administration (DE#1887) which provides that:

> **The interests of all investors in and beneficiaries of each Policy, however those interests may have been created, transferred, or characterized**, including specifically but without limitation investors' interests in the proceeds of a Policy or of its disposition **are and shall continue to be subject to this Court's orders, and, subject to procedures, terms, and conditions this Court establishes from time to**

---

[2] The Asset Purchase Agreements ("APAs") executed by the Acheron Parties provide, in pertinent part, that the Acheron Parties purchased Fractional Interests in Undersubscribed Keep Policies "free and clear of any Encumbrances," but specifically recognize that "the terms and conditions set forth in the Court's Order Regarding Future Administration of Certain Insurance Policies Subject to this Proceeding entered on April 30, 2007 (DE#1887) shall not be deemed an 'encumbrance' for purposes of this section."

7

**time, as may be subject to modification, sale, liquidation, forfeiture, or termination as the Court may expressly determine, prescribe, or permit by Order**, including specifically but without limitation by the Disposition Orders, as they may be modified from time to time, **and by any future orders authorizing, approving, or directing that specified Policies shall be sold, transferred, surrendered, or permitted to lapse**.

## IDENTIFCATION OF "TRANCHES" FOR BIDDING

The initial step of the sale process will be identifying the Keep Policies to be sold and defining certain "tranches" (i.e., groups) for purposes of submitting bids on the Keep Policies. Doing so will involve the following steps:

**A.   Removal of 100% Owned Policies to be Retained by Keep Policy Investors.**

The Trustee has already initiated a process by which Keep Policies in which a "100% Investor" has an investment interest, upon their request and their satisfaction of certain requirements, will be removed from the Trust and transferred to the Keep Policy Investor. Pursuant to the notice provided by the Trustee to the relevant Keep Policy Investors (for which the Trustee has sought Court approval, see DE#3056), Keep Policy Investors must satisfy the requirements for transfer by January 21, 2022.[3] Any Keep Policies for which these requirements are satisfied will be excluded from the sale.

**B.   Identification of Tranche "A" and Tranche "B" for Auction.**

The March 2015 Agreement provides that in the event of a liquidation of the Trust and sale of the entire portfolio of policies owned by the Trust, Acheron Capital has the right to bid upon any sale of a policy in which it has an interest. In recognition and satisfaction of that right, the Trustee, prior to conducting the auction sale, will provide Acheron Capital with an opportunity to submit a bid for any policies in which it has a fractional interest (the "Acheron Initial Bid").

---

[3] The Trustee will accommodate reasonable requests for an extension of this deadline made by a 100% Investor.

To be considered by the Trustee, the Acheron Initial Bid must be substantially in the form of the Purchase Agreement described below; must provide a deposit equal to 10% of the amount of the initial bid amount; and must provide satisfactory evidence of Acheron Capital's ability to perform all obligations under the Purchase Agreement. The Acheron Initial Bid shall identify (a) the policies to be included in the Acheron Initial Bid; and (b) the total purchase price Acheron Capital agrees to pay for all of the policies included in the Acheron Capital Bid. The Acheron Initial Bid may, but is not required to, include all of the Keep Policies in which Acheron Capital has a fractional interest.  The Acheron Initial Bid must be submitted within thirty (30) days of the Trustee giving notice to Acheron Capital of the opportunity to submit a bid. The Trustee anticipates that date will occur by **March 1, 2022**.

In connection with its submission of the Acheron Initial Bid, Acheron Capital, upon reasonable notice and upon execution of a confidentiality and non-disclosure agreement satisfactory to the Trustee and a non-collusion affidavit that it will not collude with any other prospective bidders, will be entitled to receive and review all information presently maintained in the "Data Room" established by the Trust's advisors with regard to the policies in which Acheron Capital holds ani interest.

Upon the timely submission of an Acheron Initial Bid satisfying all the foregoing conditions, all Keep Policies for which Acheron Capital has submitted a qualified Acheron Initial Bid will be identified as Tranche "A," and the bid amount submitted by Acheron Capital will be the minimum bid amount considered for any further bidding on Tranche "A." All Keep Policies for which Acheron Capital has not submitted a qualified Acheron Initial Bid will be identified as Tranche "B."

