UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  04-60573-CIV-MORENO/STRAUSS

SECURITIES AND EXCHANGE
COMMISSION,

       Plaintiff,

v.

MUTUAL BENEFITS CORP., *et al.*,

       Defendants.

_____/

## REPORT AND RECOMMENDATION[1]

**THIS MATTER** came before the Court upon the Trustee's Motion to Approve Procedures for Sale of Policies in Connection with Trust Termination ("Motion") [DE 3065].  I have carefully reviewed and considered the Motion, the responses [DE 3084, 3088] and reply [DE 3099] thereto, related correspondence (including DE 2960, 2978, 3001, 3017, 3020, 3028, 3049, 3091, 3113, and 3114), and all other pertinent portions of the record.  I also held a hearing for approximately five hours on March 16, 2022, at which Barry Mukamal ("Trustee"), the Trustee of the Mutual Benefits Keep Policy Trust (the "Trust"), provided testimony, and at which counsel presented further argument.  I have considered the Trustee's testimony, including the cross-examination of the Trustee, as well as the arguments of counsel.  For the reasons discussed herein, I respectfully **RECOMMEND** that the Motion be **GRANTED**, but with the Court finding that the Trustee may

---

[1] This matter has been referred to me by the District Court to take all necessary and proper action as required by law, with respect to any and all post-judgment matters, pursuant to 28 U.S.C. § 636 and the Magistrate Judge Rules of the United States District Court for the Southern District of Florida [DE 2631].

not condition Acheron's access to the data room or Acheron's participation in the auction on Acheron waiving any claims against the Trustee or the right to appeal.

## BACKGROUND

In 2004, the Securities and Exchange Commission commenced an enforcement action against Mutual Benefits Corporation and other defendants for fraudulently selling fractional investment interests in viatical settlements. *See* [DE 1]; *see also Acheron Cap., Ltd. v. Mukamal as Tr. of Mut. Benefits Keep Pol'y Tr. ("MBC III")*, 22 F.4th 979, 984 (11th Cir. 2022); *Sec. & Exch. Comm'n v. Mut. Benefits Corp. ("MBC II")*, 810 F. App'x 770, 772 (11th Cir. 2020); *Sec. & Exch. Comm'n v. Mut. Benefits Corp. ("MBC I")*, 408 F.3d 737, 738 (11th Cir. 2005). "A viatical settlement is a transaction in which a terminally ill insured sells the benefits of his life insurance policy to a third party in return for a lump-sum cash payment equal to a percentage of the policy's face value." *MBC III*, 22 F.4th at 984 (quoting *MBC I*, 408 F.3d at 738). "The purchaser of the viatical settlement realizes a profit if, when the insured dies, the policy benefits paid are greater than the purchase price, adjusted for time value." *Id.* (quoting *MBC I*, 408 F.3d at 738).

Following the commencement of the case, the defendant entities involved were put into receivership, and Roberto Martinez was appointed as receiver ("Receiver"). [DE 26]. Investors were provided with the option to retain their investments or to direct the Receiver to sell their interests. *MBC III*, 22 F.4th at 984. The Receiver reported in June 2009 that, pursuant to Court approval, investors in the life insurance policies had voted to either: a) sell the policy; or b) retain the policy. [DE 2291] at 3. Policies that were retained have commonly been referred to in this case as "Keep Policies." The Receiver also requested, and the Court approved, the creation of a trust to "provide for the continued maintenance and processing of the Keep Policies in accordance

with the directives of this Court." [DE 2291] at 5-6, 8; [DE 2322]. Consequently, on September 25, 2009, the Receiver and the Trustee executed the Mutual Benefits "Keep Policy" Trust Agreement ("Trust Agreement") [DE 2540-1].

Initially, approximately 3,138 policies with a face value of $383,580,782 (or 27% of the total) were designated to be sold, and roughly 3,037 policies with a face value of approximately $1,054,421,049 (or 73% of the total) were designated as Keep Policies. [DE 2958] at 2 n.4. However, according to the Motion, at the time the Trust was created, it held 2,403 policies with a total face value of $886 million. [DE 3065] at 2. As of March 2022, those numbers have decreased substantially, to 949 and approximately $191 million, respectively. [DE 3104-1]. As indicated in the Motion, the primary reason for this substantial decrease is that the Trustee has distributed more than $542 million in death benefits as policies have matured over the last twelve years.

Keep Policy Investors ("KPIs")[2] presently hold interests equal to approximately 38.81% of the face value of the policies serviced by the Trust, and Acheron Capital, Ltd. ("Acheron") holds interests accounting for the remaining 61.19%. *See* [DE 3104-1]. Unlike the KPIs who were victims of the fraudulent scheme giving rise to this case, Acheron obtained its interests in policies serviced by the Trust by purchasing those interests in undersubscribed policies after the commencement of this action – initially from the Receiver and later from the Trustee. *See MBC II*, 810 F. App'x at 772. While Acheron is not a KPI, and while the Trustee does not owe a fiduciary duty to Acheron, *see Acheron Portfolio Tr. v. Mukamal as Tr. of Mut. Benefits Keep Pol'y Tr.*, No. 18-CV-25099, 2021 WL 7368630, at *27-35, 37-40 (S.D. Fla. Sept. 24, 2021), *report and recommendation adopted*, No. 18-25099-CIV, 2022 WL 354241 (S.D. Fla. Feb. 7,

---

[2] The Trust Agreement defines KPIs as "persons who have invested in an entire interest or a fractional interest in a Keep Policy owned of record by the Receivership Entities, and whose interest in such Keep Policy has not been forfeited as of the Closing Date."

2022), the Trustee does owe contractual obligations to Acheron under various contracts, *see* [DE 2941, 2967]; *MBC II*, 810 F. App'x at 773, 775.   Specifically, when Acheron has purchased fractional interests from the Trustee, Acheron and the Trustee have entered into asset purchase agreements.   They also entered into a separate agreement in 2015 (the "2015 Agreement"), after extensive negotiations, to resolve certain concerns that Acheron had raised.   *See* [DE 2500, 2500-2, 2941].   Section 4 of the 2015 Agreement provides as follows:

> 4. Sale of Policies. The Trustee acknowledges that he will not seek to sell a policy in which Acheron owns an interest (and for which Acheron has timely paid all administrative fees, premium obligations and any other expenses for which Acheron is responsible as an owner of an interest in such policy) without first extending to Acheron the opportunity to buy other interests in the policy pursuant to the Disposition Services routinely conducted by the Servicer, except in the event of a liquidation of the Trust and sale of the entire portfolio of policies owned by the Trust. In the event of such a sale, Acheron will have the right to bid upon any sale of a policy in which it has an interest and the right to top any bid submitted by another party.

