# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 04-60573-CIV-MORENO/STRAUSS

**SECURITIES AND EXCHANGE COMMISSION**,

    Plaintiff,

v.

**MUTUAL BENEFITS CORP.**, *et al.*,

    Defendants.

_____/

## REPORT AND RECOMMENDATION[1]

**THIS MATTER** came before the Court upon the Trustee's Motion to Approve (1) Sale of Policies to Acheron Portfolio Trust, (2) Proposed Allocation and Distribution Procedures, and (3) Settlement with Acheron Capital, Ltd. ("Sale Approval Motion") [DE 3188], filed by Barry Mukamal ("Trustee"), the Trustee of the Mutual Benefits Keep Policy Trust (the "Trust"), on December 27, 2022. I have carefully reviewed and considered the Sale Approval Motion, Beverly F. Thompson's Advisory to the Court [DE 3191], which appears (at least in part) to be a response or objection to the Sale Approval Motion,[2] the Trustee's Reply in Support of Sale, Settlement and Allocation Motion [DE 3194], and all other pertinent portions of the record. I also held a status conference regarding issues related to the Sale Approval Motion on December 16, 2022 (prior to

---

[1] This matter has been referred to me by the District Court to take all necessary and proper action as required by law, with respect to any and all post-judgment matters, pursuant to 28 U.S.C. § 636 and the Magistrate Judge Rules of the United States District Court for the Southern District of Florida [DE 2631].

[2] No other objections to the Sale Approval Motion were filed or lodged at the January 26, 2023 hearing on the Sale Approval Motion.

the filing of the motion) and a hearing on the Sale Approval Motion on January 26, 2023. At the January 26, 2023 hearing, the Trustee's counsel provided a proffer of the Trustee's direct testimony in support of the Sale Approval Motion. That proffer included adopting the factual statements made in the Sale Approval Motion and various other filings by the Trustee. Although I provided an opportunity for cross-examination, no party sought to cross-examine the Trustee. I did, however, pose various questions to both the Trustee and his counsel. Additionally, counsel for the Trustee and counsel for Acheron presented arguments in favor of the Sale Approval Motion. For the reasons discussed herein, I respectfully **RECOMMEND** that the Sale Approval Motion [DE 3188] be **GRANTED**.

## BACKGROUND

In 2004, the Securities and Exchange Commission commenced an enforcement action against Mutual Benefits Corporation and other defendants for fraudulently selling fractional investment interests in viatical settlements. *See* [DE 1]; *see also Acheron Cap., Ltd. v. Mukamal as Tr. of Mut. Benefits Keep Pol'y Tr. ("MBC III")*, 22 F.4th 979, 984 (11th Cir. 2022); *Sec. & Exch. Comm'n v. Mut. Benefits Corp. ("MBC II")*, 810 F. App'x 770, 772 (11th Cir. 2020); *Sec. & Exch. Comm'n v. Mut. Benefits Corp. ("MBC I")*, 408 F.3d 737, 738 (11th Cir. 2005). "A viatical settlement is a transaction in which a terminally ill insured sells the benefits of his life insurance policy to a third party in return for a lump-sum cash payment equal to a percentage of the policy's face value." *MBC III*, 22 F.4th at 984 (quoting *MBC I*, 408 F.3d at 738). "The purchaser of the viatical settlement realizes a profit if, when the insured dies, the policy benefits paid are greater than the purchase price, adjusted for time value." *Id.* (quoting *MBC I*, 408 F.3d at 738).