C.      **Separate Sub-Tranche(s) for 100+ Year Old Policies.**

The Trust contains a small number of policies for which the insured is 100 years old (or older), and for which, under the terms of the policy, no further premium payments are required in order to maintain the policy ("100+ Year Policies"). In order to recognize the unique circumstances of these policies, the Trustee intends to sell these 100+ Year Policies in a separate tranche at auction, with the net sale proceeds for such policies directly attributed to those policies. To the extent the Acheron Initial Bid includes any 100+ Year Policies, they will be identified as Tranche "A-1" and shall be excluded from Tranche "A." Any 100+ Year Policies which are not included in the Acheron Initial Bid will be identified as Tranche "B-1" and shall be excluded from Tranche "B."

## SOLICITATION OF STALKING HORSE BID(S)

The Trustee has determined that the best method to sell the Keep Policies, once the relevant tranches for bidding are established, is a competitive bidding process by auction at which all interested, qualified bidders will have the option to top an initial bid (or bids) submitted by a "stalking horse" bidder who is willing, able and committed to close on a sale at a specified purchase price that will establish the minimum value to be offered for the Keep Policies.

The Trustee and his advisors have and will continue to market the Keep Policies through word of mouth solicitations to potentially interested parties who may wish to serve as the "stalking horse" bidder for these assets.  To be considered as a stalking horse bidder, a party must provide: (1) an affidavit identifying any relationships with the Trustee, the Trust, the Trust's Servicer, and the Receivership Entities, and any of the foregoing parties' principals; (2) a non-collusion affidavit that it will not collude with any other prospective bidders; (3) an executed confidentiality and non-disclosure agreement and (4) a representation that the bidder is an accredited investor.

Interested parties who qualify as potential "stalking horse" bidders will be provided the

opportunity to conduct due diligence on the Trust portfolio by accessing the "Data Room" to be established by the Trust's advisors in connection with the auction and sale process. The Trustee will solicit "stalking horse" bids for each "tranche" and for the entire Trust portfolio of policies. The Trustee requests confirmation of his authority to select and approve, in his business judgment, "stalking horse" bids that substantially conform to the procedures described herein and that seek customary bid protections (i.e., a "break-up fee" in the event another successful bidder outbids them in an amount not to exceed 3% of the amount of their stalking horse bid), for which the Trustee would provide notice to the Court and the Keep Policy Investors. To the extent any additional bid protections or other modifications to these procedures are proposed by a stalking horse purchaser and agreed to by the Trustee, the Trustee will supplement this motion to seek further approval of any such modifications.

Based on the feedback the Trustee has received from potential stalking horse bidders, the Trustee has determined that it is necessary to first establish the "tranches" so that prospective stalking horse bidders know and understand what they are bidding on have a framework for the anticipated bidding process. Accordingly, the Trustee proposes that any "stalking horse" bid proposals must be submitted to the Trustee by **April 1, 2022**.[4]

## THE PURCHASE AGREEMENT

The Trustee intends to require all "stalking horse" bidders and all other prospective bidders to execute a Purchase Agreement binding them to the terms of their offer. Without intending to paraphrase the entire Purchase Agreement and subject in all respects to the terms and conditions set forth in the Purchase Agreement, the key material terms will be as follows:

---

[4] The Trustee understands that the stalking horse bids will help inform the Court's consideration of the process going forward. However, until the "tranches" are defined by the submission of the Acheron Initial Bid, stalking horse bids cannot be finalized as the bidders will not know what policies are included in the tranches for which they are submitting their bids.

- Buyer will acquire all of the Trust's and Trustee's right, title and interest in and to the Keep Policies that are the subject of the Purchase Agreement.

- The Purchase Agreement shall be accompanied by a Deposit equal to 10% of the Purchase Price to be held in trust by Trustee's law firm pending completion of the auction and determination of the highest and best bid submitted for the Keep Policies.

- Buyer agrees to acquire the Keep Policies for a stated Purchase Price to be paid in cash at closing subject only to the conditions set forth in the Purchase Agreement.

- In no event shall the Purchase Agreement be contingent upon (i) financing; (ii) the completion of unperformed due diligence; or (iii) further approvals or consents from any party other than the Court.

- The Purchase Agreement shall be subject to higher and better offers in accordance with the Bidding Procedures set forth in this motion, and shall be subject to approval by the Court.