[DE 2500-2] § 4.

As indicated above, the number of policies held by the Trust and the face value of the Trust's policies have decreased substantially since the formation of the Trust in 2009.   Due to concerns that continuing to administer the Trust would become unfeasible, the Trustee sought Court approval in 2020 to initiate an orderly wind-down process and eventual termination of the Trust.   *See* [DE 2640].   In November 2020, the Court granted the Trustee's request and denied a competing wind-down motion filed by Acheron.   *See* [DE 2723, 2825].   On March 15, 2021, the Trustee provided notice that the Trust lacked resources to continue operating the Trust without a substantial increase in costs to investors and, therefore, reported that wind down of the Trust should occur by the fourth quarter of 2021.   [DE 2882] at 4-5.   The Trustee has since provided an updated timeline indicating he anticipates a sale of policies held by the Trust – in connection with winding down the Trust – to occur sometime in 2022.   *See* [DE 3061, 3065].

In May 2021, the Trustee provided a notice to investors regarding his intent to wind down the Trust and to sell the policies held by the Trust.  *See* [DE 2917, 2919-1, 2934].  Since then, a handful of investors have voiced their opposition to a sale of the policies, indicating they wish to have an option to retain ("Keep Option")[3] their beneficial interests post-Trust termination.  The Trustee has provided a Keep Option for KPIs who hold a 100% beneficial interest in a particular policy ("100% Investors"), which the Court has approved.  *See* [DE 3056, 3074].  Acheron has also been permitted to remove policies in which it holds a 100% interest from the Trust's portfolio. *See* [DE 2749].  However, the Trustee will not offer a Keep Option to non-100% investors for various reasons, which are discussed further below.  Instead, the Trustee plans to move forward with an auction of the entire portfolio of policies held by the Trust, with the exception of the single-investor policies that are removed by 100% Investors and Acheron.

## THE MOTION

The instant Motion seeks approval to proceed with an auction in accordance with the procedures proposed in the Motion.  First, the Motion addresses the assets being sold, noting that the Trustee proposes selling all of the Trust's right, title, and interest in and to the Keep Policies held by the Trust.  Upon such a sale, the interests of the Trust, the Trustee, and any other person or entity (other than the purchaser), including KPIs and Acheron, will be extinguished.

Second, the Motion proposes separating policies into a few separate tranches and sub-tranches at auction.  In other words, the Trustee does not intend to proceed with a policy-by-policy auction or an auction of the entire portfolio of policies as a single unit.[4]  To accommodate

---

[3] I recognize that the Trustee disagrees with the nomenclature "Keep Option" as the policies are owned by the Trust, not the investors (meaning KPIs would not be literally "keeping" ownership). Nonetheless, I use the term Keep Option for simplicity.

[4] The Trustee initially proposed allowing offers to be submitted on individual tranches *and* on the entire portfolio of policies.  However, to avert a potential issue raised by Acheron, the Trustee now

Acheron's contractual rights (as previously interpreted by the Court, *see* DE 2941, 2967), the Trustee's proposed procedures allow for Acheron to submit an initial bid (an "Acheron Initial Bid" or "AIB") for any policies in which Acheron has an interest by identifying the policies to be included in that bid and the total purchase price Acheron will pay for those policies.  If Acheron submits an AIB, the identified policies will comprise Tranche A.  If Acheron does not submit an AIB, Tranche A will instead include all policies in which Acheron owns a beneficial interest. Tranche B will include all of the Trust's policies that are not included in Tranche A.  Additionally, the Trustee intends to include sub-tranches (A-1 and B-1) for any policies where the insured is at least 100 years old and no remaining premiums are due.  The sub-tranches will be sold separately from the primary tranches.

Third, the Trustee intends to solicit stalking horse bidders prior to the auction. Consequently, he requests "confirmation of his authority to select and approve, in his business judgment, 'stalking horse' bids that substantially conform to the procedures described [in the Motion] and that seek customary bid protections."  Motion at 11.  Such protections would include a break-up fee of no more than 3% of the amount of the stalking horse bid in the event the stalking horse bid is outbid at auction.  The Trustee intends to require all prospective bidders, including the stalking horse bidder, to execute a purchase agreement binding them to the terms of their offer. The key material terms to be included in such purchase agreement(s) are summarized on page 12 of the Motion.

Fourth, the Trustee proposes various specific bidding procedures.  He intends to provide prospective bidders with an opportunity to undertake due diligence upon submitting certain affidavits and representations, as well as a non-disclosure agreement.  Similarly, prospective

---

intends to only allow bidding on tranches/sub-tranches, without also entertaining offers for the entire portfolio of policies.  *See* [DE 3107-1] ¶ 8 & n.4.

bidders will be required to satisfy various requirements in order to qualify to bid.  *See* Motion at 13-14.  Bidders will have 60 days to satisfy these requirements and to provide their initial offer. Once the 60-day period passes, the Trustee will determine what he views to be the preliminary successful bid for each tranche, and thereafter, he will conduct an "open outcry" auction for each tranche.

Fifth, the Trustee requests that the District Court schedule a sale approval hearing to occur within 3 business days after the auction concludes.  At that hearing, he intends to request the entry of a "Sale Approval Order" that authorizes, approves, and directs the sale of the Keep Policies to the successful bidder(s) at the auction.  He then intends to proceed with closing 7 days after the entry of the Sale Approval Order.  *See* [DE 3107-1] ¶ 3 & n.2.

Sixth, the Motion discloses that the Trustee has retained Longevity Asset Advisors LLC ("Longevity") to manage and conduct the sale process and to provide various related services.  For its services, the Trustee will pay Longevity a 7.5% commission (of the gross purchase price at auction) and will reimburse Longevity for its actual expenses.  Longevity's compensation will be payable from the sales proceeds (and from retainers paid prior to closing).

Finally, the Motion addresses the distribution of proceeds.  The Trustee specifically notes the manner of distribution will be determined following sale and that he is not seeking approval in the instant Motion regarding the manner of distribution.  He will, however, seek Court approval of his proposed manner of distribution, which will be determined post-sale.