2

Following the commencement of the case, the defendant entities involved were put into receivership, and Roberto Martinez was appointed as receiver ("Receiver"). [DE 26]. Investors were provided with the option to retain their investments or to direct the Receiver to sell their interests. *MBC III*, 22 F.4th at 984. The Receiver reported in June 2009 that, pursuant to Court approval, investors in the life insurance policies had voted to either: a) sell the policy; or b) retain the policy. [DE 2291] at 3. Policies that were retained have commonly been referred to in this case as "Keep Policies." The Receiver also requested, and the Court approved, the creation of a trust to "provide for the continued maintenance and processing of the Keep Policies in accordance with the directives of this Court." [DE 2291] at 5-6, 8; [DE 2322]. Consequently, on September 25, 2009, the Receiver and the Trustee executed the Mutual Benefits "Keep Policy" Trust Agreement ("Trust Agreement") [DE 2540-1].

Initially, approximately 3,138 policies with a face value of $383,580,782 (or 27% of the total) were designated to be sold, and roughly 3,037 policies with a face value of approximately $1,054,421,049 (or 73% of the total) were designated as Keep Policies. [DE 2958] at 2 n.4. However, according to the Sale Approval Motion, at the time the Trust was created, it held 2,403 policies with a total face value of $886 million. [DE 3188] at 3. As of January 1, 2023, those numbers have decreased substantially, to 866 policies and approximately $167 million, respectively. [DE 3190-1]. As indicated in the Sale Approval Motion, the primary reason for this substantial decrease is that, by the beginning of 2022, the Trustee had distributed more than $542 million in death benefits as policies matured over the years.[3]

---

[3] As of January 1, 2022, the Trust held 955 policies with a total face value of nearly $192 million. [DE 3061-2] at 5. Thus, in the last year, 89 policies with a total face value of approximately $25 million have matured or otherwise been removed from the Trust.

Keep Policy Investors ("KPIs")[4] presently hold interests equal to approximately 39.05% of the face value of the policies serviced by the Trust, and various trusts and entities managed by Acheron Capital, Ltd. (collectively, "Acheron") hold interests accounting for the remaining 60.95%.  *See* [DE 3190-1].  Unlike the KPIs who were victims of the fraudulent scheme giving rise to this case, Acheron obtained its interests in policies serviced by the Trust by purchasing those interests in undersubscribed policies after the commencement of this action – initially from the Receiver and later from the Trustee.  *See MBC II*, 810 F. App'x at 772.  Acheron is not a KPI, and the Trustee does not owe a fiduciary duty to Acheron.  *See Acheron Portfolio Tr. v. Mukamal as Tr. of Mut. Benefits Keep Pol'y Tr.*, No. 18-CV-25099, 2021 WL 7368630, at *27-35, 37-40 (S.D. Fla. Sept. 24, 2021), *report and recommendation adopted*, 2022 WL 354241 (S.D. Fla. Feb. 7, 2022), *aff'd*, No. 22-10748, 2022 WL 17420869 (11th Cir. Dec. 6, 2022).  However, the Trustee does owe contractual obligations to Acheron under various contracts.  *See* [DE 2941, 2967]; *MBC II*, 810 F. App'x at 773, 775.  Specifically, when Acheron has purchased fractional interests from the Trustee, Acheron and the Trustee have entered into asset purchase agreements.  They also entered into a separate agreement in 2015 (the "2015 Agreement"), after extensive negotiations, to resolve certain concerns that Acheron had raised.  *See* [DE 2500, 2500-2, 2941].  Over the last few years, substantial litigation has ensued between Acheron and the Trustee.

As indicated above, the number of policies held by the Trust and the face value of the Trust's portfolio of policies have decreased substantially since the formation of the Trust in 2009. Due to concerns that continuing to administer the Trust would become unfeasible, the Trustee sought Court approval in 2020 to initiate an orderly wind-down process and eventual termination

---

[4] The Trust Agreement defines KPIs as "persons who have invested in an entire interest or a fractional interest in a Keep Policy owned of record by the Receivership Entities, and whose interest in such Keep Policy has not been forfeited as of the Closing Date."

of the Trust. *See* [DE 2640]. In November 2020, the Court granted the Trustee's request and denied a competing wind-down motion filed by Acheron. *See* [DE 2723, 2825]. On March 15, 2021, the Trustee provided notice that the Trust lacked resources to continue operating the Trust without a substantial increase in costs to investors and, therefore, reported that wind down of the Trust should occur by the fourth quarter of 2021. [DE 2882] at 4-5. Due to intervening circumstances, including certain appeals filed by Acheron, that timeline was pushed back on several occasions.