- Closing of the sale shall occur not later than two (2) business days after the entry of the Sale Approval Order (defined below).

- If Buyer fails to close the contemplated transaction in accordance with the terms of the Purchase Agreement, the Trustee may retain the Deposit as partial damages, which shall be in addition to all other remedies the Trustee may have at law or in equity as a result of Buyers' failure to close.

## **BIDDING PROCEDURES**

In order to maximize the value of the Keep Policies, the sale must be subject to higher and better offers pursuant to procedures which encourage and promote serious yet competitive bidding

on the assets. The bid procedures which the Trustee requests that this Court approve in order to generate the highest possible sale price for the Keep Policies, and thereby maximize the benefit to the Keep Policy Investors, are summarized below:

Due Diligence: Interested parties will be afforded the opportunity to conduct due diligence on the Keep Policies available for sale, subject to providing: (1) an affidavit identifying any relationships with the Trustee, the Trust, the Trust's Servicer, and the Receivership Entities, and any of the foregoing entities' principals; (2) a non-collusion affidavit that it will not collude with any other prospective bidders; (3) an executed non-disclosure agreement; and (4) a representation that the bidder is an accredited investor. Upon satisfaction of these conditions, the Trustee will provide reasonable access to the Trustee's records and information pertaining to the Keep Policies offered for sale prior to the Bidder Qualification Deadline.

Qualification to Bid: In order to participate in the bidding process, a potential bidder must provide to the Trustee, within sixty (60) days after the entry of an Order approving these Bidding Procedures ("Bidder Qualification Deadline") the following:

(1) an executed non-disclosure agreement;

(2) an affidavit identifying any relationship or affiliation to the Trustee, the Trust, any of the Receivership Entities, or any of the foregoing parties' principals;

(3) a non-collusion affidavit that they have and not and will not collude with any other person or entity in connection with submitting a bid for the Keep Policies;

(4) a representation to the Trustee that they are an accredited investor, and evidence satisfactory to the Trustee that they have the financial ability to consummate a purchase of one or more Tranches of Keep Policies;

(5) an executed Purchase Agreement substantially in the form of the Trustee's proposed

13

Purchase Agreement and containing the material terms set forth above, with any changes clearly marked, and subject to the Trustee's approval of any such changes, for some or all of the Tranches of Keep Policies offered for sale by the Trustee. In no event shall the Purchase Agreement be contingent upon (i) financing; (ii) the completion of unperformed due diligence; or (iii) further approvals or consents from any party other than the Court.

(6) a deposit, in immediately available funds (by wire transfer, cashiers' or certified check payable to "Kozyak Tropin & Throckmorton LLP Trust Account") for the benefit of the Trustee, in amount equal to ten percent (10%) of the Bidder's initial offer contained in Bidder's Purchase Agreement.

(7) evidence satisfactory to the Trustee of Bidder's ability to consummate the transaction contemplated by the Purchase Agreement.

Highest and/or Best Bid: After the Bidder Qualification Deadline has passed, the Trustee shall determine in his sole discretion which Bidders constitute Qualified Bidders, if any, and which Qualifying Bid(s) constitutes the highest or otherwise best and acceptable offer for each Tranche (the "Preliminary Successful Bids"), and shall inform each Qualified Bidder that they have submitted a Qualifying Bid. Following the selection of the Preliminary Successful Bids, on the day of the auction, the Trustee shall conduct an "open outcry" auction ("Auction") for each Tranche and for the entire portfolio of Keep Policies.

Auction: The Auction will be conducted in accordance with procedures that the Trustee has determined in his business judgment will achieve the maximum realizable value for the Keep Policies. The procedures will be announced at the commencement of the Auction. The Trustee may terminate the Auction at any time and for any reason, and reserves the right to withdraw some or all of the Policies from the Auction.

14

(a)     *Time and Location of Auction:* It is intended that the Auction take place within two (2) business days after the Bidder Qualification Deadline at 10:00 a.m. EDT, and that it be held at the offices of Kozyak Tropin & Throckmorton, LLP, 2525 Ponce de Leon Boulevard, 9th Floor, Coral Gables, Florida 33134, or, at the Trustee's discretion, by Zoom or other video-conference platform.