As discussed in further detail below, two objections to the Motion have been filed.  The objections raised by one or both of the objecting parties include the following: (1) auctioning off all of the policies without allowing a Keep Option would result in an abuse of discretion by the Trustee; (2) conducting an auction that does not allow for policy-by-policy bidding would also be

an abuse of discretion; and (3) the Trustee should be required to provide additional auction-related information before any auction proceeds.

## TRUST AGREEMENT

Sections 2.2, 3.1, and 8 of the Trust Agreement are all relevant to the inquiry here.  As set forth in Section 2.2 of the Trust Agreement, "[t]he purpose of the Trust is to take custody of the Trust Assets and maintain and administer the Trust Assets for the benefit of the Keep Policy Investors, consistent with the terms and procedures set forth in this Trust Agreement."  The Trust Agreement grants broad powers to the Trustee to take all actions necessary in his judgment to fulfill the purposes of the Trust, including those which are enumerated in Section 3.1.  In this regard, Section 3.1(a) of the Trust Agreement specifically provides that:

> Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Trust, including, without limitation, each power expressly granted in this Section 3.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Florida.

Section 3.1(b) then specifies that, without limiting the generality of Section 3.1(a), the Trustee has certain specified powers and duties, including the following:

> (i) To receive and hold the Trust Assets, subject to the terms of this Trust Agreement;
>
> (ii) To hold the status of owner and "nominal beneficiary" with respect to all Keep Policies, as is presently held by the Receiver pursuant to the Policy Administration Orders, and to hold and execute, in his discretion, all of the rights, powers and privileges of the Receiver under the Policy Administration Orders; [and]
> . . .
> (xvii) In the event that the Servicing Agreement is terminated or expires and the continued servicing of the Keep Policies becomes unfeasible, to authorize and direct the sale, surrender, or lapse of the Keep Policies, and to distribute the proceeds, if any, of the Keep Policies, upon such sale, surrender or lapse, to the Keep Policy Investors in such manner as the Trustee determines to be appropriate.

Trust Agreement § 3.1(b).   The Trust Agreement also contains a termination provision which provides that the "Trust Agreement shall terminate upon the final disposition of all Keep Policies, whether by maturity, sale, surrender, or lapse, and the distribution of all other Trust Assets in accordance with the terms of the Servicing Agreement."  *Id.* § 8.

## TRUSTEE'S TESTIMONY

The Trustee testified at the March 16, 2022 hearing.  His direct testimony was presented via proffer, and the two objecting parties were then afforded an opportunity to cross-examine the Trustee after I questioned the Trustee.

The Trustee is a certified public accountant, a certified insolvency and restructuring advisor, a personal financial specialist, a certified fraud examiner, and certified in financial forensics.  T. 10.[5]  He serves as a Chapter 7 bankruptcy panel trustee in this district and is frequently engaged to serve as a fiduciary.  T. 10.

The Trustee's starting point for evaluating how to proceed with the Trust's liquidation was the Trust Agreement – particularly Section 3.1(b)(xvii).  T. 11-12.  He is determined to liquidate the Trust in the manner he believes will provide the most benefit to the greatest number of KPIs.  T. 12.  Additionally, he has attempted to devise a transparent sales process that will provide an even playing field and encourage bidding in a manner that will maximize the value of the Keep Policies.  T. 12.

According to the Trustee, the Trust Agreement contemplates that the Trust's policies will be sold, surrendered, or lapsed in the event of liquidation or termination.  T. 12.  It does not indicate that the settlor (the Receiver) contemplated any other liquidation mechanism.  T. 12-13.  Moreover, when the Trust was formed, the Receiver indicated in conversations with the Trustee that he

---

[5] References to "T. __" refer to pages of the March 16, 2022 hearing transcript [DE 3108].

contemplated the Trust would be liquidated through sale if continued Trust operations became unfeasible.  T. 13, 29.  The Receiver never specifically discussed the idea of a post-Trust Keep Option with the Trustee.  T. 30.

Nonetheless, the Trustee has considered requests made by a limited number of parties for a Keep Option and has evaluated Keep Options presented by Acheron and Litai Assets, LLC ("Litai"), the servicer of the Trust's policies.  T. 14, 16.  In considering such requests and deciding to proceed with an auction and his proposed procedures, the Trustee was guided by his own experience as a fiduciary and also consulted with his counsel and other professionals.  T. 14, 20. Additionally, the Trustee consulted with industry advisors, including (1) Longevity, which has extensive experience in conducting sales in the viatical and life settlement industry, particularly with auctions of policies and portfolios on behalf of fiduciaries, and (2) Doug Himmel of Melville Capital, an industry expert that has participated in numerous auctions of life insurance policies and portfolios.  T. 15, 20.

The Trustee does not view a Keep Option to be appropriate or viable for several reasons: (1) the Trust Agreement does not contemplate a Keep Option; (2) the Keep Options that have been proposed do not provide for adequate supervision and fiduciary protection to safeguard investor interests; (3) the Trustee has not identified any other viable Keep Option; (4) the Keep Options that have been proposed present unresolved securities issues;[6] and (5) designing and implementing a Keep Option for non-100% investors would be very time-consuming, complicated, and

---

[6] The Trustee has raised the issue with a securities attorney but was unable to obtain a definitive answer regarding his securities concerns.  T. 34.  The Trustee's counsel also noted that he contacted counsel for the SEC who essentially indicated that the SEC will not provide advisory opinions.  T. 55.

expensive, few investors are likely to exercise any such option,[7] and designing and implementing such an option would interfere with maximizing the value of all other policies (the substantial majority) through the sale process. T. 16-19; *see also* T. 35-37. For these reasons, the Trustee testified (via counsel's proffer) that in his business judgment, a Keep Option would run counter to providing the greatest benefit to the greatest number of KPIs and would instead prioritize the interests of Acheron and a small minority of KPIs to the detriment of the substantial majority of KPIs. T. 19-20.

With respect to his proposed sales procedures, the Trustee indicated that they are designed to provide a transparent and even-handed process aimed at eliciting the highest bid from all qualified bidders. T. 20. He considers the procedures to be standard for similar liquidation sales and has determined that they are generally recognized in the industry as procedures that will allow for maximizing the value of the assets to be sold. T. 20.