On January 21, 2022, the Trustee filed a Motion to Approve Procedures for Sale of Policies in Connection with Trust Termination ("Sale Procedures Motion") [DE 3065]. I held an evidentiary hearing on the Sale Procedures Motion on March 16, 2022. The Sale Procedures Motion sought approval to proceed with an auction in accordance with procedures outlined therein. First, the Sale Procedures Motion addressed the assets to be sold, noting that the Trustee proposed selling all of the Trust's right, title, and interest in and to the Keep Policies held by the Trust. Upon such a sale, the interests of the Trust, the Trustee, and any other person or entity (other than the purchaser), including KPIs and Acheron (if not the purchaser), would be extinguished.

Second, the Sale Procedures Motion proposed separating policies into a few separate tranches and sub-tranches at auction rather than proceeding with a policy-by-policy auction or an auction of the entire portfolio of policies as a single unit. Ultimately, by the time of the March 16, 2022 hearing, the Trustee sought to separate the policies into Tranches A, A-1, and B for purposes of bidding at auction, with Tranche B containing all policies in which Acheron did not hold an interest. Tranches A and A-1 were to include all policies in which Acheron held an interest. However, Tranche A-1 was designed to be a sub-tranche for policies where the insured is at least 100 years-old and no remaining premiums are due.

5

Third, the Sale Procedures Motion advised that the Trustee intended to solicit stalking horse bidders prior to the auction. Consequently, he requested "confirmation of his authority to select and approve, in his business judgment, 'stalking horse' bids that substantially conform to the procedures described [in the Sale Procedures Motion] and that seek customary bid protections." Sale Procedures Motion at 11. Such protections would include a break-up fee of no more than 3% of the amount of the stalking horse bid in the event the stalking horse bid is outbid at auction. *Id.*

The Sale Procedures Motion also addressed various other procedures and issues, and it disclosed that the Trustee retained Longevity Asset Advisors LLC ("Longevity") to manage and conduct the sale process and to provide various related services. For its services, the Trustee agreed to pay Longevity a 7.5% commission (of the gross purchase price at auction) and to reimburse Longevity for its actual expenses.

On April 9, 2022, I entered a Report and Recommendation ("Sale Procedures R&R") [DE 3130] recommending that the Sale Procedures Motion be granted with one exception (and with a few minor modifications reflected in the Trustee's proposed order on that motion, DE 3107-1). That is, I recommended that the Trustee be prohibited from conditioning Acheron's access to a data room or participation in the auction on Acheron waiving any claims against the Trustee or the right to appeal. In the Sale Procedures R&R, I addressed two objections to the Sale Procedures Motion – one filed by Acheron, and another filed by Jonathan Majers, a KPI. Ultimately, notwithstanding the objections that were raised, I found that the Trustee's decision to proceed with the contemplated auction represented a reasonable exercise of the Trustee's business judgment and that granting the Sale Procedures Motion would not result in the Trustee abusing his discretion or violating his contractual obligations to Acheron. I also found that the Trustee reasonably determined that the proposed auction and sale procedures were in the best interest of KPIs. On

6

June 29, 2022, the District Court entered an Order [DE 3142] affirming and adopting the Sale Procedures R&R.