(b)     *Attendance at Auction:*  Only Qualified Bidders shall be entitled to attend and participate at the Auction. Qualified Bidders must either be physically present or arrangements will be made for bidders to participate by video conference. Qualified Bidders are urged to have counsel present for the Auction.

(c)     *Bidding, Minimum Increments, etc.:* Bidding shall commence at the amount and on the terms specified in the Preliminary Successful Bid for each of the Tranches, which shall be announced by the Trustee at the commencement of the Auction. Bidders may submit successive bids in increments of at least $10,000 greater than the prior bid for each Tranche (subject to the Trustee's discretion to establish higher or lower bid increments at auction). At the conclusion of bidding for each Tranche, the Trustee will conduct bidding for the entire portfolio of Keep Policies offered for sale by the Trust. Bidding shall continue until there is only one bid for each Tranche, and for the entire portfolio of Keep Policies, that the Trustee determines to be the highest and best acceptable offer for the Tranche or portfolio (the "Final Successful Bid(s)").

(d)     *Successful Bidder(s):* At the conclusion of the Auction, the Trustee shall announce the Final Successful Bid for each Tranche, or for the entire portfolio of Keep Policies, and shall announce the back-up bid(s) ("Back-Up Bid(s)") that the Trustee has determined to be the second highest and best acceptable offer(s) for each Tranch or for the entire portfolio of Keep Policies in the event the holder of the Final Successful Bid(s) fails to timely close. At the Sale Hearing, the Trustee

15

shall present the Final Successful Bid(s) and Back-Up Bid(s) to the Court for approval.

(e)     *Reservation of Rights:* The Trustee shall have the right, in his discretion, to (i) adjourn the Auction without further notice; and (ii) to withdraw any Tranche from the Auction at any time prior to or during the Auction.

Sale Hearing: The Trustee requests that the Court schedule a hearing ("Sale Hearing") within three (3) business days after the conclusion of the Auction to approve the sale of the Keep Policies to the Bidder(s) who submitted the Final Successful Bid(s), and if such Bidder(s) fails to timely close, to the Bidder(s) submitting the Back-Up Bid(s). The Trustee will request the entry of an Order (the "Sale Approval Order") authorizing, approving and directing the sale of the Keep Policies in accordance with the Final Successful Bid(s), and if they fail to timely close, in accordance with the Back-Up Bid(s).

Back-Up Bids: Within two (2) business days following the conclusion of the Sale Hearing, the makers of the Final Successful Bid(s) must pay the balance of their offer(s) in full ("Final Payment"), to be held in the trust account of Trustee's counsel pending entry of the Sale Approval Order, and to be released to the Trustee two (2) business days after entry of the Sale Approval Order. If any of the Bidder(s) submitting the Final Successful Bid(s) fail to timely make the Final Payment, they shall be in default of the Purchase Agreement ("Failed Bid"). Within two (2) business days after such a default, the Trustee shall notify the Back-Up Bidder(s) of the Failed Bid on the relevant Tranche, and the Back-Up Bid(s), as applicable, shall be deemed the Final Successful Bid(s) and shall be required to timely close within two (2) business days after notice of the Failed Bid. If any Bidder making a Final Successful Bid fails to timely make the Final Payment, they shall be deemed to have made a Failed Bid and their Deposit shall be deemed forfeited to the Trustee, without prejudice to any and all other remedies available to the Trustee. The Deposits of all other Qualified

Bidders other than the Bidder(s) submitting the Final Successful Bid(s) and the Back-Up Bid(s) shall be returned within two (2) business days after the entry of the Sale Order.

<u>Closing:</u> Following the entry of the Sale Approval Order, the Trustee and the Bidder(s) making the Final Successful Bid(s) shall be authorized and directed to take all commercially reasonable and necessary steps to complete and implement the transaction contemplated by the Final Successful Bid(s).

## SALE APPROVAL ORDER TERMS

The procedures proposed by the Trustee contemplate the entry of a Sale Approval Order which approves and authorizes the Trustee, on behalf of the Trust, to sell and assign the Keep Policies to the Bidder(s) submitting the Final Successful Bid(s) ("<u>Buyer(s)</u>") in accordance with the Purchase Agreement, and which will include, without limitation, the following findings of fact and conclusions of law:

- Based on the record presented at the Sale Hearing and all pleadings filed and arguments by counsel and evidence presented, Buyer(s) have acted in good faith and are good faith purchaser(s) of the Purchased Assets.