The Trustee intends for the auction to include two tranches (separating policies in which Acheron owns an interest into their own tranche in order to satisfy his contractual obligations to Acheron) and up to two sub-tranches. However, the Trustee has determined in consultation with his advisors that a policy-by-policy sale would not provide the best method to elicit the highest and best offer for the Trust's portfolio of policies in light of the nature of the assets to be sold. T. 21-22. A policy-by-policy process would be cumbersome and expensive for the Trust, would increase the burden on bidders, and would discourage participation by institutional investors (who are likely to pay the most at auction) by making the auction more cumbersome and significantly longer. T. 22-23. Ultimately, the Trustee has "determined that a policy-by-policy auction would

---

[7] After extensive work to develop a Keep Option for 100% Investors, only about 15% of such investors decided to exercise the Keep Option, and the Trustee anticipates the number would likely be much lower for non-100% investors (which he believes is buttressed by the very low number of objections to the Motion).

materially diminish the value [to be] realized from the Trust['s] portfolio [of] policies to the detriment" of KPIs.  T. 23.  In fact, absent his contractual obligations to Acheron, the Trustee would not be offering separate tranches because he believes a single portfolio that is not separated into tranches would generate the most interest.  T. 41.  That is because in his experience, institutional investors look to acquire volume, value the portfolio as a whole, and want to acquire the entire portfolio.  T. 42-43.  Additionally, based on discussions with industry participants, the Trustee determined that institutional investors are unlikely to remain for the duration of a policy-by-policy auction of over 900 policies.  T. 46, 90.

The Trustee's proffer also addressed his decision to not offer stalking horse bid protections to Acheron.  Specifically: (1) Acheron did not negotiate for such protections in its contracts with the Trustee; and (2) unlike a typical stalking horse, Acheron is already an interested party, and therefore, the Trustee does not believe that typical stalking horse protections are necessary to induce Acheron's participation.  T. 24.  Additionally, the Trustee will not offer Acheron the opportunity to credit bid because Acheron is not a secured creditor or lienholder with a legal right to credit bid, and the Trustee believes that allowing Acheron to credit bid will disincentivize other bidders.  T. 25.  Likewise, the Trustee believes that excepting Acheron from the brokerage fee (if Acheron is a successful bidder) would result in an uneven playing field and discourage other parties from bidding.  T. 25-26.

## DISCUSSION

I find that the Trustee's decision to proceed with the contemplated auction represents a reasonable exercise of the Trustee's business judgment and that granting the Motion will not result in the Trustee abusing his discretion or violating his contractual obligations to Acheron.  I also

find that the Trustee has reasonably determined that the proposed auction and sale procedures are in the best interest KPIs.

No party here seems to dispute that continued servicing of the Keep Policies has become unfeasible or that the Trust Agreement authorizes the Trustee to direct the sale, surrender, or lapse of the Keep Policies.  Additionally, no party appears to dispute that the Trustee is afforded discretion in the present circumstances (under the Trust Agreement).  He clearly is.  Rather, the parties who have objected to the Motion contend that the Trustee is abusing the discretion conferred upon him under the Trust Agreement.  Acheron also contends that the Trustee is violating Acheron's contractual rights.

Significantly, "[w]here discretion is conferred upon [a] trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion."  *Sarasota Bank & Tr. Co. v. Rietz*, 297 So. 2d 91, 93 (Fla. 2d DCA 1974) (quoting Restatement (Second) of Trusts § 187 (1959)).  Moreover,

> If discretion is conferred upon the trustee in the exercise of a power, the court will not interfere unless the trustee in exercising or failing to exercise the power acts dishonestly, or with an improper even though not a dishonest motive, or fails to use his judgment, or acts beyond the bounds of a reasonable judgment. The mere fact that if the discretion had been conferred upon the court, the court would have exercised the power differently, is not a sufficient reason for interfering with the exercise of the power by the trustee.

Restatement (Second) of Trusts § 187(e) (1959).  Nonetheless, while the Trustee does have discretion under the Trust Agreement, he obviously does not have discretion to act in contravenion of Acheron's contractual rights.  Thus, the Motion should be granted so long as the Trustee is not abusing his discretion under the Trust Agreement or violating Acheron's contractual rights.  Stated differently, if granting the Motion would result in an abuse of discretion by the Trustee *or* a

violation of the Trustee's contractual obligations to Acheron, the Motion should be denied. But no abuse of discretion or breach of contract will occur here if the Motion is granted.

Two parties filed timely objections to the Motion, Acheron and Jonathan Majers ("Majers"). Majers is a KPI.[8] A few other KPIs have filed letters voicing opposition related to the Motion. I have also considered these letters (though the general sentiments appear to be covered in the objections filed by Acheron and Majers).

Acheron raises three categories of objections. First, it contends that the proposed auction and sales procedures violate Acheron's contractual rights under its agreements with the Trustee. Second, it contends that the Trustee's refusal to offer a Keep Option to non-100% investors is an abuse of discretion. Third, Acheron takes issue with certain aspects of the proposed auction and sales procedures – primarily the Trustee's decision to conduct bidding in tranches rather than through a policy-by-policy auction.

Majers likewise objects to the Trustee's refusal to consider a Keep Option for non-100% investors. He also contends that the Trustee should be required to provide investors with additional information before an auction is approved. The Keep Option issue is discussed in section A below. Acheron's objections to the proposed sales procedures are discussed in Section B below. Majers' objection regarding a lack of information is addressed in Section C below.

With respect to Acheron's contractual arguments, I do not discuss them further below as they are already the subject of an extensive Report and Recommendation that the District Court previously adopted. *See* [DE 2941, 2967]. Acheron has acknowledged that it essentially included its contractual arguments – the same arguments that this Court previously rejected – in the Motion

---

[8] By way of background, Majers' Response notes the following: In 1999, Mr. Majers invested in 42% of a life policy with a face value of $201,770.85. The insured is now 83 years old. Since 1999, Majers has paid at least $174,000 in premiums. In 2021 alone he paid over $18,000 in premiums. There are four other investors in this policy, including Acheron.

for purposes of preserving the issue for appeal.  At the March 16, 2022 hearing, I asked Acheron whether it was raising any new arguments regarding its contractual rights.  *See* T. 130.  Acheron effectively stated that its contractual arguments were the same as those previously raised, except that the Trustee has now provided a graphic illustration of how he interprets the Acheron contracts. *See* T. 130-31.  Nonetheless, Acheron seemed to acknowledge that the Trustee's application comported with the Court's prior interpretation with one exception.  *See* T. 130-31.  Specifically, the Trustee's ability to accept a higher bid for the entire portfolio even if Acheron were to submit the highest bid on the Acheron tranche (Tranche A) would arguably impair Acheron's right to top under the 2015 Agreement.  To the extent this one exception would have actually resulted in a violation of Acheron's contractual rights, it no longer will in light of the Trustee's acquiescence on this point.  *See supra* note 4.  Therefore, Acheron's contractual arguments fail for the reasons stated in my earlier Report and Recommendation adopted by the District Court.  *See* [DE 2941, 2967].