On May 26, 2022 – in between the entry of the Sale Procedures R&R and the entry of the Order adopting it – the Trustee filed a Notice of Selection of Stalking Horse Bids [DE 3140]. Therein, the Trustee advised that Scheck Alpha LP was selected as the stalking horse bidder for Tranches A and A-1. However, the Trustee was unable to secure a satisfactory stalking horse bid for Tranche B. For the Tranche A policies, the stalking horse bidder bid $16.5 million, and for the Tranche A-1 policies, it bid $10.5 million. The Trustee and the stalking horse bidder also agreed to a Break Fee of $265,000 for Tranche A and a Break Fee of $160,000 for Tranche A-1 (to be paid to the stalking horse bidder in the event it was not the successful bidder). They also reached an agreement regarding how the stalking horse bid would be adjusted in the event policies in either Tranche A or A-1 were excluded from the sale (for instance, if policies matured prior to closing).

Following the entry of the Court's Order adopting the Sale Procedures R&R, the Trustee scheduled the auction for September 15, 2022. *See* [DE 3147]. However, due to the entry of a stay pending appeal – an appeal by Acheron that has since been dismissed – the Trustee canceled and eventually rescheduled the auction, first for December 8, 2022, and subsequently for December 15, 2022. Based on the rescheduled auction date, I scheduled a sale approval hearing for December 16, 2022. However, on the eve of that hearing, Acheron and the Trustee reached an agreement under which the Trustee would sell all of the Trust's policies to Acheron – not only the policies in Tranches A and A-1, but the policies in Tranche B as well. *See* [DE 3181]. In light of that agreement, which the Trustee and Acheron were in the process of finalizing, the December 16, 2022 hearing was treated as a status conference. *See* [DE 3182, 3185]. Thereafter, the Trustee

and Acheron finalized their agreement, and on December 27, 2022, the Trustee filed the Sale Approval Motion.

## SALE APPROVAL MOTION

First and foremost, the Trustee seeks Court approval to sell the Trust's entire portfolio of policies to Acheron Portfolio Trust ("APT") for $24 million, subject to adjustments for policies that mature prior to closing. The Trustee and APT have entered into Asset Purchase Agreements, [DE 3188-1] at 17-81, setting forth the terms of the sale for which they seek approval. The Trustee and Acheron (and entities related to Acheron) also seek approval of a settlement agreement, [DE 3188-1] at 1-16, they have entered into to resolve disputes between them. At the hearing, they described the settlement agreement as intertwined with sale approval and have therefore requested approval of both the sale and settlement agreement. Additionally, the Sale Approval Motion seeks approval of proposed distribution and allocation procedures that the Trustee and Acheron have agreed upon concerning the proceeds from the sale to APT. Upon filing the Sale Approval Motion, the Trustee provided a Notice [DE 3188-3] to all KPIs that provides a brief synopsis of the Sale Approval Motion, notice of the deadline to object to the motion, notice of the hearing on the motion, and information regarding how KPIs can obtain a copy of court filings related to the Sale Approval Motion if they wish to do so. Again, no KPIs other than Ms. Thompson filed an objection, and no objections were voiced at the hearing on the Sale Approval Motion.

As with the stalking horse bid, the sale price to be paid by APT is separated by Tranche: (1) $15,898,123.48 has been allocated to Tranche A; (2) $5,914,190.93 has been allocated to Tranche A-1; and (3) $2,187,685.59 has been allocated to Tranche B.[5] At first glance, the amounts

---

[5] As of December 23, 2022 – four days before the Sale Approval Motion was filed – Tranche A included 675 policies with a total face value of $144,919,377, Tranche A-1 included 5 policies with a total face value of $9 million, and Tranche B included 194 policies with a total face value