- The Trustee has the sole and absolute authority, on behalf of the Trust, to convey all options, privileges, right, title and interest in, to and under the Keep Policies.

- The sale of the Keep Policies in accordance with the terms of the Purchase Agreement is approved and the Trustee and Buyer(s) shall be directed to consummate all of the transactions contemplated thereby.

- At the Closing, Buyer(s) will be vested with all options, privileges, right, title and interest in, to and under the Keep Policies, free and clear of all encumbrances.

- The sale of the Keep Policies is not precluded by or contrary to any prior Order issued by the

17

Court and no further consents by any Person (including any Governmental Authority) are required to convey the Keep Policies to Buyer(s) in accordance with the Purchase Agreement.

## NOTICE

The Trustee, with the filing of this Motion, has provided a Notice to Keep Policy Investors in the form of the attached Exhibit "A" advising of the filing of the Motion and the proposed procedures for the sale of the Keep Policies. Consistent with the Court's prior orders, the Notice advises that Keep Policy Investors may object to the proposed sale by submitting an objection to the Court within 30 days, and that they should seek to address and resolve their objections with the Trustee prior to submitting such an objection. Due to the expense of mailing this entire Motion, the Trustee intends to send a Notice to Keep Policy Investors with instructions for how they may request a copy of the Motion, and to post the Motion on the Trustee's website.

Upon approval of these Bidding Procedures, the Trustee will provide notice to prospective bidders – including all parties who have expressed an interest in purchasing assets of the Trust, all persons who are identified by the Trust's advisors as being potential purchasers of the Keep Policies, and all Keep Policy Investors, setting forth the specific dates for the Bidder Qualification Deadline, the Auction, and the Sale Hearing. The information will also be published on the Trust's website and will be marketed by the Trust's advisors as appropriate to provide broader outreach to potentially interested parties.

## PAYMENT OF EXPENSES

The Trustee has engaged Longevity Asset Advisors LLC ("Longevity") to manage and conduct the sale process for the Keep Policies, including review and compilation of all documents and data relating to the Keep Policies to enable the broadest range of prospective purchasers to easily

access, evaluate and submit offers; reviewing, organizing and enhancing the available data; creating and managing the Data Room; identifying and providing lists of prospective purchasers; coordinating prospective purchasers' due diligence; soliciting potential "stalking horse bidders;" designing and implementing the Bidding Procedures; coordinating and facilitating communication with Bidders and Buyers; consulting with the Trustee to evaluate all offers; coordinating with the Trust's service providers from inception of the transaction to closing and completion; advising, consulting and assisting the Trust in all activities necessary to effectuate the sale of the Keep Policies; and assisting in negotiating, completing and securing all contracts and documentation necessary to complete the sale. In consideration for those services, the Trustee has agreed to pay Longevity compensation equal to 7.50% of the gross purchase price paid for the portfolio of policies sold to one or more purchasers by the Trust, payable upon completion of the proposed transaction, plus reimbursement of actual expenses incurred and paid by Longevity. Longevity's compensation (net of retainers previously paid as of the Closing) shall be payable upon any sale completed pursuant to these Bidding Procedures from the proceeds of such sale.

In addition, the Trust anticipates incurring other expenses in connection with the sale process, and in connection with continuing to manage and maintain the Keep Policies pending completion of the sale, which likewise are payable from the Trust Assets in accordance with the terms of the Trust.[5] To the extent that the sale of the Keep Policies upon completion of the sale process is delayed for any reason, the Trust may also need to fund policy premiums and continued Trust operations pending closing. Due to the financial condition of the Trust, it may be necessary for the Trust to obtain a loan secured by the Trust Assets in order to maintain liquidity of operations pending the

---

[5] Section 4.3 of the Trust Agreement provides that "All Trust expenses, payments and any other liabilities of the Trust shall be payable solely out of the Trust Assets."

completion of the sale. Section 3.1(a) of the Trust Agreement empowers the Trustee to "take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Trust." The Florida Trust Code recognizes that a trustee may "borrow money, with or without security, and mortgage or pledge trust property for a period within or extending beyond the duration of the trust and advance money for the protection of the trust." *Fla. Stat.* § 736.0816(6). Accordingly, while no further Court approval is required, the Trustee believes it appropriate to give notice that such a loan is likely to be required.