## A. KEEP OPTION

Understandably, some KPIs have expressed a desire for a Keep Option.[9]  After being defrauded by the defendants to this action, they voted in favor of retaining policies in which they had interests, hoping to hold on to their investments until maturity and walk away with their share of the face value of the policies for which they had already poured in their funds.  Thus, as the District Court previously recognized, an essential purpose of the Trust was to "administer the

---

[9] Acheron has understandably also expressed a desire for a Keep Option.  However, because Acheron is not a KPI and the Trustee does not owe a fiduciary duty to Acheron, it is unclear why Acheron should be able to weigh in on the propriety of a Keep Option when the contracts between the Trustee and Acheron do not require the Trustee to provide any such option to Acheron. Nonetheless, I have considered Acheron's Keep Option arguments.  For the reasons discussed in this section, even if Acheron were a KPI to which the Trustee owed a fiduciary duty, the Trustee's decision to not offer a Keep Option represents a reasonable exercise of his business judgment.

policies through maturity, *if possible*, for the benefit of the [KPIs] until termination is proper." [DE 2825] at 3 (emphasis added).  Or, as the Trustee testified at the hearing on the Motion, the Receiver's intent in creating the Trust was to provide an opportunity for investors to continue to hold their interests for as long as the Trust was viable.  T. 29.

That opportunity turned fruitful for many.  As indicated above, the Trustee has been able to distribute more than $542 million in death benefits since the inception of the Trust, and the face value of the remaining Trust policies is now about one-third of that amount.  It is unfortunate for the remaining KPIs that they will not be able to hold their interests until maturity, but nobody disputes that the Trust is no longer viable.  The Trust has even reached the point of needing to borrow money to sustain operations pending termination as the wind-down process has taken longer than anticipated to date.  Given this reality, I credit that the Trustee is trying to make the best out of an unfortunate situation.  He has reasonably determined that an auction, according to his proposed procedures, represents the best way to maximize the value of the Trust's assets.  Even Acheron's expert, who also serves as a Chapter 7 bankruptcy panel trustee, recognizes that a public auction represents an accepted way of fostering competitive bidding and maximizing sale proceeds (even though Acheron's expert takes issue with the Trustee's proposed procedures).  Declaration of Kenneth P. Silverman [DE 3084-6] ¶ 9.

As indicated above, the Trustee has provided several reasons to support his decision to include all of the Trust's policies in the auction rather than offering a Keep Option to those who are seeking such an option: (1) the Trust Agreement does not contemplate a Keep Option; (2) the Keep Options that have been proposed do not provide for adequate supervision and fiduciary protection to safeguard investor interests; (3) the Trustee has not identified any other viable Keep Option; (4) the Keep Options that have been proposed present unresolved securities issues; and (5)

designing and implementing a Keep Option for non-100% investors would be very time-consuming, complicated, and expensive, few investors are likely to exercise any such option, and designing and implementing such an option would interfere with maximizing the value of all other policies through the sale process.  T. 16-19; *see also* T. 35-37.

I fully agree with the Trustee that the Trust Agreement should be the starting point for how to proceed towards Trust termination,[10] and the Trustee is clearly following the terms of the Trust Agreement by pursuing a sale of the remaining Keep Policies.  As I previously noted, both statutory and common law recognize that the terms of a trust instrument control where there are provisions governing termination.  [DE 2723] at 12 (citing § 736.0105(2), Fla. Stat.; *Schwarzkopf v. Am. Heart Ass'n of Greater Miami, Inc.*, 541 So. 2d 1348, 1349-50 (Fla. 3d DCA 1989)).  Now, that alone does not necessarily mean that the Trustee should not consider other options such as a Keep Option if in the best interest of KPIs and consistent with the settlor's intent,[11] but the evidence demonstrated that he has considered such options.  In fact, he crafted a Keep Option for 100% Investors, as this was one area where he found such an option to be viable.  Even Litai, which proposed Keep Options for both 100% Investors and non-100% investors, asserted that it was particularly "important" to provide such an option for 100% Investors, recognizing that this group is distinct from non-100% investors.  *See* [DE 2946-1].  The Trustee listened.  *See* [DE 3056, 3074].  Nonetheless, the Trustee's attempt to accommodate 100% Investors should not result in him being forced to similarly accommodate non-100% investors when he has reasonably

---

[10] *See Bryan v. Dethlefs*, 959 So. 2d 314, 317 (Fla. 3d DCA 2007) ("The polestar of trust or will interpretation is the settlor's intent." (citations omitted)).

[11] To the extent Majers seeks to modify or reform the Trust to provide a Keep Option in the event of Trust termination, he has failed to demonstrate that the Trust Agreement does not reflect the settlor's intent as written.  *See Giller v. Grossman*, 327 So. 3d 391, 395 (Fla. 3d DCA 2021) ("[I]n order for the trial court to reform a trust instrument, there must be clear and convincing evidence that the trust, as written, does not reflect the settlor's intent.").

determined that doing so would be to the detriment of most KPIs and would present myriad complications not present in the context of 100% Investors.

With respect to the Keep Options proposed to date, I agree with the Trustee that they are problematic for the reasons that he has articulated. The only somewhat clear option at the present time is Litai's proposed Keep Option,[12] but as the Trustee has noted, Litai's proposed Keep Option would leave KPIs (many of whom are unsophisticated investors) without a fiduciary to protect them. Majers contends that this issue can be cured through contractual duties, but it is reasonable for the Trustee to conclude that contractual duties will not be an adequate substitute for a fiduciary in this context. It is also reasonable for the Trustee to be concerned that enabling such an arrangement without fiduciary protections could lead to claims that he violated his own fiduciary duties.