8

allocated to Tranches A and A-1 are lower than the amount of the stalking horse bid for those tranches. However, due to intervening maturities following the date of the stalking horse bid, the adjusted stalking horse bid as of the time of the Trustee's agreement with APT would have been $14,740,326.74 for Tranche A and $5,368,602 for Tranche A-1. Thus, as the Sale Approval Motion notes, APT's bid for Tranches A and A-1 exceeds the stalking horse bid by $1,273,385.67 (after deducting the stalking horse Break Fee of $425,000 from the sales proceeds). According to the Trustee, the sale price to be paid by APT for each tranche is the highest and best offer that the Trustee has received for each tranche. With respect to Tranche B, the agreed upon purchase price is equal to the total of the cash surrender value of the policies in that tranche. Although the Trustee testified that not all of the policies in Tranche B have a cash surrender value,[6] he also explained that Acheron's offer for Tranche B is higher than any other offer made to purchase Tranche B. Additionally, the Trustee testified that surrendering the Tranche B policies for their cash surrender value rather than selling them to Acheron would likely result in delay and also generate additional costs equal to about 10-15% of the cash surrender value. Thus, he testified that a sale of the Tranche B policies to APT is likely to expedite the process and generate a greater amount than surrendering the policies for their cash surrender value, if any.

In addition to summarizing the terms of the proposed sale to APT, the Sale Approval Motion summarizes the allocation and distribution procedures that the Trustee seeks to follow. Such procedures are also set forth in greater detail in an attachment to the Sale Approval Motion. *See* [DE 3188-2]. Initially, before any funds are distributed, the Trustee plans to pay – or set aside

---

of $11,325,094. [DE 3199]. Thus, Acheron's offer for Tranche A is equal to approximately 11% of face value. Its offer for Tranche A-1 is equal to approximately 65.7% of face value. Its offer for Tranche B is equal to approximately 19.3% of face value.

[6] 145 of the 194 policies in Tranche B have a cash surrender value. The other 49 policies have no cash surrender value. [DE 3199].

enough funds to pay – Liquidation Costs from the sales proceeds. Such costs include the stalking horse Break Fee of $425,000,[7] Longevity's fee/expenses (likely between $1.5 and $1.6 million), accrued and unpaid professional fees (presently around $1 million), the balance on a line of credit taken out by the Trust (presently around $500,000), the Trustee's security intermediary fees, actuary fees, costs to distribute sales proceeds, back-up servicer termination fees, litigation expenses, and various other wind-down and operating expenses. While the total amount of Liquidation Costs is presently around $3.5 million, the Trustee testified that Liquidation Costs may ultimately reach $5 million to $6 million by the time wind-down is complete.[8]

Again, the portion of the purchase price allocated to each respective tranche may slightly decrease between now and closing on account of any policies that mature in the interim. If that occurs, the portion of the adjusted purchase price allocated to Tranche B will be equal to the total cash surrender value of the policies in Tranche B as of closing. The remainder of the purchase price will then be allocated to Tranches A and A-1 "in the same ratio as the ratio of . . . the Qualifying Bids submitted by Acheron Capital for Tranche A and Tranche A-1 on December 2, 2022." [DE 3188-2].

Once the purchase price is allocated between each tranche, "[t]he Trustee will engage an independent, nationally recognized actuary to perform and deliver a post-sale actuarial allocation of the sale price of the policies based upon the relative value of the Policies in each Tranche." *Id.* Acheron will also have its own actuary perform a valuation of the policies in Tranches A and A-1 but not Tranche B (Acheron only presently has an interest in the policies in Tranches A and A-1

---

[7] The agreed Break Fee for Tranche A ($265,000) will be allocated to Tranche A, and the agreed Break Fee for Tranche A-1 ($160,000) will be allocated to Tranche A-1.

[8] The Trustee and Acheron have agreed that Acheron reserves the right to object to Liquidation Costs in excess of $5 million.

and will thus receive a distribution for its interest in the policies in those tranches). If the Trustee's actuary and Acheron's actuary are unable to resolve any disagreements over the value of policies in Tranches A and A-1, then they will submit any such disputes to an umpire for resolution. Ultimately, provided that the Sale Approval Motion is granted, valuation will occur and the purchase price will be used to pay Liquidation Costs and distribute funds to KPIs and Acheron. Wind-down of the Trust will be completed once distributions are made and other administrative matters are addressed. Additionally, the Trustee will need to bring litigation with Litai (the Trust's servicer) to a close.