## DISTRIBUTION OF NET SALE PROCEEDS

The Trustee does not, by this Motion, seek to address or have the Court rule on the method or manner of distribution of the proceeds from the sale of the Keep Policies. That will be addressed after sale. The distribution of proceeds will be done consistent with Section 3.1(b)(xvii) of the Trust Agreement, which authorizes and directs the Trustee, upon a sale, surrender or lapse of the Keep Policies in connection with the Trust's termination, "to distribute the proceeds, if any, of the Keep Policies, upon such sale, surrender or lapse, to the Keep Policy Investors in such manner as the Trustee determines to be appropriate."[6] The Trustee advises that his intention is to allocate the net proceeds of the sale, after payment of expenses, to the Keep Policies sold based upon an actuarial evaluation of the relative value of the policies sold within each tranche. In other words, the relative value of each policy in each tranche will be assessed, and the total net sale proceeds attributable to that tranche will be allocated to each policy in accordance with that actuarial valuation. In the event that the highest and best bid at auction is a combined bid for the entire portfolio, rather than

---

[6] Acheron Capital's interests in any Keep Policies will be treated in the same manner for distribution purposes as the interests of the Keep Policy Investors.

individual bids for each tranche, then the Trustee intends to allocate the total net sale proceeds from that combined bid among the tranches based on the highest individual bid received for each tranche.[7]

## **DISCUSSION**

In designing these procedures, the Trustee's guidepost has been his fiduciary responsibilities to the Keep Policy Investors, including his responsibility to "administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries." *Fla. Stat.* § 736.0801. Here, the Trust Agreement specifies the manner for the Trust's liquidation: through the sale, surrender or lapse of the remaining Keep Policies. Trust Agreement Section 3.1(b)(xvii). Accordingly, while the Trustee's determination of when such liquidation is within his discretion, and the particulars of that process are left to the Trustee's business judgment, the manner of liquidation is expressly set forth in the Trust Agreement.

The particular procedures set forth herein are designed and intended to produce the highest and best value through the sale, surrender or lapse of the remaining Keep Policies upon Trust liquidation, as directed by the Trust Agreement, in order to maximize the value of the remaining Trust Assets for the benefit of all Keep Policy Investors. The Trustee, in extensive consultation with his advisors, has determined that the best way to maximize the value of the remaining Keep Policies is through an auction sale as provided by these proposed procedures.

The bidding procedures set forth herein are designed to maximize the value of the Keep Policies, which is the appropriate goal of any such procedure. *In re Integrated Resources, Inc.*, 147 B.R. 650 (S.D.N.Y. 1992). The Court has already determined that an auction process is consistent

---

[7] By way of example: if the highest bid for Tranche "A" is $1 and the highest bid for Tranche "B" is $2, and the highest combined bid for the entire portfolio is $4, then the high bid of the entire portfolio of $4 will be allocated between Tranche "A" and Tranche "B" on a 1:2 ratio ($1.33 to Tranche "A" and $2.67 to Tranche "B"), and the amounts allocable to each policy within Tranche "A" and Tranche "B" will be based on the relative actuarial evaluation of those policies.

with the Trustee's fiduciary obligation to maximize the value of the Trust's assets. *Sec. and Exch. Comm'n v. Mutual Benefits Corp.*, 2021 WL 3888207 at *12 (S.D. Fla. May 22, 2021:

> The main purpose of auction sales is to obtain the best financial returns for the owner of the property sold. Thus, finding that the parties contemplated an auction process consistent with the Trustee's fiduciary obligation to maximize the value of the Trust's assets for the benefit of beneficiaries is logical.

The Bidding Procedures are also designed to satisfy whatever contractual rights that Acheron Capital may claim under the March 2015 Agreement with the Trustee. The Bidding Procedures provide Acheron Capital with the "right to bid upon any sale of a policy in which it has an interest" by submitting an Acheron Initial Bid. The Bidding Procedures also provide Acheron Capital with the "right to top any bid submitted by another party" by participating in the auction for Tranche "A," which will consist of all Keep Policies for which Acheron Capital has submitted an Acheron Initial Bid in accordance with the Bidding Procedures.