The Trustee has also raised securities law concerns presented by offering a Keep Option. Previously, his explanations regarding these concerns were somewhat vague. Thus, I made clear that he would need to provide a more robust explanation and potentially obtain an affidavit from a securities expert. *See* [DE 3060] at 9 n.9. The Trustee has done the former, *see, e.g.*, [DE 3061] at 10-12, though not the latter. In providing his explanation, his reasoning largely relied on *MBC I* and a subsequent district court case applying *MBC I. See Sec. & Exch. Comm'n v. Torchia*, 183 F. Supp. 3d 1291 (N.D. Ga. 2016). I have carefully reviewed both cases (as well as the affidavit submitted by Acheron's expert). Having done so, and having considered the Trustee's analysis, it is clear that a Keep Option scenario is less likely to implicate the specific securities concerns

---

[12] At the hearing, Acheron's counsel indicated that the Keep Option Acheron envisioned would entail Wilmington Trust holding nominal title to the policies with a contractual relationship being in place for investors who choose to exercise a Keep Option. *See* T. 134-35. However, the Trustee's counsel stated that Wilmington Trust is a mere placeholder and that it is the equivalent of a securities clearinghouse that has no role other than to take instructions from the ultimate owner of a policy. T. 144-45.

addressed in *MBC I* and *Torchia* than the circumstances in those cases.  Nonetheless, I cannot conclude that the Trustee's securities concerns are unreasonable or unfounded, particularly given the complexity of the law and the paucity of cases directly on point.  Moreover, it is reasonable for him to avoid a Keep Option scenario, particularly when he has securities concerns and cannot obtain a definitive answer from securities counsel or the SEC to alleviate those concerns.  *See* T. 34, 55.

I also find that the Trustee has appropriately balanced the time and expense associated with designing and implementing a Keep Option with the expected interest.  Of the 100% Investors, only 15% elected to pursue such an option.  It is reasonable to conclude that the number is likely to be lower in the context of non-100% investors.  This is especially so when only one such investor filed a formal objection and only a few others filed letters indicating a desire to retain their interests (when there are presently 1,906 KPI interests in the Trust, *see* [DE 3104-1]).  This is consistent with the Trustee's characterizations of a small, vocal minority.  Against that backdrop, it is reasonable for the Trustee to not go through the exercise of soliciting interest in undefined and/or problematic Keep Options, especially given the other reasonable concerns he has raised.

Part of what makes the Trustee's (and the Court's) job difficult is that the Trustee owes a fiduciary duty to all of the KPIs, but the interests of the KPIs are not necessarily alligned.  As Majers has emphasized, this is a unique trust.[13]  While the Trustee has emphasized that the KPIs do not actually own portions of policies, but rather own beneficial interests in the Trust's assets, the reality is that each KPI's interest has been tied to specific trust assets, with their obligations and fortunes tied to specific policies.  The KPIs have paid premiums associated with particular policies, and they have received payouts when those particular policies have matured (as opposed

---

[13] Though Majers has not explained how this uniqueness alters the legal framework within which the Court must decide the issues before it.

to, say, owing a *pro rata* portion of all premiums owed on all of the polices in the Trust and receiving a *pro rata* payment whenever any policy matured).  In most trusts, where the beneficiaries share beneficial interests in the trust assets as a whole, maximizing the value of the trust assets as a whole serves the best interests of all of the beneficiaries, and the trustee can fulfill the fiduciary duty he owes to all of the beneficiaries by maxmizing the value of those trust assets. Here, however, those KPIs whose beneficial interests have been associated with certain policies (like those more likely to be close to maturity or those for which no further premiums may be owed) see a Keep Option as better maximizing the value of "their" policies and thus better serving their interests, even if it is not in the interests of KPIs as a whole.  The situation is even more complicated by the fact that, given the reality of the underlying Mutual Benefits scheme, KPIs are not necessarily associated with particular policies based on some conscious choice they made discerning the benefits and risks of a particular policy.  *See, e.g.*, [DE 2237] at 6 (receiver noting that "the particular policy any investor was placed on by MBC was largely out of the investor's control and often fortuitous"); *see also* [DE 3032] at 24.  In other words, the fact that one KPI was associated with a policy that matured and paid out years ago, another KPI's interest has been associated with a policy that remains active and is now relatively "more valuable," and a third KPI's interest has been associated with a policy that remains active but is now relatively "less valuable" may at least partially be a function of chance rather than investing acumen.

As such, the Trustee has to strike a certain balance.  On the one hand, what each KPI receives should be tied to the policy(ies) in which they have an interest.  In other words, simply because two KPIs each invested $10,000 at the same time does not mean that each KPI should receive the same return (unless they have identical interests tied to the same policies).  On the other hand, though, as the Trustee has emphasized, he needs to pursue a course of action that will do the

most good for the most KPIs.  I find that the Trustee has sought a reasonable balance of the competing interests of the remaining KPIs by attempting to maximize the value of the entire Trust portfolio through an auction while planning a distribution weighted to reflect the relative acutuarial value of the individual policies with which individual KPIs' interests are associated.[14]

Ultimately, I cannot find that the Trustee's decision to not offer a Keep Option is unreasonable or guided by an improper motive.  As I have previously remarked, it is undoubtedly reasonable for Majers and other investors to want a Keep Option, and I do sympathize with Majers and others who seek such an option.  That is why I previously encouraged the Trustee to further consider a Keep Option.  At any rate, it is whether the Trustee's actions are reasonable that must dictate the outcome.  And it reasonable for the Trustee to not offer a Keep Option in light of the concerns that he has raised, particularly when he is following the express terms of the Trust Agreement.  In other words, given that the Trustee is pursuing a sale in accordance with the terms of the Trust Agreement rather than a Keep Option not provided for under the Trust Agreement, I cannot find that he is abusing his discretion in this regard.