**TRUST AGREEMENT**

Sections 2.2, 3.1, 6.7, and 8 of the Trust Agreement are all relevant to the inquiry here. As set forth in Section 2.2 of the Trust Agreement, "[t]he purpose of the Trust is to take custody of the Trust Assets and maintain and administer the Trust Assets for the benefit of the Keep Policy Investors, consistent with the terms and procedures set forth in this Trust Agreement." The Trust Agreement grants broad powers to the Trustee to take all actions necessary in his judgment to fulfill the purposes of the Trust, including those which are enumerated in Section 3.1. In this regard, Section 3.1(a) of the Trust Agreement specifically provides that:

> Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Trust, including, without limitation, each power expressly granted in this Section 3.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Florida.

Section 3.1(b) then specifies that, without limiting the generality of Section 3.1(a), the Trustee has certain specified powers and duties, including the following:

> (i) To receive and hold the Trust Assets, subject to the terms of this Trust Agreement;

11

> (ii) To hold the status of owner and "nominal beneficiary" with respect to all Keep Policies, as is presently held by the Receiver pursuant to the Policy Administration Orders, and to hold and execute, in his discretion, all of the rights, powers and privileges of the Receiver under the Policy Administration Orders; [and]
>
> . . .
>
> (xvii) In the event that the Servicing Agreement is terminated or expires and the continued servicing of the Keep Policies becomes unfeasible, to authorize and direct the sale, surrender, or lapse of the Keep Policies, and to distribute the proceeds, if any, of the Keep Policies, upon such sale, surrender or lapse, to the Keep Policy Investors in such manner as the Trustee determines to be appropriate.

Trust Agreement § 3.1(b). The Trust Agreement also contains a termination provision which provides that the "Trust Agreement shall terminate upon the final disposition of all Keep Policies, whether by maturity, sale, surrender, or lapse, and the distribution of all other Trust Assets in accordance with the terms of the Servicing Agreement." *Id.* § 8. Additionally, the Trust Agreement provides the Trustee with "the right (but not the duty) at any time to seek instructions from the Court concerning the management or disposition of Trust Assets." *Id.* § 6.7.

## DISCUSSION

The Court should grant the Sale Approval Motion. As discussed above, the Court previously approved the Trustee's decision to wind down the Trust and to sell the policies owned by the Trust. Significantly, as I noted in the Sale Procedures R&R, no party here seems to dispute that continued servicing of the Keep Policies has become unfeasible or that the Trust Agreement authorizes the Trustee to direct the sale, surrender, or lapse of the Keep Policies under the circumstances. Given the feasibility issues, the Trustee determined that proceeding with a sale – which is directly authorized under the Trust Agreement – is in the best interest of KPIs. Additionally, he has determined in his reasonable business judgment that APT's offer is the highest and best offer and that a sale to APT will confer additional benefits upon the Trust and KPIs.

As the Trustee notes in the Sale Approval Motion, the Trust Agreement does not specify the manner in which the Trustee must sell, surrender, or lapse the Keep Policies. It simply provides

him with authorization to pursue one or more of these avenues. Moreover, the Trust Agreement does not specify how proceeds are to be distributed. Rather, it provides discretion to the Trustee by permitting the Trustee to distribute proceeds in a manner he deems appropriate. In other words, the Trust Agreement confers discretion upon the Trustee in these circumstances.

As I have noted in the past, "[w]here discretion is conferred upon [a] trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion." *Sarasota Bank & Tr. Co. v. Rietz*, 297 So. 2d 91, 93 (Fla. 2d DCA 1974) (quoting Restatement (Second) of Trusts § 187 (1959)). Moreover,

> If discretion is conferred upon the trustee in the exercise of a power, the court will not interfere unless the trustee in exercising or failing to exercise the power acts dishonestly, or with an improper even though not a dishonest motive, or fails to use his judgment, or acts beyond the bounds of a reasonable judgment. The mere fact that if the discretion had been conferred upon the court, the court would have exercised the power differently, is not a sufficient reason for interfering with the exercise of the power by the trustee.