The Trustee is soliciting stalking horse bids for the Keep Policies from other prospective bidders as well, because such stalking horse bids are conducive to a sale process and the maximization of value by demonstrating the existence of a serious and committed purchase offer, setting a floor for further bidding and establishing the parameters for a competitive bidding process. *See, e.g.*, *In re re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr W.D.N.Y. 2009) ("The purpose and goal of any asset sale is to maximize the recovery of value for the benefit of the bankruptcy estate. In many instances, a 'stalking horse' offer will facilitate a realization of that value, by establishing a framework for competitive bidding."); *In re Katy Industries, Inc.*, No. 17-11101, 2017 WL 5434580 (Bankr. D. Del. June 19, 2017) ("The Stalking Horse Purchaser has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Purchased Assets will be realized. The Stalking Horse Protections were negotiated by the Stalking Horse Purchaser and the Debtors and their respective advisors at arms' length and in

22

good faith. Accordingly, the Stalking Horse Protections are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates."); *In re Redwine Resources, Inc.*, No. 10-34041, 2010 WL 5209287 at \*2 (Bank. N.D. Tex. June 24, 2010) ("The Debtors have exercised sound business judgment and presented sound business reasons for approval of the Bid Procedures. The Bid Procedures are fair, reasonable, and appropriate, and are designed to maximize recoveries and the realization of value by the Debtors' estates … for the Assets.")

However, The Trustee's discussions with potential stalking horse bidders indicate that until the applicable tranches have been established by the submission (or non-submission) of an Acheron Initial Bid and the relevant asset groups are defined, those parties will not be in a position to submit stalking horse bids for the Trustee's consideration.

The Trustee has given extensive consideration to other options, as discussed in his Wind Down Status Reports and various other filings. *See, e.g.*, DE#2947, DE#3033, DE#3051. The Trustee has determined, in the exercise of his business judgment, and in consultation with his advisors, (a) that the procedures herein satisfy the provisions of the Trust Agreement that upon Trust termination, the remaining Keep Policies shall be liquidated through sale, surrender or lapse; (b) that the procedures set forth herein represent an organized and straightforward process for the Trust to maximize the proceeds it receives through the completion of a sale process for the benefit of the Trust's beneficiaries; and (c) that other options that have been proposed or requested are not consistent with the Trust Agreement, are not consistent with the Trustee's fiduciary obligations, are not viable, and are not in the best interests of the Trust's beneficiaries. The Trustee has further addressed these considerations in his most recent Wind Down Status Report (DE#3061), which is also posted on the Trust's website and will be made available to Keep Policy Investors regarding any inquiries as to the sale process.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court enter an Order: (1) approving and authorizing the Trustee proceed with the foregoing Bidding Procedures; (2) authorizing the Trustee to enter into a Purchase Agreement or Agreements with potential "stalking horse bidders" containing the material terms identified in the Motion, subject to notice of any material deviations therefrom; (3) approving the form of notice to be provided to Keep Policy Investors; and (4) setting a Sale Hearing to approve the sale of the Keep Policies to the Bidder(s) submitting the Final Successful Bid(s) and/or Back-Up Bid(s), as applicable, and to enter the Sale Approval Order, upon conclusion of the Auction. If the Court believes that a hearing on this Motion would facilitate its prompt resolution, then the Trustee requests that the Court schedule a hearing as soon as practicable after the thirty-day period for objections by Keep Policy Investors has elapsed.

## CERTIFICATION OF CONFERENCE WITH COUNSEL

Undersigned counsel certifies that the filing of this motion has been preceded by extensive consultation and conferral with interested parties.

**GENOVESE JOBLOVE & BATTISTA, P.A.**

*s/ John Arrastia*
John Arrastia
Fla. Bar No. 0072461
Jarrastia@gjb-law.com
100 S.E. Second Street, 44th Floor
Miami, FL 33131
Tel:     (305) 349-2300
Fax:    (305) 428-8832

**KOZYAK TROPIN & THROCKMORTON, LLP**
2525 Ponce de Leon, 9th Floor
Coral Gables, FL 33134
Tel:     (305) 372-1800
Fax:    (305) 372-3508

By:  *s/ David L. Rosendorf*
David L. Rosendorf
FL Bar No. 996823
dlr@kttlaw.com

*Attorneys for Trustee*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on January 21, 2022 on counsel for all the parties by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ David L. Rosendorf*
David L. Rosendorf