## B. ACHERON'S OBJECTIONS TO PROPOSED SALE PROCEDURES

Acheron objects to the Trustee's proposed procedures on two primary grounds.  First and foremost, it contends that the Trustee's failure to conduct a policy-by-policy auction – as opposed

---

[14] It is worth noting that the Trustee's decision to group whole policies together for sale and his contemplated distribution scheme follow the Receiver's lead in certain important respects.  When the Receiver previously sold policies, he sold them as "portfolios of policies for practical and strategic reasons in an effort to maximize the consideration received in their sale."  [DE 2237] at 6.  The circumstances are obviously somewhat different here, and KPIs have now paid premiums associated with particular policies for several years.  But the fact that the Trustee is planning on weighting the distribution depending on the policy in which a KPI has an interest while still aggregating the policies together for sale seems to strike a balance between the Receiver's earlier approach to maximizing the value of the policies and the recognition that distributions to investors should then be based on the value of the policies for which they have been paying premiums since the inception of the Trust.

to an auction in one or more tranches – will be an abuse of discretion.  Second, Acheron asserts that the Trustee is acting unreasonably by not offering certain protections to Acheron in order to induce Acheron to bid and by requiring the payment of the 7.5% broker's fee even if Acheron is the successful bidder.  Both arguments are framed in the abuse of discretion context.  In other words, Acheron does not appear to contend that these issues violate Acheron's contractual rights (putting aside Acheron's previously rejected argument that the Trustee is contractually obligated to conduct a policy-by-policy sale).[15]  Nonetheless, even assuming Acheron may raise these issues (as a non-KPI), they fail in all but one respect.  That is, the Trustee may not condition Acheron's participation on a waiver of claims against the Trustee.

### 1. Tranche Sale vs. Policy-by-Policy Sale

The Trustee's decision to structure the sale in a few tranches instead of proceeding with a policy-by-policy sale represents a reasonable exercise of the Trustee's business judgment.  The Trustee has clearly dedicated extensive thought to the structure of the auction and has considered pros and cons of different structures in consultation with his professionals and other advisors.  I credit the Trustee's testimony that a policy-by-policy sale will be overly cumbersome and that it is likely to discourage the participation of institutional investors who are likely to pay the most at auction.  Regardless, even if a policy-by-policy sale would be reasonable, the Trustee has discretion to pick between two reasonable options.

Acheron nevertheless posits that a policy-by-policy auction is necessary for a few reasons.  First, Acheron submits that without a policy-by-policy auction, further disputes between the

---

[15] *See* [DE 2967] (finding that "the Trustee is empowered to sell whole Keep Policies as part of his wind down and liquidation of the Trust, notwithstanding Acheron's fractional interest in many of the Policies" and that "the Trustee is not required to sell the Keep Policies on a policy-by-policy basis [or] to value the Keep Policies on a policy-by-policy basis in order to sell the Policies as part of the Trust's wind down and liquidation").

Trustee and Acheron are likely to ensue, thus causing further delay. While the Trustee should not ignore this possibility, it would be unreasonable for him to allow Acheron's threats to change his course of action when he reasonably believes that his charted course is in the best interest of KPIs (and I credit that he does believe this based on his consideration of different options and his involvement in numerous other auctions). Moreover, as the Trustee has implied, unless he accedes to all of Acheron's demands (which would likely be detrimental to KPIs), Acheron appealing and seeking a stay pending appeal are all but inevitable. Thus, proceeding with his proposed sale in tranches (rather than on a policy-by-policy basis) is unlikely to lead to any extra material delay. Even if it would, it is reasonable for the Trustee to stick with his proposed procedures when he has determined in his reasonable business judgment that such procedures provide the best way to maximize returns.[16]

Second, Acheron contends that without a policy-by-policy sale, bidders will be deterred and unnecessary disputes with bidders will arise. Again, the Trustee has extensively thought through what he views to be the best option. Based on his extensive experience as a fiduciary and based on the advice he has received from his professionals and others with extensive experience in this area, he has concluded that the bidders who are likely to pay top dollar at auction (institutional investors) will be deterred if there is a policy-by-policy sale. Obviously, his conclusion is at odds with the contentions made by Acheron and Acheron's expert, but I simply cannot conclude based on the evidence and arguments presented and the record that the Trustee is acting unreasonably. Acheron's expert evidently has substantial background in this area, like the Trustee; but as the Trustee testified, he has been living with this portfolio for years. T. 91. I cannot

---

[16] As indicated above, the Receiver also previously determined that these types of policies should be sold as a portfolio rather than individually in order to maximize their value. *See supra* note 14. Following the logic of the Receiver, who previously went through the process of selling these types of policies, is surely reasonable.

find that the Trustee is abusing his discretion by structuring the auction as he has, particularly given he has supported his decision to do so with reasonable explanations. Acheron additionally contends that more investor disputes are likely to result absent a policy-by-policy sale. However, I also find this argument unavailing and conclude that the Trustee has designed the auction in a manner that demonstrates a reasonable exercise of his business judgment.

### 2. Protections to Acheron/Waiver of Claims

According to Acheron, the Trustee has designed the auction in a manner that discourages Acheron's participation. For instance, Acheron contends that it should have the right to credit bid at auction. The Trustee disagrees. He indicates that Acheron already has every incentive to bid at auction and that he does not view the provision of a credit bid as necessary to induce Acheron's participation. This is certainly reasonable. Acheron still has a strong incentive to bid at auction even if it will not have the ability to credit bid. It stands to lose substantial amounts if it does not. For the same reason, the Trustee's determination that it is unneccessary to offer Acheron customary stalking horse protections such as a breakup fee is also reasonable. Of course, Acheron did not bargain for such protections or for the right to credit bid when it negotiated the contracts between the Trustee and Acheron. Additionally, while I understand why Acheron does not want the broker's compensation to be payable if Acheron is the successful bidder on policies in which it holds an interest, the Trustee's determination that the broker's fee is necessary to ensure a level playing field and to help realize the highest and best offer for all policies is reasonable. While Acheron may end up paying more if it is the successful bidder, it is reasonable for the Trustee to believe that the broker will engage additional bidders and, therefore, help maximize bidding for the benefit of the KPIs. Attempting to maximize returns for the KPIs is obviously what the Trustee must do (so long as he does not violate his contractual obligations to Acheron in doing so).

However, Acheron appropriately takes exception with one aspect of the documents the Trustee seeks to have Acheron sign to obtain access to the data room and participate in the auction. Specifically, Acheron notes that the Trustee's form of confidentiality agreement requires Acheron to agree it will have no claim against the Trustee related to the sale. I agree with Acheron that it is unreasonable for the Trustee to include such a requirement. While it is reasonable for the Trustee to not offer additional incentives to Acheron as it is reasonable for him to conclude that Acheron is highly likely to participate without those incentives, it is unreasonable for the Trustee to put Acheron in the position of choosing between waiving claims and the right to appeal or missing out on the opportunity to bid at the auction. Requiring such a waiver is something that could jeopardize Acheron's participation, and Acheron's participation is in the best interest of KPIs. Moreover, though Acheron has not expressly argued that requiring a waiver would violate Acheron's contractual rights, it likely would as the Trustee would effectively be adding a condition to Acheron's right to bid and right to top that is not in the 2015 Agreement. Thus, Acheron's access to the data room and participation in the auction should not be conditioned upon Acheron waiving any claims or the right to appeal.