Restatement (Second) of Trusts § 187(e) (1959).

Here, the evidence presented at the January 26, 2023 hearing demonstrated that the Trustee's proposed sale to APT represents a reasonable exercise of the Trustee's business judgment. Additionally, there was no evidence to suggest that the Trustee is acting dishonestly or with an improper motive. Therefore, it is not the Court's place to interfere with the Trustee's reasonable business judgment or second guess the Trustee, who continues to serve as a fiduciary here and who has served as a fiduciary in various contexts for decades.

Although no KPIs or interested parties other than Ms. Thompson objected to the Sale Approval Motion, I have considered Ms. Thompson's objection, and I recognize that some other KPIs must be frustrated with the outcome here. Such frustration is certainly understandable. After being defrauded by the defendants in this action, many KPIs voted to retain their beneficial

interests in policies, and have continued paying premiums, hoping to maintain such interests through maturity. While many KPIs were able to do so as a result of the Trustee's efforts over the years, unfortunately not all KPIs will be able to given the economic realities attendant to continued Trust operations. But as the Trustee has credibly testified, he is pursuing a course of action that he reasonably believes will do the most good for the most KPIs.

Ms. Thompson questions in her objection how selling policies with a face value of over $160 million[9] for $24 million is an appropriate outcome. While that sounds like a tough pill to swallow, the short answer is that continued Trust operations are not feasible, a sale is authorized by the Trust Agreement in these cirucmstances, and the Trustee credibly testified that the amount to be paid by APT is likely higher than the Trustee would have been able to bring in from any other purchaser. Continued maintenance of the Trust's policies is not costless, and the Trustee cannot simply hold on to the policies until they mature and realize the entire face value. Rather, further premiums would need to be paid (potentially for several decades for many policies), and further expenses would be incurred. Moreover, as policies continue to mature, those expenses would be borne by a shrinking universe of KPIs (and without the benefit of certain funds that had been subsidizing such expenses) thus significantly increasing the costs to those remaining KPIs. It is precisely because of all of the expenses that the Trust has been forced to incur that continued maintenance of the Trust is no longer feasible. As to the value of APT's offer, at the January 26 hearing, the Trustee explained all of the steps that he went through to facilitate an auction of the policies and that based on the offers received prior to the auction and his communications with

---

[9] Her objection states that face value is $190 million. However, that was the face value nearly a year before the Trustee agreed to sell the policies to APT. Due to the removal of policies (on account of maturity or for other reasons), the face value is now between $160 million and $170 million.

prospective purchasers, he was confident that APT's offer was the highest and best offer he would receive. In other words, the market has spoken.

While the Trustee has reasonably concluded that APT's offer was the highest and best offer he would receive even after an auction, the raw purchase price is not the only benefit of that offer. The sale to APT (as opposed to some other interested purchaser) and the settlement agreement with Acheron will save the Trust (and ultimately KPIs) both time and money. Absent the agreement with Acheron and APT, Acheron was certain to appeal the approval of the sale and related issues, which would have resulted in substantial delay and further expenses to the Trust. Furthermore, the Trustee risked having to return to square one if Acheron succeeded on appeal. Thus, the Trustee reasonably explained that a sale to APT is the best of both worlds in that it realizes the highest amount and benefits the Trust in additional ways. Moreover, notwithstanding Ms. Thompson's suggestion to the contrary, it is obvious that there has been no collusion between the Trustee and Acheron/APT. In fact, for several years, the Trustee and Acheron have been engaged in substantial, acrimonious litigation. However, they were able to resolve their disputes in a manner that is ultimately beneficial for all when compared against alternative scenarios.