### C.  MAJERS' OBJECTION REGARDING A LACK OF INFORMATION

Majers contends that the Trustee should be required to disclose anticipated returns and other information before the auction can proceed.[17] The Trustee, however, asserts that disclosing anticipated returns would not be conducive to the auction process. His conclusion is reasonable. I had anticipated, based on the Trustee's prior timeline, that a stalking horse bid would be in place

---

[17] Majers also raises issues regarding cash surrender value and contends that the Trustee has not indicated how policies with cash value will be treated at auction. At the hearing, the Trustee testified that he has considered issues relating to cash surrender value and explained that cash surrender value will be accounted for in the valuation of policies and distribution of sales proceeds. *See* T. 48-50.

prior to the filing of the Motion.  That would have provided an indication as to the "floor" for the auction.  Nonetheless, the Trustee is not abusing his discretion by moving forward with his plan to proceed to auction without the stalking horse bid in place, and he anticipates the bid will be in place shortly, well in advance of the auction.  *See* [DE 3123].  Moreover, once the auction is held, the Trustee will be required to obtain Court approval once again before closing can proceed.  Thus, the Court will have an opportunity to consider whether the Trustee is exercising reasonable business judgment in seeking final sale approval, with the benefit of knowing the amount of the high bid(s) at auction.  At this time though, the Trustee has reasonably concluded that proceeding to auction with his proposed procedures is in the best interest of KPIs (and, of course, a sale is directly authorized under the Trust Agreement).  In fact, given the reasonable concerns he has raised with a Keep Option and the need to balance the interests of KPIs to serve them as a whole, an auction appears to be the most reasonable way to maximize value to the KPIs.  Delaying that auction would disserve the interests of KPIs because the longer the process takes, the more money the Trust will need to borrow (and more premiums and servicing expenses will become due), and loans taken out by the Trust will need to be paid before KPIs are able to receive any proceeds.  Thus, putting off the auction to value policies individually in advance or to obtain further information regarding expected returns would be to the detriment of KPIs.

## **CONCLUSION**

For the reasons discussed above, I respectfully **RECOMMEND** that the District Court enter an Order **GRANTING** the Motion [DE 3065] to the extent provided in this Report and providing as follows:[18]

---

[18] The following paragraphs represent a slightly modified version of the proposed order that the Trustee submitted following the hearing [DE 3107-1].

1.     The Trustee is authorized to implement the procedures for the sale of the remaining Keep Policies held by the Trust as set forth in the Motion, subject to the modifications reflected in DE 3107-1.  Notwithstanding the foregoing, the Trustee may not condition Acheron's access to the data room and Acheron's participation in the auction on Acheron waiving any claims against the Trustee or the right to appeal.

2.     The notice attached to the Motion provides an adequate summary of the relief sought in the Motion.

3.     The Trustee is authorized to enter into an Asset Purchase Agreement(s) with prospective "stalking horse" buyers of the Keep Policies consistent with the terms set forth in and subject to the procedures set forth in the Motion.  However, the Asset Purchase Agreement(s) shall provide that the closing of any sale shall occur seven (7) days after the entry of a Sale Approval Order (as defined in the Motion).  The Asset Purchase Agreement(s) shall further provide that if the Sale Approval Order is stayed prior to closing, closing shall occur seven (7) days after any such stay is lifted.

4.     Upon the selection of a "stalking horse" buyer or buyers, the Trustee shall file a Notice of Filing indicating: (a) the amounts and material terms and conditions of the "stalking horse" offers, (b) the time and date of the auction and other relevant deadlines, and (c) any other information relevant to the conduct of the auction sale.  Notice thereof shall be provided as set forth in the Motion.

5.     Upon the submission of the Notice of Filing, the Court will schedule a hearing for the first available date after the scheduled date of the auction,[19] for consideration of the Motion

---

[19] The Trustee has requested that the hearing be scheduled before the District Judge.  *See* [DE 3107-1] ¶ 5.  He indicated that it would be optimal from a timing perspective for the District Judge to hold the sale approval hearing.  That will help minimize the time between the auction and

for Entry of Sale Approval Order to be filed pursuant to Paragraph 9 below.  If no hearing is scheduled within one (1) week of the submission of the Notice of Filing, the Trustee's counsel shall promptly contact the chambers of the Judge who will be presiding over the hearing.

6.    The Bidding Procedures set forth in the Motion, including the procedures for qualification of bidders, for submission of qualified bids, for submission of higher and better offers, and for the conduct of the auction, including the means of providing notice of the bidding procedures, are approved, except as set forth in Paragraph 1 above.

7.    The Trustee is authorized to proceed with an auction sale consistent with the Bidding Procedures among bidders who timely satisfy the qualifications set forth in the Bidding Procedures, as determined by the Trustee, except as set forth in Paragraph 1 above.

8.    At auction, the Trustee will solicit the highest and best bid for "Tranche A," "Tranche A-1," "Tranche B," and "Tranche B-1" (if applicable), as defined in the Motion, pursuant to the Bidding Procedures, and shall select the highest and best bid (and back-up bid) for each tranche.

9.    Upon the conclusion of the auction, the Trustee shall file a Motion for Entry of Sale Approval Order which shall: (a) set forth the Trustee's determination, in the exercise of his business judgment and discretion, of the highest and best bids (and back-up bids) submitted at auction; and (b) request entry of the Sale Approval Order authorizing and approving the sale of the Keep Policies to the highest and best bidder(s).  The Court will schedule and conduct a hearing on the Motion for Entry of Sale Approval Order in accordance with Paragraph 5 above.  Any objections to the entry of the Sale Approval Order shall be addressed at the hearing.

---

closing.  Additionally, any request for stay pending appeal and related timing issues could be addressed at the hearing.

10.     The procedures, as approved by this Order, represent an appropriate and reasonable exercise of the Trustee's discretion and business judgment and further satisfy the contractual rights of Acheron under Section 4 of the 2015 Agreement.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida this 9th day of April 2022.

Jared M. Strauss
United States Magistrate Judge