Not only is the Trustee's proposed sale to Acheron reasonable, but his proposed allocation and distribution procedures are reasonable as well. As discussed in further detail above, he will engage an independent actuary to provide an objective valuation of all policies. For Tranche B, the valuation process is likely to be guided in part by cash surrender value, and for Tranches A and A-1, Acheron's appraiser will weigh in, with any disputes being resolved by a neutral umpire. Simply stated, the Trustee's designed allocation and distribution process is reasonably designed to ensure that allocation and distribution occur in a fair and equitable manner. Therefore, the Sale

Approval Motion should be granted.  Likewise, the settlement agreement, which is intertwined with the sale, should be approved.

## TRUSTEE'S PROPOSED ORDER [DE 3193-1]

On January 20, 2023, the Trustee filed a proposed order [DE 3193-1] on the Sale Approval Motion.  The Trustee and Acheron/APT have agreed to the form of proposed order in conjunction with their settlement agreement.  Although the proposed order appears to be generally acceptable, there are two paragraphs that the District Court may wish to further consider.  First, on page 8 of the proposed order, paragraph 3 states that "[t]he consideration for the Acquired Assets provided by APT constitutes reasonably equivalent value and fair consideration under both Florida and federal law."  While I find that the Trustee reasonably believes that fair consideration is being provided to purchase the Acquired Assets and that the Trustee is reasonably exercising his business judgment, the Court does not need to make the finding in paragraph 3 of the proposed order to grant the motion.  Rather, as noted above, the Court's role here is to ensure that the Trustee is not abusing his discretion.  Making the finding in paragraph 3 may go beyond what that role entails.

Second, on pages 10-11 of the Trustee's proposed order, paragraph 13 states that "[t]he Court retains jurisdiction to enforce and implement the terms of the APT APAs, the Settlement Agreement, and the Allocation and Distribution Procedures, including to resolve any disputes relating thereto, and to interpret, implement, and enforce the provisions of this Order." The District Court is in the best position here to decide whether it is appropriate to retain jurisdiction, and if so, whether it should place any time limitation or any other limitations on any retention of jurisdiction.

While it may be proper to retain jurisdiction pending closing, the Court may want to decline to retain jurisdiction following the closing of the sale to APT.[10]

In the event the Court does not retain jurisdiction (or only retains jurisdiction until the sale to APT closes), it should add a paragraph at the end of its order on the Sale Approval Motion indicating that notwithstanding the Court's approval of the proposed allocation and distribution procedures, the Trustee and Acheron must agree – prior to closing – upon an expedited out-of-court process to resolve any disputes that may arise between them regarding Liquidation Costs.

## CONCLUSION

For the reasons discussed above, I respectfully **RECOMMEND** that the District Court enter an Order **GRANTING** the Sale Approval Motion [DE 3188] that is substantially in the form of the proposed order filed by the Trustee [DE 3193-1].[11]

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. Failure to timely file objections shall bar the

---

[10] Section 3.2 of each Asset Purchase Agreement between the Trustee and APT provides, in pertinent part, the following:

> Closing. Unless this Agreement shall have been terminated pursuant to Section 8 hereof, the closing of the transaction contemplated hereby (the "Closing") shall take place within fourteen (14) Days after the Effective Date (the "Closing Date"), or if the sole condition to the Effective Date occurring is that the Sale Order has been stayed, within seven (7) days after such stay is lifted, unless extended by mutual written agreement of the Parties.

[DE 3188-1] at 24, 46, 68. Article I of each Asset Purchase Agreement states that "Effective Date" means the first Business Day that all of the conditions precedent set forth in Article VII of this Agreement of both Buyer and Seller have been satisfied." *Id.* at 19, 41, 63.

[11] As indicated above, the Court may wish to further consider whether or not to adopt paragraphs 3 and 13 of the Trustee's proposed order, and if the Court does not include paragraph 13, it should add a paragraph at the end of its order requiring the Trustee and Acheron to agree upon an expedited out-of-court process to resolve any later disputes over Liquidation Costs.

17

parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida this 3rd day of February 2023.

*[signature]*
**Jared M. Strauss**
**United States Magistrate Judge**